UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

08 CV 02753

------------------------------------------------------------x

RONALD D. KASSOVER, on behalf of himself
and all others similarly situated,

                Plaintiff,

           v.

UBS AG and UBS FINANCIAL SERVICES, INC.,

                Defendants.

------------------------------------------------------------x

    No.

    **ECF CASE**

    <u>**CLASS ACTION COMPLAINT**</u>

    **JURY TRIAL DEMANDED**

RECEIVED
MAR 1 4 2008
U.S.D.C. S.D. N.Y.

## <u>NATURE OF THE ACTION</u>

1.    Plaintiff Ronald D. Kassover, a client of UBS AG's brokerage subsidiary, UBS Financial Services, Inc., brings this class action on behalf of himself and all others similarly situated, by their attorneys, Schoengold Sporn Laitman & Lometti, P.C., for their class action complaint against defendants UBS AG and UBS Financial Services, Inc. (collectively, the "Defendants"). It is alleged that Defendants, well-known and allegedly reputed investment and "Financial Advisors," engaged in a deceptive and misleading plan and scheme whereby Defendants violated the trust and confidence placed in them by their clients, and caused, allowed and permitted their clients who reposed confidence in them, to have their monies placed in Auction Rate Securities ("ARSs"), allegedly as good as cash, instead of customarily liquid investment products – *i.e.*, money market funds, treasury bills or FDIC-insured savings accounts – without disclosing the inherent risks of the ARS, which failed, and caused Plaintiff and other members of the Class to sustain damages. It is alleged that Defendants' plan and scheme violated the Investment Advisers Act of 1940, New York General Business Law ("GBL") § 349, which prohibits deceptive acts or practices, the Rules of the New York Stock Exchange ("NYSE") and the National Association of Securities Dealers ("NASD"), a breach of fiduciary

duty, a breach of the implied covenants of good faith and fair dealing and constituted common law negligence, negligent misrepresentation and unjust enrichment.

2.     In early-February 2008, the ARS market collapsed when failing auctions largely outnumbered auctions that succeeded,[1] leaving ARS investors stranded with illiquid investments and their investments "frozen." An early March 2008 document issued by Defendant UBS, notified UBS's clients that "[c]hanges in market conditions have affected the pricing of some of these securities. Some [ARS] are now priced below par ...." Finally, Defendant UBS advised its clients that, "*[a]s a result, investors looking to sell ARS securities should assume that it will take longer to do so.*" (Emphasis added).

3.     As a result of Defendants' deceptive and manipulative marketing of ARSs, Plaintiff and other members of the class are now financially stranded with illiquid investments – deceptively marketed as "cash equivalents" – and are unable to meet immediate financial obligations and thus have been damage, and those damages are continuing.

4.     This class action is brought on behalf of all UBS clients who have had cash invested into ARSs under the guise that these investments shared the same liquidity characteristics as cash (the "Class") between March 14, 2002 through present, inclusive ("Class Period").

5.     Plaintiff's allegations are based upon knowledge as to themselves and upon information and belief based upon, among other things, the investigation of their attorneys, including a review of Defendants' public documents, filings with the United States Securities

---

[1]     In an early March 2008 document issued by Defendant UBS to its clients that have invested in ARS securities, a "failed auction" occurs "when there are more sellers than buyers, which means that investors generally do not have an opportunity to sell." Conversely, an auction succeeds when buyers (demand) exceeds sellers (supply).

and Exchange Commission ("SEC"); applicable statutes, rules and regulations, communications by Defendants, and news articles and information readily obtainable on the Internet.

## JURISDICTION AND VENUE

6.     The claims asserted herein arise under and pursuant to alleged violations of Investment Advisers Act of 1940, 15 U.S.C. § 80-b-1 *et seq.*, Section 349 of the New York General Business Law ("GBL"), breaches of fiduciary duty and the implied covenant of good faith and fair dealing, as well as common law negligence, negligent misrepresentation and unjust enrichment.

7.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, as one of the causes of action arose from Defendants' violation of federal law, *i.e.*, the Investment Advisers Act, 15 U.S.C. 80b-14.  Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d) (diversity).  Although, Plaintiff is a citizen of New York, residing in this District, other members of the proposed Class numbering hundreds of thousands are citizens of a State different from any of the Defendants.  *See* 28 U.S.C. § 1332(d)(2)(A).  The matter in controversy exceeds the sum of $5,000,000, exclusive of interests and costs. Defendants' numerous false and misleading public filings, use of the U.S. mail system, and use of the Internet in the pursuit of their illegal plan and scheme violated federal statutes, as well as GBL § 349 and the common law.  To the extent the court has federal question jurisdiction, it also has supplemental jurisdiction over the state law claims.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading public documents, disclosure statements, brochures and other information, occurred in this District.  Further, venue is proper in this District pursuant to 15 U.S.C. § 80b-14.  Each of the Defendants resides, is found, transacts business, or has an agent in this state and/or this District.

Defendants UBS AG and UBS Financial Services, Inc. maintain offices located at 299 Park Avenue, New York 10171.

9.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, the internet and the facilities of the national securities markets.

## PARTIES

10.    Plaintiff Ronald D. Kassover, resides in Nassau County, New York.    Mr. Kassover at all times hereinafter mentioned maintained and continues to maintain an Individual Retirement Account ("IRA") with Defendant UBS.    Mr. Kassover, through and in reliance of Defendants' representations and their failure to inform plaintiff and member of the Class of the inherent risks of the ARSs, invested cash funds in two auction rate securities during the Class Period:  Eaton Vance Ltd Duration Income Fund; and the Nicholas-Applegate Convertible & Income Fund II.    Mr. Kassover recently repeatedly sought to sell his investment in this purported "Cash Alternative" but was advised that Defendant UBS refused and would not redeem his investment for cash, and that his investments were "frozen."

11.    Defendant UBS AG ("UBS AG") and its subsidiaries offer a wide range of financial services and products worldwide.  The Company's wealth management and business banking operations include the provision of a range of products and services for wealthy clients worldwide.  These services range from asset management to estate planning and from corporate finance advice to art banking.  UBS is a member of the NYSE and the NASD.  UBS is headquartered at Bahnhofstrasse 45, Zurich, Switzerland, and has executive and branch offices in the United States and throughout the world.    In New York, UBS's offices are located at 299

4

Park Avenue, New York, New York 10171.

12.    Defendant UBS Financial Services, Inc. ("UBS Financial") is the brokerage subsidiary of Defendant UBS AG.  UBS Financial maintains offices through the United States. In this District, UBS Financial is maintains offices at 299 Park Avenue, New York, New York 10171.  Plaintiff's account was being managed by the UBS Financial office located at 345 California Street, Suite 2200, San Francisco, CA 94104.

13.    Hereinafter, Defendants UBS AG and UBS Financial may be referred to collectively as "Defendants" or the "UBS Defendants."

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all UBS clients who have had cash invested into ARSs under the guise that these investments shared the same liquidity characteristics as cash (the "Class") without being warned of the inherent risks of failure and non performance of ARSs.  Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is presently unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff reasonably believes that there are thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by UBS or its transfer agent and may be

notified of the pendency of this action by mail, or the internet or publication using the form of notice similar to that customarily used in securities class actions.

16.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of statutory and common law complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained Schoengold, Sporn, Laitman & Lometti, P.C., counsel competent and experienced in class and securities litigation.

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Investment Advisers Act of 1940 was violated by Defendants' acts as alleged herein;

(b)    whether New York General Business Law §349 was violated by Defendants' acts as alleged herein;

(c)    whether Defendants' breached its fiduciary duties owed to Plaintiff and other members of the Class;

(d)    whether Defendants' acts complained of herein were a breach of Defendants' implied covenants of good faith and fair dealing;

(e)    whether Defendants' acts complained of herein constituted negligence;

(f)    whether Defendants' violated NYSE and NASD Rules and/or failed to observe and warn of the risks associated with ARSs as stated in Financial Accounting Standards Board ("FASB") Rules FAS Nos. 95 and 115;

(g)    whether Defendants' statements and acts complained of herein constituted negligent misrepresentations;

(h)    whether Defendant UBS AG was unjustly enriched by Defendants' acts complained of herein; and

(i)    to what extent Plaintiff and members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

### Background

20.    The auction rate market was invented in 1984 by an investment banker at Lehman Brothers. The idea was to issue long-term securities that could pay their buyers interest rate only a little above short-term rates. That was accomplished by having periodic auctions to reset the rate. As long as the auction succeeded, meaning that there were willing bidders for the securities, any holder could sell the security at face value whenever there was an auction. If an auction failed, the interest rate would rise to a penalty level that no company – or municipality – with decent credit would agree to pay for long. That issuer would redeem the bonds. So long as the auctions worked, the risk to buyers was that an issuer's credit would go bad and the buyer would be stuck with the bonds. The first auctions were for auction-rate preferred stock, but the

idea soon spread to municipal bonds and then to preferred shares issued by closed-end municipal bond funds. If the auctions did not succeed, the additional risk was that the investments of Plaintiff and members of the Class would have their assets "frozen" and they would be unable to obtain their monies.

**Defendants State That Their "Relationships" With Clients
Are As "Financial Advisors," "Focused on You and Your Needs,"
<u>Holding Themselves Out As Investment Advisers and Fiduciaries</u>**

21.    Over the last several years, Defendants, through the investment of millions of advertising dollars and repeated explicit public representations, convinced Plaintiff and members of the Class that Defendants act not merely as "stock brokers," but rather as "Financial Advisors" who provide a special relationship of trust and confidence, wherein the financial interests of the client come first. Thus, Defendants held themselves out as investment advisers and fiduciaries. For example, UBS assures it clients that "Your Financial Advisor" at UBS will help you assess whether contemplated expenses are supported by your various sources of income, as follows:

> *To keep your vision on track or assess the possibility of attaining a new vision, you should consult with your UBS Financial Advisor on a regular basis, so that together you can work on a strategy to:*
>
> - **Coordinate your investment strategy**
>   By consolidating IRAs and other assets earmarked for retirement, you can potentially benefit from simpler record keeping and more comprehensive asset allocation. Often, accounts maintained at different financial institutions are working at cross purposes with overlap of securities positions and asset allocations that vary substantially.
> - **Sustain your income**
>   Lifestyle decisions have financial consequences. *Your Financial Advisor can help you assess whether contemplated expenses are supported by your various sources of income. If gaps exist, your Financial Advisor can help you develop strategies to address them.*

http://financialservicesinc.ubs.com/wealth/PlanningforaLifetime/RetirementPlanning/LivinginRe tirement/PursuingYourVision.html (last visited March 13, 2008) (emphasis added). Further,

8

UBS touted that they were "Focused on you and your needs":

> **The UBS Client Experience**
> *Focused on you and your needs*
>
> *The essence of the UBS Client Experience is to provide a framework that helps us consistently deliver the services you want to support your financial decisions.*
>
> We understand that wealth management is more than just the wide range of financial services and solutions you can access at UBS — it is how those services and solutions are developed and delivered to help you pursue your goals.
>
> *That's why we offer a customized approach to wealth management, built on a personal relationship and shaped by an understanding of your needs and aspirations.* To help manage your wealth, we harness the advisory and investment brokerage capabilities of one of the world's largest wealth management firms on your behalf.
>
> *Our structured approach to helping you pursue your objectives* is based on findings from discussions with our clients, our Financial Advisors, and extensive market studies.

http://financialservicesinc.ubs.com/wealth/YourRelationshipWithUBS/TheUBSClientExperience.html (last visited March 13, 2008) (emphasis added).

### Defendants' Involvement In ARS-Market

22.    The UBS Defendants, during the Class Period, were and are the second largest underwriter in the $300 billion ARS market.  UBS's involvement in the ARS market had generated substantial revenue for Defendants.  In addition to its customary brokerage fees UBS charges its clients in connection with their purchase or sale of ARSs, UBS collects fees in connection with running the auctions that re-set the weekly or monthly interest rates on the ARSs.

23.    Defendants, well-known and allegedly reputed investment and "Financial Advisors," engaged in a deceptive and misleading plan and scheme whereby Defendants violated the trust and confidence placed in them by their clients, and caused, allowed and permitted their clients who reposed confidence in them, to have their monies placed in ARSs", allegedly as good

as cash, instead of customarily liquid investment products – *i.e.*, money market funds, treasury bills or FDIC-insured savings accounts – without disclosing the inherent risks of the ARS.

24.     Defendants aggressively, and albeit erroneously, marketed ARSs to their clients as "Cash Equivalents" or "Cash Alternatives" – just as good as cash.  In the monthly account statements distributed to Plaintiff and other class members, UBS systematically categorized Plaintiff's and the Class's holdings and investment in ARSs as "Cash Alternatives" and indeed, mischaracterized Plaintiff's and the Class's holdings in ARSs as "money market instruments."

**The SEC, Big Four Auditors and Accounting**
**Regulators Scrutinize Accounting Treatment for ARS**

25.     As reported in an article titled "Auction-Rate Securities: Hold that Gavel" in CFO.com on April 25, 2005, Big Four auditors, Ernst & Young ("E&Y"), in December 2004, first began advising clients to reclassify ARSs as short-term investments and not "cash equivalents" as was the prior practice.  E&Y's viewpoint was shared by the other Big Four audit companies and was endorsed by the Financial Accounting Standards Board ("FASB"), as follows:

*     *     *

Since December, when Ernst & Young first began advising clients to make the change, scores of CFOs have altered the accounting treatment for ARS. The new interpretation of two accounting standards is now endorsed by the Financial Accounting Standards Board, the Securities and Exchange Commission, and the Public Company Accounting Oversight Board, as well as all the Big Four auditors. (The reinterpreted standards are FAS No. 95, Statement of Cash Flows, and FAS No. 115, Accounting for Certain Investments in Debt and Equity Securities.)

A current SEC probe of the auctions, in which investigators are reportedly looking into alleged "bid rigging" within the ARS market, doesn't appear to involve accounting treatment of the securities. But the investigation led some audit clients to reevaluate their investments and later question the accounting treatment, according to an audit manager who preferred not to be identified. **After taking another look at the accounting rules, each of the Big Four concluded**

10

that a wholesale reinterpretation of the standards was needed, and the audit firms passed the word to their clients.

The accounting change might turn out be the latest crimp in corporate treasurers' use of what's long been seen as an effective cash-management tool. **The securities are long-term municipal and corporate bonds (usually with 20-year to 30-year maturities) that are priced and traded like short-term debt.**

**The reason for the resemblance to short-term debt is that ARS interest rates are reset through a Dutch auction.** In a Dutch auction, what sets the price is the bid with the lowest yield that would enable all the bonds in a single block to be sold. (A block of bonds is usually worth at least $200,000.) **Generally, the auctions are held every 7, 28, or 30 days, which gives finance executives a chance to liquidate their holdings when they need cash.**

(Emphasis added.)

26.    The SEC and the Public Company Accounting Oversight Board (PCAOB) have

followed E&Y and the other auditors to "correct" the wrong application of accounting rules, as

they relate to ARSs.    As reported on February 28, 2005 article in iTreasurer.com titled "The

Brave New World of Regulatory Activism,"

*        *        *

Under reported pressure from the Public Company Accounting Oversight Board (PCAOB) and the SEC, audit firms have been revisiting decades-old (and apparently seldom read) literature on auction-rate securities—i.e., should they be counted as "cash equivalent" on the balance sheet or be classified as FAS 115 securities?

**Waiting for the (third) shoe to drop**

No one believes that the SEC and auditors are changing the rules. **The guidance on auction-rate securities, for example, dates back to the late 1980s.** And so far, the impact on corporate financials does not appear too dramatic. But these seemingly unrelated initiatives may be symptomatic of a common trend:

"There's greater scrutiny of how companies apply existing accounting rules and how auditors are enforcing them," explains PricewaterhouseCoopers Senior Manager, Muneera Carr. In the wake of Enron and the Sarbanes-Oxley Act, "regulators are clearly playing a more active role."

These latest moves are not the first show of standard-setters "activism." EITF 03-1 was also initially conceived as clarification of preexisting rules on impairment (SAB 59).

Later, however, the FASB reconsidered whether indeed it was doing more than clearing up some old misconceptions. Perhaps more worrisome, however, the February initiatives are not going to be the last: As *International Treasurer* was going to press, sources said a third accounting "bombshell" was to drop; this one "would blow the other two out of the water," one accounting pro notes.

**What if it walks like a duck. . .**

Just how auction-rate securities suddenly reemerged as a hot issue is murky, and **this is not the first time there's been some discussion of whether they belong in the "cash equivalent" line on the balance sheet. The buzz is that the PCAOB raised the issue during a routine inspection of a local audit practice of a Big-Four audit firm. The disagreement was escalated to the SEC Staff. And the SEC reaffirmed the guidance present in auditing manuals—i.e., auction-rate securities may look and feel like cash, but they are in effect FAS 115 securities**.

It's also not entirely clear why for years, companies have gone on classifying auction-rate securities as cash equivalents, and auditors accepted. (From a practical standpoint, the securities are nearly always as liquid as cash and have little price risk, hence the designation.)

What's crystal clear is why this has become an issue—now. With SOX-driven focus on compliance, auditors are carefully monitoring clients' financials. And with years of rising cash assets, and declining returns, many corporates have turned to auction securities to enhance yield with little—if any—additional liquidity or market risk.

At stake, then, is where to put auction-rate securities, if the apparently prevalent "cash equivalent" classification under FAS 95 is wrong. And the worry among corporate treasurers is that the new balance sheet "geography" may adversely affect key liquidity ratios.

*Experts at E&Y and PwC say that the "cash-like" designation for auction-rate securities was almost never correct*. For example, E&Y guidance dating back to 1991 explains why auction-securities should not be considered cash equivalents under FAS 95.

(Emphasis added).

    27.    Despite seemingly clear guidance from the SEC, the Big Four audit firms and the

PCAOB, Defendants continued to market ARSs to Plaintiff and other members of the Class as "Cash Alternatives" in violation of FAS No. 95 and FAS No. 115.

**February 2008 ARS-Market Collapse**

28.    In early-February 2008, the ARS market collapsed when failing auctions largely outnumbered auctions that succeeded, leaving ARS investors stranded with illiquid investments.

29.    As a result of the ARS market collapse in February 2008, Plaintiff and other member of the Class were unable to sell their position in ARSs.   Unable to liquidate their ARSs holdings to cash, Plaintiff and other members of the Class were unable to meet their current financial obligations sustaining hardship and damages and forcing them to consider other alternatives to free up cash to meet current financial obligations.

30.    An early March 2008 document issued by Defendant UBS, notified UBS's clients that "[c]hanges in market conditions have affected the pricing of some of these securities.  Some [ARS] are now priced below par ...."    Finally, Defendant UBS advised its clients that, *"[a]s a result, investors looking to sell ARS securities should assume that it will take longer to do so."* (Emphasis added).

**Defendants Blatantly Violated NASD Requirement**
**That Financial Advisors Proposed Transactions Be "Suitable"**

31.    Defendant UBS is a member of the NYSE and the NASD.  As set forth on UBS's web site, "UBS [a foreign company] ... has voluntarily adopted the overwhelming majority of the NYSE Rules for US Companies."

32.    Defendants violated the bedrock principle of "know thy customer."  NYSE Rule 405, "Diligence as to Account" (commonly referred to as the "Know thy customer rule"), requires that "every member organization is required ... to (1) *Use due diligence to learn the*

*essential facts relative to every customer*, every order, every cash or margin account ...." (Emphasis added). In addition, NYSE Rule 342.17, "Review of communications with the public", states: "Members and member organizations must develop written policies and procedures that are appropriate for their business, their size, structure and customers in connection with the review of communications with the public relating to their business." Further, NYSE Rule 472, Communications With The Public, sub-section (i) "General Standards for All Communications", states, in pertinent part: *"No member organization shall utilize any communication which contains (i) any untrue statement or omission of a material fact or is otherwise false or misleading,* ..." and sub-section (j), "Specific Standards for Recommendations," states in part that "[a] recommendation (even though not labeled as a recommendation) must have a basis which can be substantiated as reasonable."

33.    Defendants' violated the most basic NASD requirement that the financial transactions proposed by "Financial Advisors" to their clients be *"suitable"* meaning that they met the *"customers' financial objectives."* The false and deceptive marketing of ARSs as "Cash Alternatives" was clearly "unsuitable" and could only serve to meet only Defendants' financial objectives at their clients' expense.

34.    The NASD has also promulgated "suitability" rules governing a broker's relationship with its customers. NASD Rule 2310 provides, *inter alia*, as follows:

**2310. Recommendations to Customers (Suitability)**

(a)    In recommending to a customer the purchase, sale or exchange of any security, a member shall have reasonable grounds for believing that the recommendation is suitable for such customer upon the basis of the facts, if any, disclosed by such customer as to his other security holdings and as to his financial situation and needs.

(b)    Prior to the execution of a transaction recommended to a non-institutional

14

customer, other than transactions with customers where investments are limited to money market mutual funds, a member shall make reasonable efforts to obtain information concerning:

(1)     the customer's financial status;

(2)     the customer's tax status;

(3)     *the customer's investment objectives; and*

(4)     *such other information used or considered to be reasonable by such member or registered representative in making recommendations to the customer.*

(Emphasis added).

35.     Defendants' conduct in connection with their marketing, consulting and advising Plaintiff and other Class members regarding ARSs also violated NASD Interpretative Materials for Rule 2310, which mandate "fair dealing," with the public including the requirement to not issue fraudulent misrepresentations and omissions in connection with financial transactions:

**IM-2310-2. Fair Dealing with Customers**

(a)(1)  *implicit in all member and registered representative relationships with customers and others is the fundamental responsibility for fair dealing.* Sales efforts must therefore be undertaken only on a basis that can be judged as being within the ethical standards of the Association's Rules, with *particular emphasis on the requirement to deal fairly with the public.*

(2)     this does not mean that legitimate sales efforts in the securities business are to be discouraged by requirements which do not take into account the variety of circumstances which can enter into the member-customer relationship. *It does mean, however, that sales efforts must be judged on the basis of whether they can be reasonably said to represent fair treatment for the persons to whom the sales efforts are directed*, rather than on the argument that they result in profits to customers.

(Emphasis added).

## COUNT I

### Violation of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 et seq.

36.    Plaintiff repeats and realleges the allegations as set forth above as if set forth fully herein.

37.    Defendant UBS Financial is an investment adviser under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, who entered into express brokerage contact with Plaintiff and other members of the Class.  Defendant UBS Financial, for compensation, engages in the business of advising Plaintiff and other members of the Class, either directly or through publications or writings, as to the value of "securities" or as to the advisability of investing in, purchasing, or selling "securities" as defined at 15 U.S.C. § 80b-2(11).

38.    The provision of an auction market is not incidental to the conduct of their usual brokerage business and Defendant UBS Financial receives special compensation therefore.

39.    Under the Investment Advisers Act, Defendant UBS Financial, as Investment Advisers, owed to Plaintiff and other members of the Class a fiduciary duty to fully and fairly disclose to all material facts, and an affirmative obligation to employ reasonable care to avoid misleading clients.

40.    In breach of their fiduciary duties to Plaintiff and other members of the Class in violation of the Investment Adviser Act, Defendant UBS Financial made the above-described misrepresentations, concealment and omissions of material facts concerning their actions as "Financial Advisors" to customers in connection with ARSs thereby deceiving Plaintiff and other members of the Class with full knowledge that they were false and misleading and that Plaintiff and other Class members' cash was not being invested in liquid securities – "Cash Alternatives" – just as good as cash.

41.    As a result of Defendant UBS Financial's fiduciary duty breaches, Plaintiff and other Class members' purchases, investment, or acquisition of ARSs are void under Section 15

16

of the Investment Advisers Act, 15 U.S.C. § 80b-15(b), which provides:

> Every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

42.    Further, Defendant UBS AG acquired rights under and was benefited by Defendant UBS Financial's acts and conduct as set forth above and had actual knowledge of the conduct engaged in by Defendant UBS Financial that violated the Investment Advisers Act.

43.    In addition to seeking a declaratory judgment that the ARSs transactions with Plaintiff and the Class are void, Plaintiff seeks an accounting and restitution on behalf of the Class of all monies and fees wrongfully obtained by Defendants and disgorgement of all profits made by the Defendants due to their conduct in violation of the Investment Advisers Act.

**COUNT II**

**Violation of the New York General Business Law § 349**

44.    Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein.

45.    Section 349 of the New York's General Business Law states:

Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

46.    As set forth above, Defendants' deceptive, acts, practices, and the false representations and omissions to state material facts and risks made by Defendants to Plaintiff

and the other Class members in connection with their investment in ARSs were prepared and disseminated from New York in the course of conducting their business, trade and services in New York, including but not limited to all of the statements, mailings made in monthly brokerage statements and other public statements.  Defendants' statements, omissions and deceptive scheme, directed at consumers, misled Plaintiffs and other Class members. Defendants' misrepresentations and omissions were likely to mislead reasonable consumers acting reasonably under the circumstances.

47.     Defendants' conduct and actions, as described above, constitute deceptive business practices in violation of the GBL.

48.     The damages sustained by Plaintiffs and the other Class members were a direct and foreseeable result of, and were proximately caused by Defendants' deceptive business practices.

49.     As a result of Defendants' actions, Plaintiffs and other Class members have been injured and damaged in an amount to be determined at trial.

## COUNT III

### Breach of Fiduciary Duty

50.     Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein.

51.     Defendants, through their agents and representatives, held themselves out as financial advisors to Plaintiff and other Class members, and as such owed fiduciary duties to Plaintiff and the other Class members.  The Defendants participated in a false and deceptive scheme which violated their fiduciary duties of loyalty and fair dealing owed to Plaintiffs and the Class by causing Plaintiffs and Class members' to invest their formerly liquid cash holdings into

ARSs, under the guise that ARSs were "Cash Alternatives" – safe, liquid investments, just as good as cash, even though such investments were wholly unsuitable under the NASD rules and failed to represent best execution under the rules, and were done solely in order to enhance their own profits at the Plaintiff's and the Class' expense. The Defendants also violated their fiduciary duties of full and complete disclosure in that the investment was unsuitable for Plaintiff and the Class and of all conflicts of interest.

52.     As a result of Defendants' breach of fiduciary duties, Plaintiff and other members of the Class have suffered damage in the form of lost earnings on their funds, and Defendants have profited at Plaintiff's and the Class's expense in an amount to be determined at trial. The damages sustained by Plaintiff and other Class members were a direct and foreseeable result, and were proximately caused by, Defendants' breaches of their fiduciary duties.

53.     The Defendants' conduct was willful, wanton, and reckless. Based on the intentionally dishonest nature of the Defendants' conduct, which was directed at the Class and at the public generally, the Defendants should also be held liable to the Class for punitive damages, in an amount to be determined at trial.

## COUNT IV

### Breach of the Implied Covenants of Good Faith and Fair Dealing

54.     Plaintiff repeats and reiterates the allegations set forth above as though fully set forth herein.

55.     In connection with the retention of UBS Financial Services as a financial or investment advisor or broker-dealer, there is an implied covenant of good faith and fair dealing on the part of UBS Financial to Plaintiff and the Class.

56.     UBS Financial breached the covenant of good faith and fair dealing by, among

other things, failing to make full and complete representations about the nature of ARSs at Plaintiff's and the Class's expense.

57.    By reasons of the foregoing, Plaintiff and other members of the Class are entitled to compensatory damages in the amount to be determined at trial.

58.    Defendants' conduct was willful, wanton, and reckless.    Based on the intentionally dishonest nature of Defendants' conduct, which was directed at the Class and at the public generally, the Defendants should be held liable to Plaintiff and other Class members for actual damages as well as punitive damages in an amount to be determined at trial.

## COUNT V

### Negligence

59.    Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein.

60.    The Defendants' advertising, touting and holding themselves out to be investment and financial advisors, owed to Plaintiff and other Class members a duty of care concerning Defendants' consultation, direction and/or advice in connection with Plaintiff and other Class members' investment in ARSs.

61.    The Defendants breached their duty of care, *inter alia*, by advising Plaintiff and other Class members that ARS were "cash alternatives" – just as good as cash – and readily liquid investments.

62.    The Defendants' conduct as described herein was, at minimum, negligent.

63.    The damages sustained by Plaintiff and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' breaches of their duty and negligent conduct.

64.    As a result of the Defendants' actions, Plaintiff and the other Class members have been damaged and injured, in an amount to be determined at trial.

## COUNT VI

### Negligent Misrepresentation

65.    Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein.

66.    Defendants' above-described misrepresentations and conduct in connection with Plaintiff and other Class members investment in ARSs were false and misleading, in violation of their duties to Plaintiff and the Class.

67.    Defendants were negligent in making the above-described misrepresentations, concealment and omissions of material facts.

68.    Defendants' misrepresentations and omissions concerning the ARS, including the liquidity risks inherent in ARSs and the proper designation of ARSs as short-term investment and not cash equivalents, were material in Plaintiff's and the other Class members' decision include ARS as part of their cash management investment strategy.

69.    Plaintiff and other Class members justifiably relied upon such misrepresentations, concealment and omissions to their damage and detriment.

70.    The damages sustained by Plaintiff and the other Class members were a direct and foreseeable result of, and were proximately caused by, Defendants' misrepresentations, concealment and omissions.

71.    As a result of Defendants' actions, Plaintiff and the other Class members have been damaged and injured in an amount to be determined at trial.

## COUNT VII

### Unjust Enrichment

72.    Plaintiff repeats and reiterates the allegations as set forth above as if set forth fully herein.

73.    Plaintiff and the other Class members entered into contracts with the Defendant UBS Financial to open and maintain brokerage accounts.

74.    Throughout the Class Period, the Defendants, by advising, consulting and/or directing their clients to invest, purchaser or acquire ARSs – in lieu of actual "cash alternatives," such as money market funds, FDIC-insured money market accounts, Treasury bills – caused Plaintiff and other members of the Class to invest in ARSs, generating increased revenues for Defendants.

75.    Defendant UBS AG has been unjustly enriched at the expense of and to the detriment of Plaintiff and each member of the Class by collecting money to which they are not entitled.  Specifically, Defendant UBS AG was the recipient of substantial ill-gotten profits in connection with Defendant UBS Financial's underwriting of ARS issuances, dominant presence in the ARS auction-market and trading commissions and advisory fees generated from Plaintiff and other Class members' investment in ARSs.

76.    Defendants should be required to disgorge this unjust enrichment.

**WHEREFORE,** Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Declaring that the Defendants' ARS transactions with the Plaintiff and

other member of the Class are void;

   C. Awarding compensatory damages in favor of Plaintiff and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

   D. Seeking disgorgement of any and all monies Defendants realized from the ARS transactions with Plaintiff and other member of the Class;

   E. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including interest, counsel fees and expert fees; and

   F. Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

  Plaintiff hereby demands a trial by jury.

DATED: New York, New York
    March 14, 2008

       SCHOENGOLD SPORN LAITMAN &
       LOMETTI, P.C.

       Samuel P. Sporn (SPS-4444)
       Joel P. Laitman (JL-8177)
       Frank R. Schirripa (FS-1960)
       19 Fulton Street, Suite 406
       New York, New York 10038
       Telephone: (212) 964-0046
       Facsimile (212) 267-8137

       *Attorneys for Plaintiff and*
       *Lead Counsel for the Proposed Class*