Keith W. Miller
PAUL, HASTINGS, JANOFSKY & WALKER LLP
75 East 55th Street
New York, New York 10022
(212) 318-6000

James D. Wareham
PAUL, HASTINGS, JANOFSKY & WALKER LLP
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1700

William F. Sullivan
Howard M. Privette
John S. Durrant
PAUL, HASTINGS, JANOFSKY & WALKER LLP
515 South Flower Street
Los Angeles, California 90071
(213) 683-6000

Attorneys for Defendants

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RONALD D. KASSOVER, *et al.* on behalf of themselves and all others similarly situated,<br><br>      Plaintiffs,<br><br>    v.<br><br>UBS AG and UBS FINANCIAL SERVICES, INC.,<br><br>      Defendants. | Case No:  08-CV-02753 (LMM) (KNF)<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANTS' MOTION FOR PROTECTIVE ORDER STAYING DISCOVERY** |

**TO THE COURT AND TO ALL PARTIES APPEARING IN THIS ACTION:**

Pursuant to Rule 201 of the Federal Rules of Evidence ("Rule 201"), Defendants UBS AG and UBS Financial Services, Inc. (the "Defendants") request this Court take judicial notice of the documents listed below in connection with Defendants' Motion for Protective Order Staying Discovery. True and correct copies of the following documents are attached to this Request for Judicial Notice as Exhibits A through G filed concurrently herewith:

(a) Class Action Complaint for Violations of Federal Securities Laws filed in Chandler, et al. v. UBS AG, et al., No. 08-cv-02967, filed in the United States District Court for the Southern District of New York ("S.D.N.Y.") on March 21, 2008, a true and correct copy of which is attached hereto as Exhibit A;

(b) Class Action Complaint for Violations of Federal Securities Laws filed in Sanchez v. UBS AG, et al., No. 08-cv-3082, filed in the S.D.N.Y. on March 26, 2008, a true and correct copy of which is attached hereto as Exhibit B;

(c) Class Action Complaint for Violations of Federal Securities Laws filed in Bonnist v. UBS AG, et al., No. 08-cv-4353, filed in the S.D.N.Y. on May 8, 2008, a true and correct copy of which is attached hereto as Exhibit C;

(d) Class Action Complaint for Violations of Federal Securities Laws filed in Streit, et al. v. UBS AG, et al., No. 08-cv-5251, filed in the S.D.N.Y. on June 9, 2008, a true and correct copy of which is attached hereto as Exhibit D;

(e) Stipulation and Order of Consolidation of Related Cases filed in Chandler, et al. v. UBS AG, et al., No. 08-cv-02967 and Sanchez v. UBS AG, et al., No. 08-cv-3082 on May 15, 2008, a true and correct copy of which is attached hereto as Exhibit E;

(f)     Movants' Motion to Transfer for Coordination, filed before the Judicial Panel on

Multidistrict Litigation on June 25, 2008, a true and correct copy of which is

attached hereto as Exhibit F; and,

(g)     An order of consolidation, <u>In re Citigroup Auction Rate Securities Litigation</u>,

No. 08 Civ. 83095 (LTS)(FM) (S.D.N.Y. June 25, 2008), a true and correct copy

of which is attached hereto as Exhibit G.

## I.     THE COURT SHOULD TAKE JUDICIAL NOTICE OF ALL PUBLICLY FILED DOCUMENTS

Rule 201(b) of the Federal Rules of Evidence permits judicial notice of facts that

are "capable of accurate and ready determination by resort to sources whose accuracy cannot

reasonably be questioned."  Judicial notice is mandatory as "requested by a party" who supplies

the court with the necessary foundational information and may be taken at any stage of a

proceeding.  <u>See</u> Fed. R. Evid. 201(d), (f).  Here, Defendants request judicial notice of

documents publicly filed in federal courts.  <u>See</u> Exs. A-G.  Because these documents are a matter

of public record, the court may take judicial notice of them, "not for the truth of the matters

asserted in the other litigation, but rather to establish the fact of such litigation and related

filings."  <u>Kramer v. Time Warner, Inc.</u>, 937 F.2d 767, 774 (2d Cir. 1991); <u>see also</u> <u>Rothman v.</u>

<u>Gregor</u>, 220 F.3d 81, 92 (2d Cir. 2000) (taking judicial notice of a complaint filed in another

lawsuit); <u>Murray v. Admin. for Children's Servs.</u>, 476 F. Supp. 2d 436, 441 (S.D.N.Y. 2007) ("a

court may take judicial notice of documents filed in other courts, state and federal").

## II.     CONCLUSION

For the reasons set forth above, the Defendants respectfully request the Court

grant judicial notice of Exhibits A through G reflecting the existence of the litigations and related

filings.

Dated: Los Angeles, California        PAUL, HASTINGS, JANOFSKY & WALKER LLP
June 27, 2008


By:_____/s/_____
        WILLIAM F. SULLIVAN

williamsullivan@paulhastings.com
Howard M. Privette
howardprivette@paulhastings.com
John S. Durrant
johndurrant@paulhastings.com
515 South Flower Street
Los Angeles, California 90071
(213) 683-6000

Keith W. Miller
keithmiller@paulhastings.com
75 East 55th Street
New York, New York 10022
(212) 318-6000

James D. Wareham
jameswareham@paulhastings.com
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1700

Attorneys for Defendants

<u>**CERTIFICATE OF SERVICE**</u>

I, William F. Sullivan, do hereby certify that on June 27, 2008, a true and correct copy of the foregoing Request for Judicial Notice in Support of Defendants' Motion for Protective Order Staying Discovery was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of electronic filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/_____

WILLIAM F. SULLIVAN

# EXHIBIT A



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID and SHELLY CHANDLER,<br>Individually, And As Trustees of the Chandler<br>Trust Dated 12/28/2005, And On Behalf of All<br>Others Similarly Situated, | CIVIL ACTION NO. _____ |
| | **CLASS ACTION COMPLAINT<br>FOR VIOLATIONS OF<br>FEDERAL SECURITIES LAWS** |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| v. | |
| UBS AG, UBS Securities LLC and UBS<br>Financial Services Inc., | |
| Defendants. | |

RECEIVED
MAR 21 2008
U.S.D.C. S.D. N.Y.
CASHIERS

## INTRODUCTION

1.     This is a federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who purchased and continue to hold auction rate securities (also known as auction rate preferred stock, auction market preferred stock, variable rate preferred securities, money market preferred securities, periodic auction rate securities and auction rate bonds) offered for sale by Defendants between March 21, 2003 and February 13, 2008, inclusive (the "Class Period").

2.     Defendants represented to investors that auction rate securities were equivalent to cash or money market funds; were highly liquid, safe investments for short-term investing; and were suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

3.     Defendants knew, but failed to disclose to investors, material facts about auction rate securities. In particular, Defendants knew, but failed to disclose that these auction rate securities were not cash alternatives, but were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. Defendants knew, but failed to disclose that auction rate securities were only liquid at the time of sale because Defendants were artificially supporting and

1

manipulating the auction market to maintain the appearance of liquidity and stability. Defendants knew, but failed to disclose that auction rate securities would become illiquid as soon as Defendants stopped maintaining the auction market.

4.    On February 13, 2008, 87% of all auctions of auction rate securities failed when Defendants and all other major broker-dealers refused to continue to support the auctions. As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities collapsed, leaving the holders of more than $300 billion in auction rate securities with no means of liquidating investments Defendants offered and sold as a suitable alternative to money market funds and other short term cash management vehicles.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5).

6.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), §1337. Defendants maintain their principal places of business within this District and many of the acts giving rise to the violations complained of herein took place in this District.

7.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

8.     Plaintiffs David and Shelly Chandler, as set forth in the accompanying certification, incorporated by reference herein, purchased auction rate securities underwritten and sold by UBS during the Class Period and continued to hold such auction securities as of February 13, 2008.

9.     Defendant UBS AG is a Swiss corporation headquartered in Zurich and Basil, Switzerland.   UBS AG is one of the world's leading financial firms and does business in the United States through its subsidiaries UBS Securities LLC and UBS Financial Services Inc.

10.    Defendant UBS Securities LLC ("UBS Securities") is incorporated in Delaware and its principal executive offices are located in New York, New York.  UBS Securities, a wholly-owned subsidiary of UBS AG, is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA").

11.    Defendant UBS Financial Services Inc. ("UBS Financial Services") is incorporated in Delaware and its principal executive offices are located in New York, New York.  UBS Financial Services, a wholly-owned subsidiary of UBS AG, is registered with the SEC as a broker-dealer and investment adviser pursuant to the Exchange Act and the Investment Advisers Act of 1940, and offers investment advisory and brokerage services to UBS clients.

12.    Unless specifically noted, "UBS" refers collectively to Defendants UBS AG, UBS Securities and UBS Financial Services.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

13.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased auction rate securities from UBS between March 21, 2003 and February 13, 2008, inclusive, and continued to hold such auction securities as of February 13, 2008 (the "Class"). Excluded from the Class are Defendants, the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest.

3

14.    The members of the Class are so numerous that joinder of all members is impracticable. The market for auction rate securities, while it existed, was estimated to exceed $300 billion in the United States and UBS was the second largest broker-dealers of auction rate securities while the market for such securities existed. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

15.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the liquidity of and risks associated with auction rate securities and the market for such securities; and

(c)    To what extent the members of the Class have sustained damages and the proper measure of damages.

16.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

17.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

18.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

4

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

19.     In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## GENERAL ALLEGATIONS

### Background

20.     The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." Auction rate securities have generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

21.     Auction rate securities were first introduced in the 1980s. Since then, the market for auction rate securities grew dramatically and the current estimated value of auction rate securities in existence (prior to the collapse of the auction market) is around $350 billion.

22.     Investments in auction rate securities were initially limited to institutional investors, with required minimums of $250,000. In recent years, however, issuers and sellers of auction rate securities have lowered the minimum amount invested to $25,000, in an effort to market auction rate securities as widely as possible to the general public.

5

23.    Auction rate securities were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction. The method for auctioning the securities was described in the prospectus of the fund through which they were offered, though the formula was substantially similar for all securities offered as auction rate securities.

24.    The number of days between each auction was set by the prospectus. Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period.

25.    The auction itself was of the type commonly referred to as a "Dutch" auction, i.e. one where the price was initially set at a presumably economically unattractive level and then made more attractive to purchasers throughout the course of the auction. For auction rate securities, bids with successively higher rates were offered until all of the securities at the auction were sold.

26.    At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate." The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction. If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders. The auction agent, at the end of the auction, allocated the shares per the formula. If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction and the rate was set at a level defined in the prospectus. This rate was generally lower than the market rate.

27.    During an auction, an investor could submit one of four different orders: (1) a Hold order to keep the shares out of the auction regardless of the new interest rate; (2) a Hold at Rate order, where if the clearance rate was below the bid to hold rate, then the securities were sold; (3) a Sell order, which was to sell the shares at the auction regardless of the clearing rate; and (4) a Bid order, to submit a bid to buy at a new position at a specified minimum interest rate. Since there was no preference in awarding shares to existing holders and new buyers, there was little practical difference between a Hold at Rate order and a Buy order.

6

28.     If there were not enough orders to purchase all the shares being sold at the auction, a failed auction occurred. In this situation, the rate was set to a "maximum rate" described by either a formula or a multiplier of a reference rate, such as the Bond Market Association index. Either way, the maximum rate was set out in the prospectus. If the auction failed then none of the current shareholders could sell their shares, no matter what type of order they issued. The maximum rate for many auction rate securities, particularly those invested in corporate debt securities or preferred stocks, was relatively small, however. As a result, if the auction failed, owners unable to sell their shares would receive limited interest on their illiquid investments.

29.     The issuer of each auction rate security selected one or more broker-dealers to underwrite the offerings and to manage the auction process. Investors could only submit orders through the selected broker-dealers. The issuer paid an annualized fee to each broker-dealer engaged to manage an auction.

30.     Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer. This deadline was generally set early enough by the broker-dealer so that it had time to process and analyze the orders before having to submit the orders to the auction agent. This gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.

31.     Broker-dealers would often engage in a number of practices to influence the auction process, including, for example, submitting their own orders to purchase or sell shares for their own accounts. In 2004, the SEC began to investigate these manipulative practices affecting the auction market. In 2006, the SEC entered into a consent decree with a number of major broker-dealers which required them to disclose certain practices to investors and to stop engaging in certain other practices. The SEC consent decree noted that in many cases, the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed. The consent decree did nothing to end the practice of the broker-dealers submitting bids for their own accounts after receiving notice of what orders their customers planned to place, so long as the broker-dealers disclosed this practice to their customers.

7

**During the Class Period, UBS Materially Misrepresented the
Liquidity of and Risks Associated With Auction Rate Securities and
Omitted Material Facts About Its Role and the Auction Market**

32.     Auction rate securities were extremely profitable for UBS and for the UBS financial advisors who sold the securities. As the second largest underwriter of auction rate securities, UBS received significant underwriting fees from the issuers of these securities. As one of the largest broker-dealers, UBS also entered into broker-dealer agreements with the issuers and was paid an annualized broker-dealer fee for operating the auction process for more than auction rate securities. UBS also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell auction rate securities for its own account. Individual UBS financial advisors had a significant financial incentive to sell auction rate securities, as they were compensated by UBS for each auction rate security sold.

33.     In order to perpetuate the auction market and sell as many auction rate securities as possible, UBS represented to investors in its written materials and uniform sales presentations by financial advisors that auction rate securities were the same as cash and were highly liquid, safe investments for short-term investing. Pursuant to uniform sales materials and top-down management directives, UBS financial advisors throughout the United States represented to current and potential UBS clients that the auction rate securities sold by UBS were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

34.     UBS failed to disclose to purchasers of auction rate securities material facts about these securities. UBS failed to disclose that these securities were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30 year maturity dates, or longer. UBS failed to disclose that the auction rate securities it was selling were only liquid at the time of sale because UBS and other broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity

8

and stability. In fact, at all relevant times during the Class Period, the ability of holders of auction rate securities to liquidate their positions depended on the maintenance of an artificial auction market maintained by UBS and the other broker-dealers. When UBS and the other broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the auction rate securities sold by UBS became illiquid. UBS also failed to disclose that the auction rate securities it was selling were not short-term investments, but rather long term bonds or preferred stocks with maturities sometimes exceeding 30 years. Finally, UBS failed to disclose that the short-term nature of the securities and the ability of investors to quickly convert their auction rate securities into cash depended entirely on the perpetuation of the artificial auction market being maintained by UBS and the other broker-dealers.

35.     UBS also failed to disclose to purchasers of auction rate securities material facts about its role in the auctions and the auction market in which these securities were traded. UBS failed to disclose that in connection with the sale of auction rate securities, UBS simultaneously was acting on behalf of the issuer, who had an interest in paying the lowest possible interest rate, on behalf of the investor, who was seeking the highest possible return, and on its own behalf, to maximize the return to UBS on its holdings of the auction rate securities. UBS failed to disclose that it and other broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions. UBS failed to disclose that without this manipulation of the auction market, many auctions likely would have failed, as a result of which investors would have had the ability to determine the true risk and liquidity features of auction rate securities. UBS continued to aggressively market auction rate securities after it had determined that it and other broker dealers were likely to withdraw their support for the periodic auctions and that a "freeze" of the market for auction rate securities would result.

36.     During the Class Period, UBS failed to disclose that the auctions it was conducting were not governed by arms-length transactions but instead suffered from systemic flaws and manipulative practices, including allowing customers to place open or market orders in auctions,

intervening in auctions by bidding for UBS's proprietary account or asking customers to make or change orders, preventing failed auctions and all-hold auctions to set the market rate, submitting or changing orders after auction deadlines, not requiring customers to purchase partially-filled irrevocable orders, providing certain customers with higher returns than the auction clearing rate, and providing inside information about the auction process to certain customers in connection with the auction bidding.

### The Market for Auction Rate Securities Collapses

· 37.    In the summer of 2007, some auctions for auction rate securities backed by sub-prime debt began to fail, but these securities represented only 2-6% of the entire auction rate securities market.  In the fall-winter of 2007, more auctions began to fail.  Even though some of the auctions that failed initially were conducted by UBS, it continued to encourage investors to purchase auction rate securities and continued to represent to investors that these securities were the same as cash or money markets and were highly liquid, safe investments for short-term investing, without any disclosure of the risks associated with the securities.

38.    On February 13, 2008, 87% of all auctions of auction rate securities failed when all of the major broker-dealers, including UBS, refused to continue to support the auctions.

39.    That same day, UBS notified its 8,200 brokers and investment advisors that UBS was no longer supporting the auction market for auction rate securities.  This information was not released to UBS investors or to the public, but was leaked to the press and publicly reported the next day.   Virtually every other major broker-dealer, including Goldman Sachs, Lehman Brothers, Citigroup and Merrill Lynch, among others, also decided around the same time to withdraw their support of the auction market. As a result of the withdrawal of support by all of the major broker-dealers, the market for auction rate securities has collapsed, rendering more than $300 billion of outstanding securities illiquid.

40.    The market for auction rate securities sold by UBS was open, well-developed and efficient at all relevant times until the truth emerged and the auction market collapsed.  As a result of the materially false and misleading statements and failures to disclose, auction rate

securities sold by UBS traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased and continued to hold auction rate securities sold by UBS relying upon the integrity of the auction market and the market price of those securities, and have been damaged thereby.

41.     During the Class Period, Defendants materially misled the investing public, thereby allowing the auction market to continue and inflating the price of auction rate securities sold by UBS by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the auction market and the auction rate securities sold by UBS, as alleged herein.

42.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the auction market and the auction rate securities sold by UBS. These material misstatements and omissions had the cause and effect of perpetuating the auction market and creating in that market an unrealistically positive assessment of the auction rate securities sold by UBS, thus causing those securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing and continuing to hold auction rate securities sold by UBS at artificially inflated prices, thus causing the damages complained of herein.

## NO SAFE HARBOR

43.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

The statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of UBS who knew that those statements were false when made.

<u>LOSS CAUSATION/ECONOMIC LOSS</u>

44.     During the Class Period, as detailed herein, Defendants engaged in a scheme and course of conduct to create a market for and artificially inflate the price of auction rate securities sold by UBS that operated as a fraud or deceit on purchasers of auction rate securities sold by UBS by misrepresenting the liquidity of and risks associated with such securities. Defendants achieved this by making false and misleading statements about the auction market and the auction rate securities sold by UBS. When UBS's prior misrepresentations and omissions were disclosed and became apparent to the investing public, the market for auction rate securities collapsed and the auction rate securities sold by UBS have become illiquid. As a result of their purchases of auction rate securities from UBS during the Class Period, Plaintiffs and other members of the Class suffered economic loss, i.e., damages under the federal securities laws in that the securities have substantially less value than that represented by Defendants.

45.     The collapse of the auction rate securities market at the end of the Class Period was a direct result of Defendants' unilateral decision to no longer artificially support the auction rate securities market and the nature and extent of Defendants' fraud finally being revealed to investors.

12

## BASIS OF ALLEGATIONS

46.     Plaintiffs have alleged the following based upon the investigation of Plaintiffs' counsel, which included a review of SEC filings, regulatory filings and reports, securities analysts' reports, interviews with purchasers of auction rate securities, press releases and media reports, and Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act
### Against All Defendants

47.     Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiffs bring this cause of action on behalf of themselves and the Class.

48.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) enable Defendants to sell hundreds of millions, if not billions, of dollars of auction rate securities to current and prospective UBS clients, and on which UBS made substantial commissions; and (iii) cause Plaintiffs and other members of the Class to purchase auction rate securities from UBS at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

49.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from UBS in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

13

50.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the auction rate securities sold by UBS, as specified herein.

51.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the auction rate securities sold by UBS were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the auction rate securities in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of auction rate securities from UBS during the Class Period.

52.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate disregard for the truth in that they failed to ascertain and to disclose such facts.  Such Defendants' material misrepresentations and/or omissions were done knowingly or deliberately and for the purpose and effect of concealing the truth about the liquidity of and risks associated with auction rate securities from the investing public and supporting the artificially inflated price and market for these securities.  If Defendants did not have actual knowledge of the misrepresentations and omissions alleged, they were deliberate in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market and market price of the auction rate securities sold by UBS was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of auction rate securities were artificially inflated, and relying

14

directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the auction market in which the auction rate securities were traded, and/or on the absence of material adverse information that was known to or deliberately disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired and continued to hold auction rate securities sold by UBS during the Class Period at artificially high prices and were damaged thereby.

54.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the liquidity of and risks associated with the auction rate securities sold by UBS, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased and continued to hold their auction rate securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

56.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of auction rate securities sold by UBS during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Defendant UBS AG

57.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiffs bring this cause of action on behalf of themselves and the Class.

58.    Defendant UBS AG acted as a control person of Defendants UBS Securities and UBS Financial Services within the meaning of Section 20(a) of the Exchange Act as alleged herein.

By virtue of its 100% ownership of UBS Securities and UBS Financial Services, UBS AG had the power to influence and control and did influence and control, directly or indirectly, the decision-making by UBS Securities and UBS Financial Services including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. UBS AG was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.    As set forth above, UBS Securities and UBS Financial Services violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of its position as a controlling person, UBS AG is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchase and retention of auction rate securities from UBS AG during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

16

E.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demands a trial by jury.

Dated: March 21, 2008                          Respectfully submitted,


                                               SEEGER WEISS LLP



                                               By: _____
                                                  Christopher A. Seeger (CS-4880)
                                                  Stephen A. Weiss (SW-3520)
                                                  David R. Buchanan (DB-6368)
                                                  One William Street
                                                  New York, NY 10004
                                                  Telephone: (212) 584-0700
                                                  Facsimile: (212) 584-0799


                                                  Jonathan K. Levine (JL-8390)
                                                  Daniel C. Girard
                                                  Aaron M. Sheanin
                                                  **GIRARD GIBBS LLP**
                                                  601 California Street, 14th Floor
                                                  San Francisco, CA 94108
                                                  Telephone: (415) 981-4800
                                                  Facsimile: (415) 981-4846

                                                  Norman E. Siegel
                                                  **STUEVE SIEGEL HANSON LLP**
                                                  460 Nichols Road, Suite 200
                                                  Kansas City, MO, 64112
                                                  Telephone: (816) 714-7100
                                                  Facsimile: (816) 714-7101


                                                  Counsel for Plaintiffs
                                                  David and Shelly Chandler

17

# ATTACHMENT A

## CERTIFICATION OF PROPOSED LEAD PLAINTIFFS
## PURSUANT TO THE FEDERAL SECURITIES LAWS

We, David and Shelly Chandler, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    We have reviewed the complaint against UBS AG, prepared by Girard Gibbs LLP, whom we designate as our counsel in this action for all purposes.

2.    We did not acquire any auction rate securities from UBS AG at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3.    We are willing to serve as lead plaintiffs either individually or as part of a group. We understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4.    We will not accept any payment for serving as a representative party beyond our pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5.    We have not sought to serve or served as representative parties for a class in an action under the federal securities laws within the past three years.

6.    We understand that this is not a claim form, and that our ability to share in any recovery as a class member is not affected by our decision to serve as a representative party.

7.    Our purchases and sales of auction rate securities sold to us through UBS AG are attached as Attachment A to this document:

1

8.      We declare under penalty of perjury that the foregoing is true and correct.

Executed this 20 th day of March, 2008

David Chandler
_____
David Chandler

Shelly Chandler
_____
Shelly Chandler

2

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RICARDO L. SANCHEZ, on behalf of
himself and all others similarly situated,

Plaintiff,

v.

UBS AG, UBS SECURITIES LLC, UBS
FINANCIAL SERVICES, INC.

Defendants.

Civil Action No. **08 CV 3082**

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

Plaintiff, individually and on behalf of all other persons similarly situated, by his undersigned attorneys, alleges the following upon personal knowledge as to himself and his own acts and upon information and belief as to all other matters based upon the investigation made by and through his attorneys, which investigation included, among other things, a review of the public documents and news releases concerning the Defendants, including their press releases and public filings with the U.S. Securities and Exchange Commission (the "SEC").

## NATURE OF THE ACTION

1.      Plaintiff brings this action as a class action on behalf of himself and all other persons who purchased and/or repurchased auction rate securities ("ARS")(defined below) from the Defendants from March 21, 2003 through February 13, 2008 (the "Class" and "Class Period"), to recover damages caused as a result of Defendants' violation of the federal securities laws.

2.      ARS are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically re-set through auctions, typically every 7, 14, 28, or 35 days. ARS are issued with long-term maturities or even in perpetuity. In the case of Auction Rate Preferred Securities typically issued by closed-

end funds in order to provide the funds' leverage, there is no maturity date and some are paying interest rates of just above 3.00%. However, due to ARS's interest rate or dividend yield re-set feature, ARS have been marketed as short-term instruments. ARS, however, bear no resemblance to any cash management vehicles and, in fact, federal regulations prohibit money market funds from investing in ARS.

3.      Defendants deceptively marketed ARS as cash alternatives to money market funds for investors needing liquidity and utterly failed to disclose material information about the ARS they were marketing. Indeed, in monthly account statements periodically sent to investors, Defendants listed ARS under the heading of "cash alternatives."

4.      Defendants uniformly failed to disclose that ARS are not cash alternatives to money market funds but are instead complicated financial products based on bonds having maturities of 30 years and longer. Defendants also failed to disclose that ARS were only "liquid" because they and other broker-dealers created an artificial market for ARS which would dry up as soon as these broker-dealers decided to remove themselves from the auction process. Defendants also failed to disclose that during the Class Period they purchased ARS for their own accounts to avert auction failures, and that, but for its intervention a great deal of these auctions would have failed.

5.      Instead of disclosing the true nature of ARS and the substantial liquidity risks associated with them, Defendants continued to push as many ARS as possible unto its customers in order to unload the inventory off its already troubled balance sheet.

6.      After unloading millions of dollars worth of ARS by means of a rigged auction market, on or about February 13, 2008, Defendants and other broker-dealers simply stopped participating in ARS auctions and walked away entirely. As a result, thousands of investors who thought they were holding highly liquid investments purchased from the Defendants are now saddled with long term securities they cannot sell.

7.    Investors have no prospect of ever selling their securities through the auction market which has now been exposed as manipulated and artificial. The only chance for investors to sell their ARS and to achieve liquidity is to take a "haircut" and sell their securities at a substantial discount to par value.

8.    Thus, Plaintiff and the other Class members have been harmed as a result of Defendants' deceptive conduct and misrepresentations because the ARS they purchased from the Defendants are no longer liquid and are also now worth less due to their illiquidity.

9.    This lawsuit seeks injunctive relief to compel the Defendants to rescind millions of dollars in ARS transactions they executed during the Class Period and to recover compensatory and punitive damages on behalf of the Class who have suffered and continue to suffer damages as a result of being stuck with these illiquid securities.

## JURISDICTION AND VENUE

10.    The claims alleged herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

11.    The jurisdiction of this Court is based on Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. §§ 1331 and 1337.

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Many of the acts alleged herein, including the dissemination to the investing public of the misleading statements and omissions at issue, occurred in substantial part in this District. Moreover, Defendants maintain their principal U.S. executive offices in this District.

13.    In connection with the acts, transactions and conduct alleged herein, Defendants used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of national securities exchanges and markets.

## PARTIES

14.     Plaintiff purchased ARS from the Defendants during the Class Period as set forth in the attached certification.

15.     Defendant UBS AG is a Swiss corporation headquartered in Zurich and Basil, Switzerland. UBS AG is one of the world's leading financial institutions and does business in the United States through its subsidiaries UBS Securities LLC and UBS Financial Services, Inc.

16.     Defendant UBS Securities LLC ("UBS Securities") is incorporated in Delaware and its principal executive offices are located in New York, New York. UBS Securities, a wholly owned subsidiary of UBS AG, is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange and the Financial Industry Regulatory Authority.

17.     Defendant UBS Financial Services Inc. ("UBS Financial Services") is incorporated in Delaware and its principal executive offices are located in New York, New York. UBS Financial Services, a wholly-owned subsidiary of UBS AG, is registered with the SEC as a broker-dealer and investment adviser pursuant to the Exchange Act and the Investment Advisers Act of 1940, and offers investment advisory and brokerage services to UBS clients.

18.     Unless specifically noted, "UBS" refers collectively to Defendants UBS AG, UBS Securities and UBS Financial Services.

## CLASS ACTION ALLEGATIONS

19.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all persons who acquired ARS from UBS from March 21, 2003 through February 13, 2008, and who were damaged thereby.  Excluded from the Class are the Defendants, their officers and directors, affiliates, legal representatives, heirs, predecessors, successors and assigns, and

any other entity in which the Defendants have a controlling interest or of which they are a parent or subsidiary.

20.    The members of the Class are located in geographically diverse areas and are so numerous that joinder of all members is impracticable.  Throughout the Class Period, there were more than $300 billion ARS outstanding, which were actively traded by UBS.  While the exact number of Class members is unknown at this time and can only be ascertained through appropriate discovery, Plaintiff believes there are thousands of members of the Class who acquired ARS from UBS during the Class Period.

21.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

- Whether UBS violated the federal securities laws based upon the facts alleged herein;

- Whether UBS acted knowingly or recklessly in making materially misleading statements and/or omissions during the Class Period;

- Whether the market prices and liquidity of ARS marketed by UBS during the Class Period were artificially inflated because of the conduct complained of herein; and

- Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

22.    Plaintiff's claims are typical of the claims of the members of the Class as Plaintiff and members of the Class sustained damages arising out of UBS' wrongful conduct in violation of federal laws as complained of herein.

23.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

24.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of this Class is impracticable. Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

**The ARS Market**

25.    ARS are municipal bonds, corporate bonds, and preferred stocks with interest rates or dividend yields that are periodically re-set through auctions, typically every 7, 14, 28, or 35 days. ARS are usually issued with maturities of 30 years, but the maturities can range from 5 years to perpetuity.

26.    ARS were first developed in 1984, and the ARS market has grown to well over $300 billion. In the past, mostly institutional investors participated in the ARS markets but recently the broker-dealers reduced the minimum investment from $250,000.00 to $25,000.00, placing these securities within reach of individual investors.

**Auction Mechanics**

27.    ARS are auctioned at par so the return on the investment to the investor and the cost of financing to the issuer between auction dates is determined by the interest rate or dividend yield set through the auctions.[1]

28.    According to the disclosure documents (the prospectus or official statement) for each security, the interest rate or dividend yield is supposed to be set through an auction (commonly referred to as a "Dutch" auction) in which bids with successively higher rates are accepted until all of the securities in the auction are sold.

---

[1]    Between auctions, investors might be able to buy or sell ARS in the secondary market at prices greater than, equal to, or less than par.

29.    Typically, investors can only submit the following types of orders: 1) a "hold" order, which is the default order for current investors (i.e., the order that is entered for a current holder if the holder takes no action), where a current investor will keep the securities at the rate at which the auction clears; 2) a "hold-at-rate" bid, where a current investor will only keep the securities if the clearing rate is at or above the specified rate; 3) a "sell" order, where a current investor will sell the securities regardless of the clearing rate; or 4) a "buy" bid, where a prospective investor, or a current investor who wants more securities, will buy securities if the clearing rate is at or above the specified rate.

30.    Disclosure documents often state that an investor's order is an irrevocable offer. The final rate at which all of the securities are sold is the "clearing rate" that applies to all of the securities in the auction until the next auction. Bids with the lowest rate and then successively higher rates are accepted until all of the sell orders are filled. The clearing rate is the lowest rate bid sufficient to cover all of the securities for sale in the auction.[2]

31.    If there are not enough bids to cover the securities for sale, then the auction fails, the issuer pays an above-market rate set by a pre-determined formula described in the disclosure documents, and all of the current holders continue to hold the securities, with minor exceptions. If all of the current holders of the security elect to hold their positions without bidding a particular rate, then the clearing rate is the all-hold rate, a below-market rate set by a formula described in the disclosure documents.

---

[2]    For example, suppose $100,000 of securities were for sale and the auction received four buy bids. Bid A was for $50,000 at 1.10%, Bid B was for $50,000 at 1.15%, Bid C was for $50,000 at 1.15%, and Bid D was for $25,000 at 1.20%. Under these circumstances, the "clearing rate" would be 1.15%, meaning all of the securities in the auction would pay interest at a rate of 1.15% until the next auction. Bid A would be allocated $50,000, Bids B and C would receive pro-rata allocations ($25,000 each), and Bid D would receive no allocation.

This is how a true Dutch auction is supposed to operate, and this is how the auction process is described to investors in offering documents. However, as described below, the actual auction process employed by UBS bore little resemblance to a true Dutch auction.

**Broker-Dealers' Role in Auctions**

32.    The issuer of each security selects one or more broker-dealers to underwrite the offering and/or manage the auction process. Investors can only submit orders through the selected broker-dealers. During the Class Period, UBS was a broker-dealer in the ARS market.

33.    The issuer pays an annualized fee to each broker-dealer, such as UBS, engaged to manage an auction. The fee is typically 25 basis points (i.e., .25% of 1%) for the par value of the securities that it manages.

34.    The issuer also selects an auction agent to collect the orders and determine the clearing rate for the auction. Investors must submit orders for an auction to the broker-dealer by a specified time. Many broker-dealers have an internal deadline by which investors must submit their orders to them.

35.    This internal deadline allows the broker-dealer sufficient time to process and submit the orders to the auction agent. Other broker-dealers allow investors to submit orders up until the submission deadline, i.e., the deadline for broker-dealers to submit orders to the auction agent. The broker-dealers must submit the orders to the auction agent before the submission deadline, and usually must identify each separate order.

**Auction Agents' Role in Auctions**

36.    After receiving the orders from the broker-dealers, the auction agent calculates the clearing rate that will apply until the next auction. In practice, however, if there is only one broker-dealer, as in the case of many of the auctions managed by UBS, the broker-dealer can discern the clearing rate before submitting the orders to the auction agent.

37.    The auction agent allocates the securities to the broker-dealers based on the orders they submitted. The auction procedures generally state that orders are filled in the following order: hold orders, hold-at-rate and buy bids with a rate below the clearing

8

rate, hold-at-rate orders with a rate at the clearing rate, and buy bids with a rate at the clearing rate.

38.    When there are more bids for securities at the clearing rate than securities remaining for sale, the securities are allocated on a pro rata basis first to the hold-at-rate bidders and then to the buy bidders.  Generally, the auction procedures require broker-dealers to follow the same hierarchy in allocating the securities to their customers.

**SEC Finds Bid-Rigging of ARS Auctions by Broker-Dealers**

39.    From 1984 to 2006, the ARS market had grown to more than $200 billion and the fees collected by the 20 or so broker-dealers running this market exceeded $600 million per year.

40.    In order to keep this gravy train operating, it was of utmost importance for broker-dealers to portray the ARS market as extremely liquid because the primary target market for these securities were investors with short-term investment goals or money-market needs.

41.    Any hint that the auction market for ARS was anything but robustly liquid would send investors running for the exits. Thus, a failed auction, or even a rumor of one, was a marketing stigma that UBS could not tolerate.

42.    However, the ARS auctions were not nearly liquid enough to support the billions of dollars in ARS that UBS and other broker-dealers were pumping out to investors on a daily basis.

43.    In order to conceal the inherent illiquidity of the auction market – which would be a death-knell to the industry – certain broker-dealers agreed to engage in various practices they termed "stabilization."  In reality, however, the conduct was nothing short of market-manipulation designed to mask an auction market that lacked sufficient demand.

44.    In an Administrative Proceeding dated May 31, 2006, the SEC found that certain broker-dealers engaged in various illegal practices in order to make it appear that

the auctions were successful and legitimate when, in fact, they were not.

45.    Broker-dealers were found to routinely take over customers' bid orders by filling in the blanks on open or market orders after viewing other bidders' orders. This practice favored certain customers over others and allowed the broker-dealers to easily manipulate the auction price.

46.    Broker-dealers bid for their own accounts without disclosing this to clients or asked their customers to change orders in order to:

   i.    prevent failed auctions, thereby supporting the "no failed auction" marketing claim; and

   ii.   set artificial "market" rates, at levels chosen by broker-dealers themselves.

47.    The SEC found rearranging bids through "netting" of in-house buy-and-sell orders ahead of actual auctions in order to change the priority of bids. Before submitting bids to the auction agent, broker-dealers changed or "prioritized" their customers' bids to increase the likelihood that the bids would be filled. As a result of this prioritization and a similar practice known as "cross-trading," certain bids were moved up in the disclosed hierarchy by which different types of bids would be filled.[3] In certain instances, these practices resulted in certain investors' bids displacing other investors' bids when the auction was oversubscribed, affected the clearing rate, and did not conform to disclosed procedures.

48.    The SEC also found rampant submission or revision of bids after deadlines. As described above, most auctions had an internal deadline that broker-dealers

---

[3]    One example of prioritization occurred when certain broker-dealers received a sell order from one customer and a buy order from another customer in the same auction. Rather than submitting each order to the auction agent as required by the disclosure documents, broker-dealers instead netted those orders before submitting them to the auction agent. Cross-trading occurred when certain broker-dealers actually transferred securities from a customer that wanted to sell to a customer that wanted to buy, rather than submitting the bids in the auction. Pursuant to both practices, these customers that wanted to buy securities were considered to be existing holders so that their orders had a higher priority in the auction than other new customers' bids for securities. None of these procedures were consistent with the description of the auction process found in the various prospectuses for the ARS marketed by UBS.

set for investors to submit bids to the broker-dealers and a formal submission deadline set by the offering documents for broker-dealers to submit bids to the auction agent. Broker-dealers allowed certain investors to submit or revise bids after these deadlines. In addition, the broker-dealers themselves submitted or revised bids after these deadlines. These practices advantaged investors or the broker-dealers who bid after a deadline by displacing other investors' bids, affected the clearing rate, and did not conform to disclosed procedures.

49.    The SEC also found that broker-dealers collaborated with certain customers by asking them to bid at auctions and then compensating them with higher-than-clearing rates in the secondary market. For example, pursuant to an express or tacit understanding reached prior to or during an auction: (1) certain broker-dealers provided a higher return by having the investor submit its bid at a lower rate than the investor actually wanted to receive, allowing the auction to clear at the lower rate, buying the securities from the investor after the auction, and then selling the securities back to the investor at below par value; (2) certain broker-dealers simply displaced an investor's bid and then compensated the investor by selling securities to the investor at below par value in the secondary market; and (3) certain broker-dealers provided a higher return by delaying the settlement date for certain investors.

50.    Finally, the SEC found that certain broker-dealers provided different "price talks"[4] to different customers, placing certain customers at an advantage over others.

51.    The SEC's findings demonstrated that the ARS auctions were often auctions in name only and allowed broker-dealers and/or their preferred customers to earn the best interest rates and manipulate the ARS market.

52.    The 15 broker-dealers were fined $13 million, censured by the SEC and ordered to "cease and desist" from these practices in the future.

---

[4]    Price talk is a broker-dealer's estimate of the likely range within which an auction will clear.

53.    The fines and SEC investigations not withstanding, the broker-dealers were not prepared abandon their abusive practices and to allow a failed, or even a potentially failed, auction.

54.    Throughout the Class Period, the broker-dealers continued to engage in various practices to artificially bolster the auction markets without fully disclosing their conduct to the investing public.

**The Auction Market Starts to Unravel**

55.    In 2007, a credit crisis of unprecedented proportion swept across the United Stated that continues to roil the financial markets to this day.

56.    By mid 2007, banks stopped financing private equity deals, the prices of U.S. residential real estate went into a steep decline, and the mortgage market for sub-prime borrowers essentially shut down.    The collapse of the credit markets forced financial institutions to report more than $50 billion in losses and write-downs and began infecting the ARS market.

57.    UBS struggled to maintain the illusion of a healthy and liquid auction market despite the fact that demand of ARS by its corporate and institutional clients essentially dried up. This shift was driven, in large part, by a March 2007 decision by the Financial Accounting Standards Board ("FASB") requiring ARS to be listed on balance sheets as "short-term investments" rather than under the heading of "cash equivalents."

58.    Corporations responded to this by moving out of ARS so that their balance sheet cash positions would not be reduced as a result of the FASB decision.    This meant that many corporations no longer wanted to buy ARS.    As corporate demand for ARS waned, UBS had to maintain more ARS inventory on its books.

59.    Rather than disclose the weakening demand for ARS in the auctions during the Class Period, UBS continued to intensely market ARS to its customers as a liquid cash alternative, and, indeed, represented such securities as "cash equivalents" in monthly account statements sent to customers.

60.     By the middle of 2007, legitimate demand for ARS virtually disappeared. However, broker-dealers continued to manipulate the ARS auctions and to disseminate information that did not reflect the actual supply-and-demand dynamics of the ARS market in order to maintain an aura of legitimacy and liquidity for these ARS.

61.     UBS engaged in this conduct, among other reasons, in order to unload the millions of dollars in ARS it had in inventory. The only way UBS could accomplish this was by deceiving investors into believing that the ARS market was liquid, when in reality, it was not.

62.     By August 16, 2007, several monthly auctions failed amid the turmoil in the credit markets. Investors did not show to bid in auctions during August for about 60 auctions worth $6 billion of ARS. Also, some credit rating agencies were advising that "they would not be surprised to see further failed auctions in the days or weeks ahead."

63.     Thereafter, auctions began failing with some regularity, and those that did succeed, would have failed but for the broker-dealers' intervention. The broker-dealers, continued to intervene in order to prop-up the auction market by bidding with knowledge of other bids, submitting bids after the internal bidding deadline imposed on investors, and by directly or indirectly influencing or setting the clearing rates with considerable frequency.

64.     Although UBS was aware that there was no legitimate auction demand for ARS, it still marketed and sold ARS as a liquid cash alternative.

65.     After unloading as many ARS from its balance sheet unto unsuspecting investors, on or about February 13, 2008, UBS stopped supporting the auctions and simply walked away from the ARS market.

66.     On February 13, 2008, 87% of the auctions for ARS failed when UBS and other broker-dealers pulled the plug on the ARS market. As a result, thousands of investors holding millions of dollars of ARS purchased from UBS are now left with illiquid ARS. ARS holders have no prospect of ever selling their securities by means of

an auction market that has been exposed as artificial and manipulated by the broker-dealers running the market. Class members' only prospect is to try to sell their illiquid ARS at a steep discount to par value.

67.     Accordingly, Plaintiff seeks injunctive relief to compel UBS to rescind billions of dollars in ARS transactions sold to customers during the Class Period and to recover compensatory and  punitive damages on behalf of the Class who have suffered and continue to suffer damages as a result of UBS' deceptive conduct.

### ADDITIONAL SCIENTER ALLEGATIONS

68.     The Defendants have acted with scienter in that they knew that the statements issued or disseminated about ARS were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the ARS market, their control over and/or their associations with the ARS market which made them privy to confidential proprietary information concerning the ARS market, participated in the fraudulent scheme alleged herein.

69.     Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described could not have been perpetrated over a substantial period of time, as described herein, without the knowledge and complicity of the personnel at the highest levels of UBS. Defendants were motivated to materially misrepresent the true nature of the ARS auction market in order to: (i) attract new investors who would only invest in ARS if they believed a highly liquid auction market existed; (ii) unload ARS in their inventory to unsuspecting investors who believed they were purchasing a liquid investment; and (iii) continue collecting substantial fees of

approximately 25 basis points per year for managing the ARS auctions on behalf of issuers.

### THE SAFE HARBOR PROVISION IS INAPPLICABLE

70.　　The statutory safe harbor under the Private Securities Litigation Reform Act of 1995, which applies to forward-looking statements under certain circumstances, does not apply to any of the allegedly false statements pleaded in this complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

71.　　Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Defendants who knew that those statements were false, misleading, or omitted necessary information when they were made.

### LOSS CAUSATION / ECONOMIC LOSS

72.　　During the Class Period, as detailed herein, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the value and liquidity of ARS and operated as a fraud or deceit on acquirers of ARS purchased from UBS.

73.　　As detailed above, when the true nature of the ARS auction market was revealed, the ARS held by members of the Class became illiquid and as a result declined

in value. This decline in the liquidity and value of ARS was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing of the illiquidity in ARS and magnitude of the price decline negates any inference that the loss suffered by Plaintiff and other members of the Class was cause by changed market conditions, macroeconomic or industry factors or other facts unrelated to the Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by the Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the ARS price by manipulating the auction markets and the subsequent significant decline in the liquidity and value of ARS sold by Defendants' after their prior misrepresentations and other fraudulent conduct was revealed.

74.    At all times relevant, the Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiff and other Class members. These statements were materially false and misleading because they failed to disclose a true and accurate picture of the ARS auction market as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and made omissions of material facts, causing the market price of ARS to be artificially inflated. Plaintiff and other Class members purchased ARS at these artificially inflated prices and were damaged thereby.

**COUNT I**
**Violations of §10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

75.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

76.    This Count is alleged against all of the Defendants and is based upon Section 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder.

77.    During the Class Period, Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly

engaged in acts, transactions, practices, and course of business which operated as fraud and deceit upon Plaintiff and the other members of the Class, and failed to disclose material information in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class. The purpose and effect of said scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase ARS during the Class Period at artificially inflated prices and under false pretenses that the market for ARS was liquid and robust.

78.     As a result of the failure to disclose material facts, the information Defendants disseminated to the investing public was materially false and misleading as set forth above, and the market price and liquidity of ARS was artificially inflated during the Class Period.

79.     In ignorance of the duty to disclose the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by the Defendants, Plaintiff and other members of the Class relied, to their detriment, on the integrity of the market price and liquidity of the auction market when purchasing ARS from Defendants. Had Plaintiff and the other members of the Class known the truth, they would not have purchased said securities or would not have purchased them at the inflated prices that were paid.

80.     Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs herein alleged in an amount to be proved at trial.

81.     By reason of the foregoing, Defendants directly violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) failed to disclose material information; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their purchases of ARS during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against Defendant UBS AG)**

82.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.    Defendant UBS AG acted as a control person of Defendants UBS Securities and UBS Financial Services Inc. within the meaning of Section 20(a) of the Exchange Act as alleged herein.

84.    By virtue of its 100% ownership of UBS Securities and UBS Financial Services Inc., UBS AG had the power to influence and control and did influence and control, directly or indirectly, the decision-making by its subsidiaries, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. UBS AG was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

85.    As set forth above, UBS Securities and UBS Financial Services Inc. have violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint. By virtue of its position as a controlling person, UBS AG is liable pursuant to Section 20(a) of the Exchange Act.

**WHEREFORE**, Plaintiff, on his own behalf and on behalf of the Class, prays for judgment as follows:

(a)    Determining that this action to be a proper class action and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure;

b)    Awarding compensatory damages in favor of Plaintiff and the other members of the Class against the Defendants for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

(c)     Awarding Plaintiff the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiff's attorneys and experts;

(d)     Granting extraordinary equitable and/or injunctive relief as permitted by law, equity and federal and state statutory provisions sued on hereunder; and

(e)     Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: March 26, 2008                    **LEVI & KORSINSKY, LLP**

By: _Eduard Korsinsky_
Eduard Korsinsky (EK 8989)
Joseph E. Levi (JL 0848)
Juan E. Monteverde (JM 8169)
39 Broadway, Suite 1601
New York, NY 10006
Telephone:  212/363-7500
Fax:        212/363-7171

*Counsel for Plaintiff*

## CERTIFICATION

I, Ricardo L. Sanchez, MD, state:

1.      I have reviewed this Complaint from Levi & Korsinsky, LLP and authorized its filing.

2.      Further, I am willing to serve as a representative on behalf of the Class.

3.      I did not purchase any of the securities described below at paragraph 4 for the purpose of participating in this litigation.

4.      Below is the amount of securities that are the subject of this litigation that I have bought and sold during the Class Period described in the Complaint:

| Security Name | Amount |
| --- | --- |
| Cohen & Steers REIT and Utility Income Realty Fund | $550,000.00 |

5.      I have not served as a representative party on behalf of a class under the federal security laws during the last three (3) years, except if detailed below.

6.      I have not received, been promised or offered, and will not accept, any form of compensation, directly or indirectly, for prosecuting or serving as a representative party in this class action, except for (i) such damages or other relief as the Court may award to me as my pro rata share of any recovery or judgment; (ii) such fees, costs or other payments as the Court expressly approves to be paid to or on behalf of me; or (iii) reimbursement, paid by my attorneys, of actual or reasonable out-of-pocket expenditures incurred directly in connection with the prosecution of this action.

I declare under penalty of perjury that the aforementioned is true and correct.

Dated: March 24, 2008

Ricardo Sanchez MD

# EXHIBIT C

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RANDOLPH BONNIST, Individually and On Behalf of All Others Similarly Situated, ) ) ) | |
| ) | Civil Action No. _____ |
| Plaintiff, ) | |
| ) | CLASS ACTION COMPLAINT |
| v. ) | FOR VIOLATIONS OF FEDERAL |
| ) | SECURITIES LAWS |
| UBS AG, UBS SECURITIES LLC and ) | |
| UBS FINANCIAL SERVICES INC., ) | **JURY TRIAL DEMANDED** |
| ) | |
| ) | |
| Defendants. ) | |

**INTRODUCTION**

Plaintiff, individually and on behalf of all other persons similarly situated, hereby alleges the following upon personal knowledge as to himself and upon information and belief as to all other matters based upon the investigation of his attorneys, which included, *inter alia*, a review of the publicly available documents, press releases, regulatory filings with the United States Securities and Exchange Commission ("SEC"), securities analysts' reports, and interviews with purchasers of ARS. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.    Plaintiff brings this action as a class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities who purchased and continue to hold auction rate securities ("ARS") offered for sale by Defendants between May 8, 2003 and February 13, 2008, inclusive (the "Class Period").

2.      Defendants represented to investors that ARS were "cash equivalents" or better than money market funds, and that these securities were highly liquid and for short-term investing. Defendants also represented that ARS were suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

3.      Defendants knew, but failed to disclose to investors, material facts about ARS. In particular, Defendants knew, but failed to disclose that these ARS were not cash alternatives, but were instead, complex, long-term financial instruments with 30-year maturity dates, or longer. Defendants knew, but failed to disclose that ARS were only liquid at the time of sale because Defendants were artificially supporting and manipulating the auction market to maintain the appearance of liquidity and stability. Defendants knew, but failed to disclose that ARS would become illiquid as soon as Defendants stopped maintaining the auction market.

4.      Defendants also knew that the statements issued or disseminated about ARS were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated in or acquiesced to the issuance or dissemination of such statements or documents as primary violations or the federal securities laws. As set forth herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding the ARS market, their control over and/or their associations with the ARS market which made them privy to confidential proprietary information concerning the ARS market, participated in the fraudulent scheme alleged herein.

5.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described could not have been perpetrated over a substantial period of time, as described herein, without the knowledge and complicity of senior UBS executives. Defendants were motivated to materially misrepresent the true nature of the ARS auction market in order to: (i) attract new investors who would only invest in ARS if they believed a highly liquid auction market existed; (ii) unload ARS in their inventory to unsuspecting investors who believed they were purchasing a liquid investment; and (iii) continue collecting substantial fees for managing the ARS auctions on behalf of issuers.

6.    On February 13, 2008, 87% of all auctions of ARS failed when Defendants and all other major broker-dealers refused to continue to support the auctions. As a result of the withdrawal of support by all of the major broker-dealers, the market for ARS collapsed, leaving the holders of more than $300 billion in ARS with no means of liquidating investments Defendants offered and sold as a suitable alternative to money market funds and other short term cash management vehicles.

## JURISDICTION AND VENUE

7.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5).

8.    Venue is proper in this District pursuant to Section 27 of the Exchange Act

and 28 U.S.C. §1391(b), §1337. Defendants maintain their principal places of business within this District and many of the acts giving rise to the violations complained of herein took place in this District.

9.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

10.     Plaintiff Randolph Bonnist is an individual investor residing in Fairfield County, Connecticut. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff purchased ARS underwritten and sold by UBS during the Class Period and continued to hold such auction securities as of February 13, 2008.

11.     Defendant UBS AG is a Swiss corporation, with its principal executive offices at Bahnhofstrasse 45, 8021 Zurich, Switzerland and its principal U.S. offices at 299 Park Avenue, New York, New York. UBS AG is one of the world's leading financial firms and does business in the United States through its subsidiaries UBS Securities LLC and UBS Financial Services Inc.

12.     Defendant UBS Securities LLC ("UBS Securities") is a Delaware corporation with its principal executive offices located at 677 Washington Boulevard, Stamford, Connecticut. UBS Securities is a wholly-owned subsidiary of UBS AG, is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange ("NYSE") and the Financial Industry Regulatory Authority ("FINRA").

13.    Defendant UBS Financial Services ("UBS Financial Services") is a Delaware corporation with its principal executive offices located at 1285 Avenue of the Americas, New York, New York. UBS Financial Services is a wholly-owned subsidiary of UBS AG, is registered with the SEC as a broker-dealer and investment adviser pursuant to the Exchange Act and the Investment Advisers Act of 1940, and offers investment advisory and brokerage services to UBS clients.

14.    In this Complaint, the three UBS Defendants are referred to collectively as "UBS," unless specifically noted.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

15.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons and entities who purchased ARS from UBS between May 8, 2003 and February 13, 2008, inclusive, and continued to hold such ARS as of February 13, 2008 (the "Class"). Excluded from the Class are Defendants, the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any Defendant has or had a controlling interest.

16.    The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable. The market for ARS, while it existed, was estimated to exceed $350 billion in the United States and UBS is one of the largest broker-dealers of ARS while the market for such securities existed. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be

identified from records maintained by Defendants and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public during the Class Period misrepresented or omitted material facts about the liquidity of and risks associated with ARS and the market for such securities; and

(c)     The extent to which members of the Class have sustained damages and the proper measure of such damages.

18.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

19.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively

56096.1                                          6

small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

21.    In the alternative, the Class may be certified under the provisions of Fed. R. Civ. P. 23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by the individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members which would establish incompatible standards of conduct for Defendants; (b) the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## FACTS

22.    The term "auction rate security" typically refers to either municipal or corporate debt securities or preferred stocks which pay interest at rates set at periodic "auctions." ARS generally have long-term maturities, typically 30 years, and in the case of preferred stocks, no maturity date.

23.    ARS were first introduced in the 1980s. Since then, the market for ARS grew dramatically and the current estimated value of ARS in existence (prior to the collapse of the auction market) is approximately $350 billion.

24.    Investments in ARS were initially limited to institutional investors, with

required minimums of $250,000.  In recent years, however, issuers and sellers of ARS have lowered the minimum amount invested to $25,000, in an effort to market ARS as widely as possible to the general public.

25.    ARS were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction. The method for auctioning the securities was described in the prospectus of the fund through which they were offered, though the formula was substantially similar for all securities offered as ARS.

26.    The number of days between each auction was set by the prospectus. Generally, the auctions were held every 7, 28, or 35 days, with interest paid at the end of the auction period.

27.    The auction itself was of the type commonly referred to as a "Dutch" auction, *i.e.,* one where the price was initially set at a presumably economically unattractive level and then made more attractive to purchasers throughout the course of the auction. For ARS, bids with successively higher rates were offered until all of the securities at the auction were sold.

28.    At the end of the auction, the rate at which all of the securities were sold was set uniformly and was called the "clearing rate." The clearing rate was determined by finding the lowest rate bid which was sufficient to cover all of the securities for sale in the auction.  If several bidders had bids at the clearing rate, and there were more bids than shares, the shares were divided pro-rata between the clearing rate bidders. The auction agent, at the end of the auction, allocated the shares per the formula.  If all of the current holders decided to hold their securities, then the auction was an "all-hold" auction

and the rate was set at a level defined in the prospectus. This rate was generally lower than the market rate.

29.    During an auction, an investor could submit one of four different orders: (1) a Hold order to keep the shares out of the auction regardless of the new interest rate; (2) a Hold at Rate order, where if the clearance rate was below the bid to hold rate, then the securities were sold; (3) a Sell order, which was to sell the shares at the auction regardless of the clearing rate; and (4) a Bid order, to submit a bid to buy at a new position at a specified minimum interest rate. Since there was no preference in awarding shares to existing holders and new buyers, there was little practical difference between a Hold at Rate order and a Buy order.

30.    If there were not enough orders to purchase all the shares being sold at the auction, a failed auction occurred. In this situation, the rate was set to a "maximum rate" described by either a formula or a multiplier of a reference rate, such as the Bond Market Association index. Either way, the maximum rate was set out in the prospectus. If the auction failed then none of the current shareholders could sell their shares, no matter what type of order they issued. The maximum rate for many ARS, particularly those invested in corporate debt securities or preferred stocks, was relatively small, however. As a result, if the auction failed, owners unable to sell their shares would receive limited interest on their illiquid investments.

31.    The issuer of each auction rate security selected one or more broker-dealers to underwrite the offerings and to manage the auction process. Investors could only submit orders through the selected broker-dealers. The issuer paid an annualized fee to each broker-dealer engaged to manage an auction.

32. Investors were required to submit an order to the broker-dealer by a deadline set by the broker-dealer. This deadline was generally set early enough by the broker-dealer so that it had time to process and analyze the orders before having to submit the orders to the auction agent. This gave the broker-dealer enough time to determine what, if any, orders the broker-dealer wished to place for its own account.

33. Broker-dealers would often engage in a number of practices to influence the auction process, including, for example, submitting their own orders to purchase or sell shares for their own accounts. In 2004, the SEC began to investigate these manipulative practices affecting the auction market.

34. In an administrative proceeding on May 31, 2006, the SEC found that certain broker-dealers engaged in various illegal practices in order to make it appear that the ARS auctions were successful and legitimate when, in fact, they were not. As a result of this investigation, the SEC entered into a consent decree with a number of major broker-dealers which required them to disclose certain practices to investors and to stop engaging in certain other practices. The SEC consent decree noted that in many cases, the broker-dealers intervened in auctions for their own benefit rather than to maintain liquidity, as they claimed. However, the consent decree did nothing to end the practice of the broker-dealers submitting bids for their own accounts after receiving notice of what orders their customers planned to place, so long as the broker-dealers disclosed this practice to their customers.

### UBS Made Material Misrepresentions and Omissions During the Class Period Regarding the Liquidity of and Risks Associated With ARS

35. ARS were extremely profitable for UBS and for the UBS financial advisors who sold the securities. As one of the largest underwriter of ARS, UBS received significant underwriting fees from the issuers of these securities. As one of the largest broker-dealers, UBS also entered into broker-dealer agreements with the issuers

and was paid an annualized broker-dealer fee for operating the auction process for more than ARS. UBS also acted as a principal for its own account, using its access to inside information about the auction process to buy and sell ARS for its own account. Individual UBS financial advisors had a significant financial incentive to sell ARS, as they were compensated by UBS for each auction rate security sold.

36.     In order to perpetuate the auction market and sell as many ARS as possible, UBS represented to investors in its written materials and uniform sales presentations by financial advisors that ARS were the same as cash and were highly liquid, safe investments for short-term investing. Pursuant to uniform sales materials and top-down management directives, UBS financial advisors throughout the United States represented to current and potential UBS clients that the ARS sold by UBS were equivalent to cash or money market funds and were safe, highly liquid short-term investment vehicles suitable for any investor with at least $25,000 of available cash and as little as one week in which to invest.

37.     UBS failed to disclose to purchasers of ARS material facts about these securities. UBS failed to disclose that these securities were not cash alternatives, like money market funds, and were instead, complex, long-term financial instruments with 30-year maturity dates, or longer. UBS failed to disclose that the ARS it was selling were only liquid at the time of sale because UBS and other broker-dealers in the auction market were artificially supporting and manipulating the market to maintain the appearance of liquidity and stability. In fact, at all relevant times during the Class Period, the ability of holders of ARS to liquidate their positions depended on the maintenance of an artificial auction market maintained by UBS and the other broker-

dealers. When UBS and the other broker-dealers stopped artificially supporting and manipulating the auction market, the market immediately collapsed and the ARS sold by UBS became illiquid. UBS also failed to disclose that the ARS it was selling were not short-term investments, but rather long term bonds or preferred stocks with maturities sometimes exceeding 30 years. Finally, UBS failed to disclose that the short-term nature of the securities and the ability of investors to quickly convert their ARS into cash depended entirely on the perpetuation of the artificial auction market being maintained by UBS and the other broker-dealers.

38.     UBS also failed to disclose to purchasers of ARS material facts about its role in the auctions and the auction market in which these securities were traded. UBS failed to disclose that in connection with the sale of ARS, UBS simultaneously was acting on behalf of the issuer, who had an interest in paying the lowest possible interest rate, on behalf of the investor, who was seeking the highest possible return, and on its own behalf, to maximize the return to UBS on its holdings of the ARS. UBS failed to disclose that it and other broker-dealers routinely intervened in auctions for their own benefit, to set rates and prevent all-hold auctions and failed auctions. UBS failed to disclose that without this manipulation of the auction market, many auctions likely would have failed, as a result of which investors would have had the ability to determine the true risk and liquidity features of ARS. UBS continued to aggressively market ARS after it had determined that it and other broker dealers were likely to withdraw their support for the periodic auctions and that a "freeze" of the market for ARS would result.

39.     During the Class Period, UBS failed to disclose that the auctions it was conducting were not governed by arms-length transactions but instead suffered from

systemic flaws and manipulative practices, including allowing customers to place open

or market orders in auctions, intervening in auctions by bidding for UBS's proprietary

account or asking customers to make or change orders, preventing failed auctions and all-

hold auctions to set the market rate, submitting or changing orders after auction

deadlines, not requiring customers to purchase partially-filled irrevocable orders,

providing certain customers with higher returns than the auction clearing rate, and

providing inside information about the auction process to certain customers in connection

with the auction bidding.

### The ARS Market Collapses

40.     In the summer of 2007, some auctions for ARS backed by sub-prime debt

began to fail, but these securities represented only 2-6% of the entire ARS market.  In the

fall-winter of 2007, more auctions began to fail.  Even though some of the auctions that

failed initially were conducted by UBS, it continued to encourage investors to purchase

ARS and continued to represent to investors that these securities were the same as cash

or money markets and were highly liquid, safe investments for short-term investing,

without any disclosure of the risks associated with the securities.

41.     On February 13, 2008, 87% of all auctions of ARS failed when all of the

major broker-dealers, including UBS, refused to continue to support the auctions.

42.     The next day, UBS, the second largest underwriter of ARS, disclosed that

it would no longer support the auction market.  Virtually every other major broker-

dealer, including Merrill Lynch, Goldman Sachs, Lehman Brothers and Citigroup,

among others, also decided on or about that same time to withdraw their support of the

auction market.  As a result of the withdrawal of support by all of the major broker-

dealers, the market for ARS has collapsed, rendering more than $300 billion of outstanding securities illiquid.

43.    The market for ARS sold by UBS was open, well-developed and efficient at all relevant times until the truth emerged and the auction market collapsed.  As a result of the materially false and misleading statements and failures to disclose, ARS sold by UBS traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased and continued to hold ARS sold by UBS relying upon the integrity of the auction market and the market price of those securities, and have been damaged thereby.

44.    During the Class Period, Defendants materially misled the investing public, thereby allowing the auction market to continue and inflating the price of ARS sold by UBS by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Defendants' statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the auction market and the ARS sold by UBS, as alleged herein.

45.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the auction market and the ARS sold by UBS.  These material misstatements and omissions had the cause and effect of

perpetuating the auction market and creating in that market an unrealistically positive

assessment of the ARS sold by UBS, thus causing those securities to be overvalued and

artificially inflated at all relevant times. Defendants' materially false and misleading

statements during the Class Period resulted in Plaintiff and other members of the Class

purchasing and continuing to hold ARS sold by UBS at artificially inflated prices, thus

causing the damages complained of herein.

## SAFE HARBOR ALLEGATIONS

46.     The statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in

this complaint. The statements pleaded herein were not identified as "forward-looking

statements" when made. To the extent there were any forward-looking statements, there

were no meaningful cautionary statements identifying important factors that could cause

actual results to differ materially from those in the purportedly forward-looking

statements. Alternatively, to the extent that the statutory safe harbor does apply to any

forward-looking statements pleaded herein, Defendants are liable for those false forward-

looking statements because at the time each of those forward-looking statements was

made, the particular speaker knew that the particular forward-looking statement was

false, and/or the forward-looking statement was authorized and/or approved by an

executive officer of UBS who knew that those statements were false when made.

## LOSS CAUSATION/ECONOMIC LOSS

47.     During the Class Period, as detailed herein, Defendants engaged in a

scheme and course of conduct to create a market for and artificially inflate the price of

ARS sold by UBS that operated as a fraud or deceit on purchasers of ARS sold by UBS

by misrepresenting the liquidity of and risks associated with such securities. Defendants

achieved this by making false and misleading statements about the auction market and

the ARS sold by UBS. When UBS's prior misrepresentations and omissions were

disclosed and became apparent to the investing public, the market for ARS collapsed and

the ARS sold by UBS have become illiquid. As a result of their purchases of ARS from

UBS during the Class Period, Plaintiff and other members of the Class suffered

economic loss, *i.e.*, damages under the federal securities laws in that the securities have

substantially less value than that represented by Defendants.

48.    The collapse of the ARS market at the end of the Class Period was a direct

result of Defendants' unilateral decision to no longer artificially support the ARS market

and the nature and extent of Defendants' fraud finally being revealed to investors.

## COUNT I

### Violation Of Section 10(b) Of The Exchange Act
### Against All Defendants

49.    Plaintiff repeats and realleges each and every allegation set forth in the

paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on

behalf of itself and the Class.

50.    During the Class Period, Defendants carried out a plan, scheme and

course of conduct which was intended to and, throughout the Class Period, did: (i)

deceive the investing public, including Plaintiff and other Class members, as alleged

herein; (ii) enable Defendants to sell millions of dollars of ARS to current and

prospective UBS clients, and on which UBS made substantial commissions; and (iii)

cause Plaintiff and other members of the Class to purchase ARS from UBS at

artificially inflated prices. In furtherance of this unlawful scheme, plan and course of

56096.1                                    16

conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

51.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of ARS from UBS in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

52.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the ARS sold by UBS, as specified herein.

53.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the ARS sold by UBS were the same as cash and were highly liquid, safe short-term investment vehicles suitable for almost all investors, which included the making of, or the participation in the making of, untrue statements. of material facts and omitting to state material facts necessary in order to make the statements made about the ARS in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which

17

operated as a fraud and deceit upon the purchasers of ARS from UBS during the Class
Period.

54.    The Defendants had actual knowledge of the misrepresentations and
omissions of material facts set forth herein, or acted with deliberate disregard for the truth
in that they failed to ascertain and to disclose such facts. Such Defendants' material
misrepresentations and/or omissions were done knowingly or deliberately and for the
purpose and effect of concealing the truth about the liquidity of and risks associated with
ARS from the investing public and supporting the artificially inflated price and market for
these securities. If Defendants did not have actual knowledge of the misrepresentations
and omissions alleged, they were deliberate in failing to obtain such knowledge by
deliberately refraining from taking those steps necessary to discover whether those
statements were false or misleading.

55.    As a result of the dissemination of the materially false and misleading
information and failure to disclose material facts, as set forth above, the market and
market price of the ARS sold by UBS was artificially inflated during the Class Period. In
ignorance of the fact that the market prices of ARS were artificially inflated, and relying
directly or indirectly on the false and misleading statements made by Defendants, or
upon the integrity of the auction market in which the ARS were traded, and/or on the
absence of material adverse information that was known to or deliberately disregarded by
Defendants but not disclosed in public statements by Defendants during the Class Period,
Plaintiff and the other members of the Class acquired and continued to hold ARS sold by
UBS during the Class Period at artificially high prices and were damaged thereby.

56.    At the time of said misrepresentations and omissions, Plaintiff and other

18

members of the Class were ignorant of their falsity, and believed them to be true. Had

Plaintiff and the other members of the Class and the marketplace known the truth

regarding the liquidity of and risks associated with the ARS sold by UBS, which were not

disclosed by Defendants, Plaintiff and other members of the Class would not have

purchased and continued to hold their ARS, or, if they had acquired such securities during

the Class Period, they would not have done so at the artificially inflated prices which

they paid.

57.     By virtue of the foregoing, Defendants have violated Section 10(b) of the

Exchange Act, and Rule 10b-5 promulgated thereunder.

58.     As a direct and proximate result of Defendants' wrongful conduct,

Plaintiff and the other members of the Class suffered damages in connection with their

respective purchases of ARS sold by UBS during the Class Period.

## COUNT II

### Violation Of Section 20(a) Of The Exchange Act
### Against Defendant UBS AG

59.     Plaintiff repeats and realleges each and every allegation set forth in the

paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf

of themselves and the Class.

60.     Defendant UBS AG acted as a control person of Defendants UBS

Securities and UBS Financial Services within the meaning of Section 20(a) of the

Exchange Act as alleged herein. By virtue of its 100% ownership of Defendants UBS

Securities and UBS Financial Services, UBS AG had the power to influence and control

and did influence and control, directly or indirectly, the decision-making by UBS

Securities and UBS Financial Services including the content and dissemination of the

various statements which Plaintiff contend are false and misleading. UBS AG was provided with or had unlimited access to copies of the reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61. As set forth above, UBS Securities and UBS Financial Services violated Section 10(b) and Rule 10b-5 by its acts and omissions as alleged in this complaint. By virtue of its position as a controlling person, UBS AG is liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchase and retention of ARS from UBS AG during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D. Awarding extraordinary, equitable and/or injunctive relief as permitted

by law, equity and the federal statutory provisions sued hereunder; and

     E.     Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: May ___, 2008         Respectfully submitted,

Joe R. Whatley, Jr.
Edith M. Kallas
Joseph P. Guglielmo
**Whatley, Drake & Kallas, LLC**
1540 Broadway, 37th Floor
New York, NY 10036
Telephone: (212) 447-7070
Facsimile: (212) 447-7077

Joseph P. Danis
Michael J. Flannery
Corey D. Sullivan
CAREY & DANIS, LLC
8235 Forsyth Blvd.
Suite 1100
St. Louis, MO  63105
Telephone: (314) 725-7700
Facsimile: (314) 721-0905

Edward M. Gergosian
GERGOSIAN & GRALEWSKI LLP
655 West Broadway
Suite 1410
San Diego, CA  92101
Telephone: (619) 237-9500
Facsimile: (619) 237-9555

A. Hoyt Rowell, III
Daniel O. Myers
T. Christopher Tuck
RICHARDSON, PATRICK, WESTBROOK &
BRICKMAN, LLC
1037 Chuck Dawley Blvd., Bldg. A

# EXHIBIT D

ORIGINAL

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————————————x
ARIC A. STREIT and MARY STREIT as )
Trustees for the benefit of the STREIT LIVING )
TRUST, Individually And On Behalf of All )
Others Similarly Situated, )
                         )
                  Plaintiffs, )
                         )
v. )
                         )
UBS AG, UBS SECURITIES LLC and UBS )
FINANCIAL SERVICES, INC., )
                         )
                  Defendants. )
———————————————————x

CIVIL ACTION NO. 08 CIV. 5251

**CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF**
**FEDERAL SECURITIES LAWS**

**JURY TRIAL DEMANDED**

1.     Plaintiffs Aric A. Streit and Mary Streit as Trustees for the benefit of the Streit Living Trust (the "Plaintiffs") make the following allegations, except as to allegations specifically pertaining to Plaintiffs and their counsel, based upon the investigation undertaken by Plaintiffs' counsel, which included review and analysis of, among other things, filings with the Securities and Exchange Commission ("SEC"), regulatory filings and reports, interviews with purchasers of auction rate securities and former UBS employees, news releases and media reports. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.     This is a federal securities class action brought on behalf of the Plaintiffs and all other similarly situated persons or entities who purchased one or more auction rate securities ("ARS") offered for sale by UBS AG, UBS Securities LLC and UBS Financial Services, Inc. (collectively, "Defendants" or "UBS") between June 9, 2003, and February 13, 2008 (the "Class"), and who continued to hold said securities as of February 13, 2003, inclusive (the "Class

Period"). This action is brought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as well as the Investment Advisors Act, 15 U.S.C. § 80b-1 *et seq.*

3.      Auction rate securities are municipal bonds, corporate bonds or preferred stocks with interest rate or dividend yield components that are periodically reset through "auctions," typically every 7, 14, 28, or 35 days, as determined by the prospectus for the security, with interest paid at the end of the auction period. ARS usually have intermediate to long-term maturities, typically 20 to 30 years, or, in the case of preferred stocks, no maturity date. Prior to the collapse of the market in February 2008, ARS generally traded at par and were callable at par on any interest payment date at the option of the issuer. After a successful auction, new purchasers and continuing holders would receive the rate determined at auction, and sellers, who had been receiving interest payments, got back the face value of their investment. At the end of the Class Period, the market for ARS reached an aggregate value of approximately $330 billion.

4.      The growth of the ARS market is attributable in part to Defendants' portrayal of ARS as cash equivalents (such as CDs and money market funds) suitable for risk-averse investors seeking liquidity and preservation of principal. These representations were, in fact, materially false and misleading. Defendants omitted to disclose to Class members that they were artificially maintaining the market for ARS by serving as buyers of last resort to ensure that auctions were continuously successful and, without such participation, Class members faced the risk of illiquidity and loss of principal. Class members reasonably relied on Defendants' material misstatements in purchasing ARS and were damaged thereby.

5.      Throughout the Class Period, Defendants knew, but did not disclose, that if they ceased maintaining the ARS market by purchasing ARS for their own accounts, there was a risk that auctions would fail due to the lack of willing buyers. Defendants knew that there was an

2

undisclosed risk that Class members would be locked into illiquid ARS holdings and suffer a loss of their principal given the inability to trade the securities for cash. In addition, throughout the Class Period, Class members should have received higher rates of return on their ARS holdings to fairly compensate them for the investment risks.

6.    As fiduciaries to Class members, Defendants owed a duty to disclose all material facts in connection with the sale of ARS and were required to adhere to the highest professional standards in recommending and selling the securities to Class members. They violated this duty by failing to disclose that the purported cash equivalency of ARS was totally dependent on UBS' and other broker/dealers' voluntarily serving as buyers of last resort at the auctions, the continuation of which activity was highly uncertain.

7.    Defendants acted intentionally or with reckless disregard for the truth in engaging in the wrongdoing described herein. Plaintiffs are informed and believe that Defendants were aware in 2005 that the "Big Four" accounting firms were advising corporate clients to cease characterizing ARS as cash equivalents on their balance sheets because of the illiquidity risk and were so advised by their own accountant, Ernst & Young, Ltd. Additionally, plaintiffs are informed and believe that Defendants knew in or before May 2006 that the SEC investigated and sanctioned fifteen other banks and broker-dealers for misconduct similar to that alleged herein, including, among other things, failing to disclose to customers their intervention in auctions to prevent the auctions from failing. Defendants knew of these developments as a result of their status as one of the largest banks and broker-dealers in the world, their participation in industry groups such as the Securities Industry and Financial Markets Association and through their accountants and auditors, among other sources.

8.      In contrast, Class members only began to learn the truth about the ARS market

on February 13, 2008 when Defendants and other banks and broker-dealers stopped actively

intervening in auctions and purchasing ARS for their own accounts to prevent auctions from

failing. As a result, nearly *ninety percent* of all ARS auctions failed, stranding more than $300

billion in ARS for which there was no longer a market. The effect on Class members was in

many cases devastating, and especially harsh on those who needed their purportedly liquid ARS

for ready cash to satisfy such needs as medical expenses, tax bills, home mortgages and other

pressing obligations.

9.      Not surprisingly, the recognized value of ARS plummeted with the collapse of the

ARS market. On May 6, 2008, UBS AG filed a Form 6-K with the SEC, in which it stated that:

> In first quarter 2008, as a result of the general deterioration of
> credit markets and exacerbated by concerns about the financial
> status of monoline insurers, the markets for ARCs [auction rate
> certificates] and VRDOs [variable rate demand obligations] -
> particularly those ARCs backed by student loans - were severely
> disrupted, resulting in illiquidity in the majority of student loan
> ARCs and certain VRDOs. In the early part of first quarter, UBS
> built up significant inventory through its support for these markets,
> which in the case of ARCs has since been discontinued and in the
> case of VRDOs is limited. The inventory was marked down to
> account for the market's illiquidity, resulting in a loss of USD 974
> million in first quarter 2008, mainly in ARCs.

Other brokerages and corporate ARS holders announced similar write-downs.

10.      Although Defendants sustained a loss as result of the collapse of the ARS market

they once supported and maintained, such loss is offset by the billions of dollars the Defendants

earned (and continue to earn) from purchasers and issuers of these securities. For example, UBS

and other broker-dealers are currently charging their clients fees pegged to their ARS holdings,

thus reportedly earning approximately $825 million this year alone. To add insult to injury,

Defendants are also earning interest on loans they made to Plaintiffs and other Class members

4

who have been unable to liquidate their ARS holdings for cash, but needed access to those funds. These loans are not only secured by the ARS holdings of these Class members, but also their other non-ARS assets.   As a result, these Class members are subject to additional financial risk and damage caused by Defendants' misconduct.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).   The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC") (17 C.F.R. 240.10b-5), and also the Investment Advisors Act, 15 U.S.C. § 80b-1 *et seq.*

12.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b), §1337.  Defendants maintain two places of business within this District and do substantial business herein, and many of the acts giving rise to the violations complained of herein occurred in this District.

13.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

14.    Aric A. Streit and Mary Streit are trustees and beneficiaries of the Streit Living Trust and authorized to bring this action on behalf of themselves and their Trust.  As set forth in the accompanying certification, incorporated by reference herein, Plaintiffs purchased ARS that were marketed, sold and/or underwritten by UBS during the Class Period, and have been damaged thereby.  Plaintiffs continued to hold such ARS as of February 13, 2008.

5

15.    Defendant UBS AG (the "Company") is a Swiss bank and global financial services corporation with its principal executive offices in Zurich and Basel, Switzerland. UBS AG does business and maintains offices in the United States, including two offices in New York at 299 Park Avenue, New York, NY 10171 and 1285 Avenue of the Americas, New York, NY 10019, respectively. UBS AG also does business in the United States through its wholly-owned subsidiaries UBS Securities LLC and UBS Financial Services, Inc.

16.    Defendant UBS Securities LLC ("UBS Securities") is incorporated in Delaware with its principal place of business at 677 Washington Boulevard, Stamford, CT 06901. UBS Securities is registered with the SEC as a broker-dealer pursuant to Section 15(b) of the Exchange Act and is a member of the New York Stock Exchange and the Federal Industry Regulatory Authority. UBS Securities is the investment banking division of UBS AG.

17.    Defendant UBS Financial Services, Inc. ("UBS Financial") is located at 1285 Avenue of the Americas, New York, NY 10019. UBS Financial offers individuals various financial planning and investment products. It also offers corporations services such as employee stock benefit and deferred compensation plans. UBS Financial also has access to the array of brokerage, investment banking and asset management services provided by other UBS-affiliated companies. UBS Financial is registered with the SEC as a broker-dealer and investment advisor pursuant to the Exchange Act and the Investment Advisors Act of 1940. Plaintiffs purchased ARS through UBS Financial.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

18.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23(a) and (b)(3) on behalf of a Class consisting of all persons and entities who purchased ARS from or through UBS between June 9, 2003 and February 13, 2008, inclusive and continued to hold them through the end of the Class Period. Excluded from the

Class are the Defendants herein, officers and directors of any Defendant, members of any of the Defendants' immediate families, or any of their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest.

19.    The members of the Class are so numerous that joinder of all members is impracticable. The market for ARS is estimated at approximately $330 billion in the United States. UBS was one of the largest underwriters and broker-dealers of ARS while the market for such securities existed. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at a minimum, hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Defendants and may be notified of the pendency of this action by mail using a form of notice similar to that customarily used in securities class actions.

20.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are, inter alia:

(a)    Whether Defendants' actions as alleged herein violated federal securities laws and the Investment Advisors Act;

(b)    Whether statements made by or on behalf of Defendants to the investing public during the Class Period omitted and misrepresented material facts about, among other things, the extent of the Defendants' and other broker-dealers' creation of and support for the ARS market, and the liquidity of, and true risks associated with, ARS and the market for such securities; and

7

(c)     To what extent Class members have suffered damages, and the proper measure of those damages.

21.    Plaintiffs' claims are typical of those of other Class members, as all members of the Class were and are similarly affected by Defendants' wrongful conduct in violation of federal law which is complained of herein.

22.    Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class action and securities litigation.

23.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it practically impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

24.    In the alternative, the Class may be certified under the provisions of FRCP 23(b)(1) and/or 23(b)(2) because: (a) the prosecution of separate actions by the individual Class members would pose the risk of inconsistent or varying adjudications with respect to individual Class members, as well as establishing incompatible standards of conduct for Defendants; (b) such separate actions by individual Class members would pose the risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members who are not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and (c) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

I.     **BACKGROUND**

25.    Accordingly, UBS initially kept ARS out of the hands of inexperienced investors by selling them only to institutional clients from whom they required a $250,000 minimum investment. Eventually, however, UBS began marketing ARS to the general public and lowered the minimum investment amount to $25,000 to increase sales. UBS did not typically provide these customers with prospectuses for ARS because the securities were considered secondary market issues rather than initial offerings. As alleged above, the securities were marketed to Class members as cash equivalents without disclosing the true nature of Defendants' manipulation of the ARS market and the risks associated with these securities.

26.    In general, coupon-paying bonds may be "fixed-rate" or "variable-rate." Fixed-rate bonds pay coupons of the same amount every period based on one fixed rate, while variable-rate coupons vary in amount and are based on a rate that changes from one period to the next. This variable rate is typically set as a spread over some benchmark rate, for example, The London Interbank Offered Rate ("LIBOR") or the federal funds rate ("Fed Funds"). In the case of auction-rate securities, this variable rate is periodically re-determined through modified "Dutch auctions," as further alleged below. In other words, the auction is an alternative mechanism for resetting the coupon rate or dividend on the bond or preferred stock.

27.    ARS are auctioned at par and are remarketed by one or more broker-dealers. The underwriter receives a fee based on a percentage of principal of securities sold, typically 25 basis points. Auctions are generally held every 7, 28, 35, or 49 days, but there is rarely a resale market outside the periodic auctions. After a successful auction, new purchasers and continuing holders receive the rate determined at auction, and sellers, who have been receiving interest payments,

get back the face value of their investment. If the auctions are continuously successful, ARS share characteristics with short-term, liquid securities.

28.     ARS carry upfront fees associated with a fixed-rate bond issuance, along with ongoing maintenance fees. The industry standard is $5 per bond for the initial placement fee plus annual fees of 25 basis points for broker-dealer fees and 1 to 2 basis points for auction agent fees. Credit risk associated with ARS mirror those of other municipal and corporate issues in terms of default risk associated with the issuer. Because they do not carry a "put" feature (which allows the bondholder to require the purchase of the bonds by the issuer or by a specified third party), ARS are very sensitive to changes in credit ratings and normally require the highest ratings to make them marketable. This is usually achieved with bond insurance. While bond insurance protects the holder against default by the issuer, the insurance does not cover the risk of illiquidity resulting from failed auctions. Thus, the high credit rating and insurance features of ARS issues bolstered the false appearance that ARS were safe investments when, in fact, the illiquidity and other risks remained undisclosed.

29.     Prior to a typical ARS auction, broker-dealers survey investor interest and give guidance to potential investors called "price talk." This is the range of rates within which the broker-dealer believes the auction is likely, though not guaranteed, to clear. The broker-dealer may consider factors such as prevailing market conditions and clearing rates for recent auctions of comparable securities. Current holders may sell, continue to hold at any clearing rate, or indicate that they wish to hold only if the clearing rate is at or above a particular level. Interested buyers submit purchase bids, and sellers submit sale bids. In summary, there are four types of bids:

Buy - The potential investor's bid includes a given rate and a quantity it will buy if the clearing rate is equal to or greater than this given rate;

Hold - The current holder will continue to hold a given quantity at any clearing rate;

Hold-at-Rate - The current holder will continue to hold a given quantity if the clearing rate is equal to or greater than the given rate, otherwise it will sell at the clearing rate;

Sell - The current holder will sell a given quantity at any clearing rate.

If an existing holder does not submit a bid, most auction procedures treat this as a hold bid.

30.     Bids are submitted to broker-dealers, who collect the information and pass it on to the "auction agent" by a particular deadline. Some broker-dealers allow bid submission right up until their own deadline with the auction agent, and some have an earlier internal deadline to allow time for processing. The auction agent determines if bids are such that the auction will succeed, i.e., if there is enough buyer demand to cover seller supply. Then the auction agent determines the clearing rate. Bids for each broker-dealer are then filled, sometimes on a pro rata basis, generally with settlement on the next business day. Broker-dealers in turn fill bids for their individual clients. Hold bids are filled first, followed by hold-at-rate and buy bids below the clearing rate, followed by hold-at-rate bids at the clearing rate, and finally, buy bids at the clearing rate. Hold-at-rate and buy bids above the clearing rate are not filled.

31.     An "all-hold" auction occurs if all ARS holders determine to hold their ARS without specifying a minimum rate. In this instance, the rate is set at a below market rate as defined in the prospectus for the security, and is termed the "All Hold Rate." The All Hold Rate is typically set based on a percentage of LIBOR, Fed Funds or another benchmark rate..

11

32.    Failed auctions occur when there are insufficient orders to purchase all the securities. At that point interest is reset to a "maximum rate" applicable to the specific securities being auctioned, as set forth in the prospectus. This rate is also often a specified fixed percentage, and based on one of the particular benchmark rates set forth above. When an auction fails, none of the current holders can sell their shares or otherwise exit their positions through the auction. The maximum rate is insufficient to compensate current holders for the loss of liquidity and in many instances, such as student loan ARS and auction preferreds of closed-end funds, the increases in interest, if any, are tiny adjustments of perhaps 20 or 30 basis points.

33.    Because Defendants intervened in the ARS market to prevent auctions from failing without alerting Class members to their manipulation, Class members had no reason to disbelieve Defendants representations that ARS were liquid, cash equivalents. But liquidity features of traditional money market securities such as commercial paper, negotiable certificates of deposits, agency discount notes, short corporate bonds and asset backed securities differ greatly from ARS. For example, investors in the aforementioned securities can reach out to multiple dealers (typically five or more) to solicit bids from each dealer to ensure best execution. By contrast, investors in ARS hold an illiquid security often dependent on a single broker-dealer structure where the same broker underwrites, runs, and sells the majority of the auction, significantly concentrating risk and investment bias. The collective pool of money earned for selling ARS and managing each auction created a unique incentive for Defendants (and other broker-dealers) to market these securities rather than other capital preservation tools. Defendants' financial incentive to market ARS and the distinctions between ARS and other short-term, capital preservation investments were concealed from unsuspecting Class members in Defendants' rush to sell them ARS.

12

II.   **UBS REGULARLY MADE MATERIAL OMISSIONS AND MISREPRESENTATIONS CONCERNING THE NATURE AND RISKS OF ARS INVESTMENTS, AS WELL AS THE CONDUCT OF THE BROKER-DEALERS IN ARTIFICIALLY CREATING AND SUSTAINING THE ARS MARKET**

A.   **UBS's Use Of A Uniform And Standardized Sales Pitch To Market And Sell ARS**

34.   UBS directed its sales force to sell ARS through a uniform, standardized sales pitch that was false and misleading because it omitted to disclose and misrepresented material facts as alleged herein. To the extent, documents were disseminated to Class members, they, too, were materially false and misleading in similar respects.

1.   **The True But Undisclosed Nature Of The Auction Process And the ARS Market**

35.   On February 28, 2008, "Market Pipeline" published an article headlined "Auction Rate Securities: Manipulated from the get-go" in which traders reportedly stated that "the failed auction rate securities market was always dependent on stabilization by dealers." While the Market Pipeline article recognized that the term "stabilization" had a specific technical definition as used by the SEC, whether "the market manipulation by the dealers f[ell] within SEC guidelines" was doubtful, considering that "[t]he immediate cause of the auction failures was the pullback of the banks and brokerages. In mid-February the financial institutions conducting the auctions stopped acting as principals or buyers of excess ARS inventory . .." The article further stated that:

> "Wall Street executives have defended their conduct, saying losses on holdings such as mortgage assets have curtailed their ability to use their balance sheets to support faltering markets," the Wall Street Journal's Randall Smith and Liz Rappaport report in their article today about a large bond marketer lashing out against Wall Street over the auction failures.
>
> ***But this raises the question of why the markets were faltering in the first place.*** In our earlier reporting, we revealed how accounting changes may have set some corporate buyers running

13

for the exits from this market. *More recent conversations with a broader array of bond traders and dealers points toward another possibility—the market never had enough buyer demand to support itself and has been dependent on stabilization from the banks for a very long time.*

*"The truth is there was no natural auction success rate. But for the banks acting as market makers, these auctions would have failed from the get go,"* [stated one] bond trader . . .

*Rather than merely acting as buyers of the last resort, the financial institutions have been consistently called upon to stabilize the ARS market. In many cases, investors were led to believe the market was much healthier than it has ever been.* [Emphasis added].

36.    A September 29, 2006 speech to the Tenth Annual Conference of Women in Public Finance by Martha Mahan Haines, the Chief of the SEC's Office of Municipal Securities, also confirms UBS's failure to adequately disclose the true nature of the ARS market to ARS investors such as the Plaintiffs and other Class members. As Ms. Mahan Haines recognized, "it appears that the way rates are actually set on auction rate securities often may bear little resemblance to the way the process was described in offering statements." Ms. Mahan Haines also stated, *inter alia*, that:

> *It is true that, due in large part to [broker-dealer] intervention, there have been few "failed" auctions, resulting in windfall interest rates for investors until the next auction, or "all hold" auctions, resulting in below market rates briefly benefiting issuers.* Broker-dealers also intervened when the rate that would be set was not, in that broker-dealer's opinion, an appropriate market rate. (But wasn't a determination of the market rate the very purpose of an auction?) We are told that this is in the best interests of both issuers and investors. But is it? *The true liquidity risk, volatility and fragmented nature of this market was not made clear to issuers or investors.* Furthermore, broker-dealer intervention does not necessarily set the rate at the same point as would be set in a successful multi-bidder auction. *This intervention supported the rapid growth of this market to over $200 billion. Was it in the best interests of issuers and investors to be so heavily dependent on broker-dealer intervention to support the expansion of that market?*

14

\*      \*      \*

> *To simply say that a Broker-Dealer may submit orders in Auctions for its own account, in which case it might have an advantage over other bidders because it would have knowledge of other orders placed through it for that Auction just does not give an accurate picture of the reality of how this market functions. Disclosure should make it clear that broker-dealers commonly intervene in auctions,* ... I would suggest that as part of your own due diligence investigation, you should ask for *information regarding the frequency of broker-dealer bidding . . . Do not dance around this issue: describe what really happens flat out.*

\*      \*      \*

> Perhaps consideration should be given to a different name for this type of security or of the process by which rates are set? "Managed auction process" and "bidding system" have been suggested to me. . . . I recognize that "BS Securities" is not an appealing acronym and I leave it to those more creative than me to come up with an alternative title.

\*      \*      \*

> You have all heard me talk about the importance of market integrity and investor confidence before. *I suggest that the lack of transparency regarding the actual rates set in these auctions undermines both. Market participants should insist that the rates set in these auctions and other critical information be made public.* You have all heard the remark by Justice Brandeis to the effect that sunlight is the best disinfectant. The former head of investment banking at one firm put it this way: "We believe everybody is honest, but they are more honest if you watch them like a hawk." *Giving investors, potential investors, issuers and broker-dealers a way to monitor the rates, the bidding ranges and number of bids received, would allow them to see inside the black box of this market. Disclosure of such information, which is routine in Treasury auctions, would promote market integrity, enhance investor confidence and improve pricing efficiency. Transparency would benefit everyone.* [Emphasis added].

37.     According to an article recently appearing in the New York Times entitled "It's a Long, Cold, Cashless Siege for Investors" on April 13, 2008, as the ARS market became much larger, "it became harder for Wall Street to arrange true auctions regularly" and so these

15

"auctions" devolved into what one industry observer termed a "managed bidding system," but a system which was hidden from investors by the materially misleading omissions and misrepresentations made by UBS and the other broker-dealers.

38.     According to that <u>New York Times</u> report, Joseph S. Fichera of Saber Partners observed that "[a]uction securities became a managed bidding, not a true investor auction" and that "investors never knew how many investors there were, how often the brokerage firms were stepping in to make the system work, ***nor that the broker' support could stop all of a sudden***. If we had transparency in the system, investors could have judged the ability to sell in the individual auctions and bid accordingly." [Emphasis added.]

### 2.     UBS's Standardized And Uniform Deceptive Sales Pitch And Document Disclosures

39.     UBS developed and implemented a uniform and standardized sales pitch, which was presented to Plaintiffs and the other Class members by UBS financial advisors, that falsely represented that ARS were liquid, cash equivalents, suitable alternatives to money market funds or CDs, and safe and secure vehicles for short-term investing. UBS financial advisors pitched ARS accordingly throughout the United States. One Financial Advisor, who worked for UBS from 2005-2007 and whose branch manager discussed the advantages of ARS with him and explained why he should pitch them to clients, stated that his office pitched ARS as short-term 7-day commercial paper that was a cash equivalent. This former financial advisor stated that:

> The ARS were an alternative to someone who was sitting on the fence about doing something at UBS and a way to lock the customer in for seven days or so, before we made a decision to do another investment. The client was told it was a safe, liquid investment; a place to park money short term that offered an attractive yield until something better came along. It was seven day commercial paper in essence.

16

Similarly, a former UBS Financial Advisor from 2002 to 2006 stated that his boss would solicit ARS investments and tell customers that they are cash equivalents to money markets with accelerated rates of return.

40.     In furtherance of their scheme, UBS regularly classified ARS on client monthly account statements as "cash alternatives," thereby falsely representing that the level of risk involved in purchasing ARS was essentially similar to cash equivalent investments such as money market funds.

41.     In such communications, UBS failed to disclose material facts about ARS and the ARS market to investors, including information concerning the risks associated with, and high potential for illiquidity of, these investments. UBS failed to disclose, among other things, that:

- ARS were not cash equivalents or suitable alternatives, like money market accounts or CDs, or short term investments; and

- ARS liquidity was in fact highly uncertain, because the ARS market never had enough independent buyer demand or participation to support itself and depended upon UBS (and other broker-dealers in the ARS market) to create artificial demand. Consequently, if and when the ARS became too risky or it was no longer in UBS's self-interest to continue to buy and hold large investments in ARS, UBS could stop purchasing them, thereby, leaving investors holding the bag (i.e., ARS for which there was no market).

42.     As alleged above, PwC issued an advisory in February 2005 which called for ARS to be classified as short-term securities rather than the cash equivalent classification enjoyed by corporations that used them to manage their cash. PwC's rationale was that the legal maturity of ARS was typically 20 to 30 years, despite the auction mechanism, and that the auction liquidity was provided by third parties not factored into the ARS credit ratings. Plainly put, ARS are not cash equivalents because they are dependent on third-party demand. The other "Big Four" accounting firms (including UBS's auditor, Ernst & Young, Ltd.) followed this approach and began requiring clients to reclassify ARS holdings. At their March 21, 2007

17

meeting, the Financial Accounting Standards Board ("FASB") announced its intention to eliminate the classification of "cash equivalent," for ARS and that the securities should be classified as "short term investments".

43. Corporate holders reacted to these changes by exiting ARS investments *en masse*, to avoid having to drastically reduce balance sheet cash positions as a result of the FASB directive. At the close of 2006, corporations owned eighty percent of all ARS issues; as of July 1, 2007, corporate ownership had dropped to "$170 billion of these securities, or just over half of the total outstanding"; and "through the second half of 2007, corporate investors were dumping their stakes," cutting their aggregate holdings to only $98 billion, or less than 30%, out of a total $330 billion market, according to *The New York Times* (April 13, 2008). "[A] number of corporations understood there was a rising threat to their securities; there had been failures and warnings," the Times article stated.

44. In spite of their duty of candor as fiduciaries, Defendants did not inform Class members about the increasing risk of failed auctions and illiquidity due to the downturn in corporate America's appetite for these securities. Instead, to shore up demand, Defendants and other broker-dealers escalated their sales efforts to the general public and unsuspecting Class members.

45. Defendants' scienter is further demonstrated by their alleged knowledge of the SEC's investigation into auction manipulation and inadequate disclosure by banks and broker-dealers engaged in the ARS market. After an investigation, beginning in 2004, of underwriting practices and the auction process, the SEC issued cease and desist orders and settled with fifteen banks and broker-dealers for a collective $13.375 million in May 2006. The SEC's order identified several "volatile practices," including, *inter alia*, (i) manipulating the flow of

18

information about prices and interest and the allocation of securities to the advantage of certain investors over others, (ii) bidding to prevent auction failures without disclosing their actions to customers, (iii) manipulating bids so that auctions cleared at rates considered to be appropriate market rates and to prevent "all-hold" auctions, (iv) changing or prioritizing customers' bids to increase the likelihood that the bids would be filled and submitting and revising bids after the auction deadline.  In January 2007, three additional broker-dealers reached a $1.6 million settlement with the SEC based on similar charges.  Additionally, in May 2007, the SEC fined Citigroup Global Markets, as successor by merger to Legg Mason Wood Walker, $200,000 for "interven[ing] in auctions by bidding for its proprietary account to prevent failed auctions without adequate disclosure... LMWW submitted bids to ensure that all of the securities would be purchased to avoid failed auctions and thereby, in certain instances, affected the clearing rate."

46.   Defendants' aggressively marketed ARS as liquid and safe investment to unsuspecting Class members without making full or adequate disclosure of their conduct with respect to ARS auctions in spite of their knowledge that concealing and misrepresenting such conduct was fraudulent. A graphic example of Defendant's scienter and wrongdoing is shown by the circumstances of UBS customer Marilyn Gales. Unaware of the FASB report, SEC proceedings or the position adopted by the Big Four accounting firms, she invested all or a portion of her life savings in ARS on February 11, 2008 after a UBS broker pitched these securities as AAA rated, liquid, safe cash equivalents. The ARS market collapsed just three days later. When Mrs. Gales called her UBS broker after the collapse, the broker stated that he was not aware of the risks and was "only following orders."

**B.    The Collapse Of The ARS Market**

47.    During the summer of 2007, approximately 2 to 6 percent of ARS auctions, apparently involving ARS backed by sub-prime debt, failed.    The rate of auction failures increased throughout the end of 2007.    Some of these auctions were operated and managed by UBS, but Defendants continued to maintain that investors should purchase ARS as liquid, cash equivalents, suitable for conservative, short-term investing, without disclosing the severe risks associated with these securities.    UBS and other broker-dealers were fully aware (or at the very least recklessly ignorant) of, the deteriorating condition of the ARS market, and the high likelihood of a total collapse.    By abruptly withdrawing their support for the ARS market, Defendants and other broker-dealers sought to limit their financial risk at the expense of investors, including Class members..

48.    On February 13, 2008, a stunning 87% of all ARS auctions suddenly failed when UBS and all of the other major broker-dealers refused to continue to prop up the auctions.    The following day the financial press reported that UBS was refusing to support the auction market any longer.    Other major broker-dealers (including Citigroup, Goldman Sachs, Lehman Brothers and Merrill Lynch, among others), decided virtually simultaneously, to overwhelmingly, if not totally, cease participation in or support of the ARS market and these auctions.    Consequently, the entire ARS market, totaling approximately $330 million, shut down virtually instantaneously and completely, with ARS investments becoming illiquid almost overnight.

49.    According to the April 13, 2008 New York Times report, the ARS market shut-down was preceded by the broader credit crisis at UBS and other big brokerage houses.    As a result of the credit crunch, they became unwilling to put up the substantial capital from their reserves needed to keep the ARS auctions running.    For example, on October 1, 2007, the

20

Company announced that it was forced to take a write down of positions in fixed income, rates and currencies which were mainly related to the deteriorating conditions in the U.S. sub-prime residential mortgage market. Due to this write-down, UBS announced on that date that it was likely to record an overall Group pre-tax loss between CHF 600 million and CHF 800 million for the third quarter 2007, ended September 30.

50.    The market-wide credit crisis, which began in approximately the first half of 2007, put pressure on UBS and the other brokerages' balance sheets, and in turn caused the Defendants to cease committing the substantial capital necessary to artificially prop up the ARS market, until finally virtually all broker-dealer support for the ARS market vanished, causing the market to collapse.

51.    The collapse of the ARS market had a significant negative impact on the recognized value of these securities. UBS announced in a May 6, 2008 6-K that its inventory of ARS and variable rate demand obligations were marked down to account for the market's illiquidity, resulting in a loss to the Company of $974 million in the first quarter of 2008, mainly in ARS. Other corporate holders of these securities followed suit, for example with Palm taking a write-down of $25.5 million in ARS and a "reclassification" of these securities as illiquid, and Imclone Systems, Inc., reportedly writing down their portfolio of these securities by $84.9 million. Since February 13, 2008, a very limited secondary market has developed in which ARS are trading at deep discounts below their face value.

52.    While the market for ARS has collapsed, UBS and other broker-dealers nevertheless continue to improperly make money from the investors to whom they sold ARS in connection with these investments. For instance even under these circumstances, as investors are unable tap their money, with a collapsed market and ineffective auctions, UBS and other

brokerage firms continue to earn the same fees -- approximately 0.25 percent of the amount of the shares or notes outstanding on an annual basis, repeatedly generating aggregate fees of approximately $825 million this year alone -- despite that fact that few auctions are currently succeeding. UBS and other broker-dealers are further victimizing investors by requiring those who need current access to cash to borrow against the value of their ARS holdings, sometimes up to the full par amounts, and then charging them interest on these loans.

53. Defendants' conduct and materially false and misleading statements and omissions during the Class Period caused ARS to be marketed and sold and traded by UBS at artificially inflated prices. Plaintiffs and other Class members purchased ARS marketed and sold by UBS in reliance upon the integrity of the auction market and of the market price of the ARS, and have suffered damage thereby. Moreover, when Plaintiffs and other Class members refrained from selling their ARS on those securities' reset dates, they did so in reliance upon Defendants' continued material misrepresentations and omissions, and suffered damage thereby.

54. Defendants materially misled public investors and artificially created and enabled the perpetuation of the ARS market, thereby inflating the price of ARS marketed and sold by UBS while underpaying Class members a fair return on the investments given the undisclosed risks. Defendants accomplished this by making materially false and misleading public statements and failing to disclose material facts necessary to render Defendants' statements, as set forth herein, not false and misleading. As a result, Defendants created an unrealistically positive assessment of, and artificial demand for, the ARS they underwrote, marketed and sold, and thereby caused those securities to be overvalued and artificially inflated at all relevant times.

## NO SAFE HARBOR

55. The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this

22

complaint. Nor were the forward-looking statements, if any, pleaded herein accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from the statements made therein. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the defendant responsible for the statement knew it was false and misleading, and/or the forward-looking statement was authorized and/or approved by a director and/or an executive officer of UBS who knew that it was false when made.

## LOSS CAUSATION/ECONOMIC LOSS

56.    At all relevant times, the material misrepresentations and omissions particularized in this complaint, and the ultimate disclosures thereof, directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class.

57.    During the Class Period, Defendants engaged in a scheme and course of conduct to create, prop up, perpetuate and manipulate for their own benefit an artificial market for ARS, and to artificially inflate the price of ARS marketed and sold by UBS. This course of conduct operated as a fraud or deceit on purchasers of these securities by, *inter alia*, omitting to disclose material risks concerning the liquidity of ARS. Such risks included factors that made them very different from cash equivalent investments, including, but not limited to, the overwhelming, if not total, dependence of the ARS market on the willingness of UBS and other broker-dealers to continue to create an artificial demand in order to sustain the ARS market and keep auctions from failing. Defendants made materially false and misleading statements about the nature and characteristics of the ARS market, the ARS themselves, and the auctions at which they were traded and sold. The purported value of the ARS were artificially inflated by this deception.

58.     Among after things, the interest rates on ARS were much lower than the rate the market would have put on them had the investing public been widely aware that these investments were not truly cash equivalents or suitable alternatives to investments such as CDs or money market funds, or fully understood the liquidity risks involved, and the artificial and unreliable nature of the demand created and sustained by the broker-dealers. Given the higher interest rate that would have resulted from full disclosure, buyers would have been able to acquire a lower face amount of ARS while still obtaining the same dollar amount of interest they received on the ARS actually purchased. Defendants' material misrepresentations and omissions were disclosed and became known to the investing public when the ARS market collapsed, and the securities themselves became illiquid. Defendants' (and other broker-dealers') decisions to cease artificially creating and sustaining the ARS market -- a process that had been fraudulently concealed from the Class -- caused the dramatic collapse of the ARS market and also finally began to reveal the nature and extent of Defendants' massive fraud in connection with the marketing and sale of ARS. As a result, the perceived values of ARS have declined substantially. For example, as alleged herein, UBS, and other broker-dealers have begun writing down the value of ARS to reflect the fact they were actually worth materially less than their face amount.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

### A.     UBS's Use Of A Uniform And Standardized Sales Pitch Containing Materially Misleading Omissions

59.     A presumption of reliance is applicable here due to UBS's use of a uniform and standardized sales pitches containing materially misleading omissions regarding, *inter alia*, the true nature of ARS investments, the risks of illiquidity of the ARS market and UBS's (and other broker-dealers') virtual wholesale creation and sustenance of that market.

24

60.    Here, UBS brokers were required to and did use uniform, standardized, and materially identical sales pitch created and/or approved by UBS senior management to market and sell ARS to unsuspecting Class members such as the Plaintiffs herein. The sale pitch did not vary appreciably, if at all, among Class members, and uniformly omitted material facts concerning, among other things, the true nature of ARS investments, the true extent and nature of the illiquidity risks of investments in ARS and the fact that without the routine and constant involvement by Defendants and other broker-dealers in propping up the ARS market, the market and auctions could not provide continuing liquidity for the securities.

61.    In light of Defendants' knowledge that their sales force was routinely representing to investors that ARS were liquid and cash equivalents, and suitable alternatives to money market funds and CDs, it was materially misleading for Defendants to fail to correct the record and state expressly that ARS were, among other things, in fact not liquid or cash equivalents, or suitable money market, CD or similar cash preservation alternatives.

62.    As set forth herein, Plaintiffs and the other Class members would not have invested in ARS, or, alternatively, would not have purchased their ARS investments on the terms at which they actually did so, had the Defendants' material omissions not concealed the true nature of the ARS investments and the risks related thereto. Plaintiffs' and the other Class members' fraud-based claims stem largely if not entirely from misleading material omissions, for which reliance may be presumed.

**B.    Fraud-On-The-Market Doctrine**

63.    The ARS market (on which UBS and other broker-dealers marketed and sold ARS), until the truth came out and prior to its collapse, was at all relevant times hereto open, well-developed and efficient.

25

64.     Plaintiffs rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made false and misleading public misrepresentations and failed to disclose adverse facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     ARS traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge, among other things, the value of the securities at issue; and

(e)     Plaintiffs and the other members of the Class purchased ARS between the time Defendants failed to disclose and misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

65.     The market for ARS digested current information regarding these securities and reflected such information in the prices of ARS. As would be expected where a security is traded in an efficient market, material news concerning ARS had a prompt and immediate effect on the market price of these securities, as evidenced by, among other things, the rapid decline in the market price occurring after the seizure of the ARS markets in mid-February, 2008, as described herein. Under these circumstances, all purchasers of ARS from UBS (not to mention from other broker-dealers) during the Class Period suffered similar injury due to the fact that the price of those securities was artificially inflated throughout the Class Period. At the times they purchased or otherwise acquired these ARS, Plaintiffs and other Class members were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts. As a result, the presumption of reliance applies.

26

## COUNT I

### Violations Of Section 10(b) Of The Exchange Act
### Against All Defendants

66.    Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein.  Plaintiffs bring this cause of action on behalf of themselves and the Class.

67.    During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did, among other things: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) enable Defendants to sell hundreds of millions, if not billions, of dollars of ARS to current and prospective UBS clients, and on which UBS collected many millions of dollars in fees and commissions; and (iii) cause Plaintiffs and other Class members to purchase ARS from UBS at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, jointly and individually (and each of them) took the actions set forth herein.

68.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business and conduct which operated as a fraud and deceit upon the purchasers of ARS from UBS in an effort to maintain artificially high sales and market prices for such securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants herein are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

69.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a

27

continuous course of conduct to conceal material adverse information about the ARS sold by UBS, as specified herein.

70.     These Defendants engaged in the scheme and conduct alleged herein, including using devices, schemes and artifices to defraud, while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors that the ARS being marketed and sold by UBS were as good as cash or were cash equivalents, similar to money market funds or CDs, and were liquid and safe investments, suitable for short-term investing and for investors with as little as $25,000 of available cash and/or as little as one week in which to invest. Defendants' conduct, which involved and included the making of, or the participation and acquiescence in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about the ARS and that ARS market, in the light of the circumstances under which they were made, not false and misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business and conduct which operated as a fraud and deceit upon the purchasers of ARS from UBS during the Class Period, *i.e.*, the Class members.

71.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with deliberate and reckless disregard for the truth in that they failed to ascertain and to disclose such facts which were fully accessible to them. Such Defendants' material misrepresentations and/or omissions were done knowingly and/or deliberately and recklessly and for the purpose and effect of concealing the truth about the liquidity of and other risks associated with ARS from the investing public and supporting the artificially inflated price and market for these securities. If Defendants did not have actual

knowledge of the misrepresentations and omissions alleged, they were deliberate and reckless in failing to obtain such knowledge by refraining from taking those steps necessary to discover whether those statements were false or misleading.

72.     At all relevant times, the senior management and/or directors of UBS knew and/or recklessly disregarded that the ARS continued liquidity depended on the purely voluntary willingness of UBS and the other major broker-dealers to serve as buyers of ARS in order to create and sustain the market demand necessary to keep the ARS market alive, and to keep the auctions from failing. Defendants knew this fact because UBS itself was a prominent participant in (and often a manager or agent of) the auctions, but knowingly or recklessly failed to disclose this material information to Plaintiffs and the class members.

73.     Moreover, upon information and belief, even while ARS were being aggressively marketed to individual investors by UBS in 2007, Defendants knew that the corporate clients of UBS and other broker-dealers were fleeing the ARS market in droves, having apparently become concerned that ARS were not cash equivalents. As Defendants also knew, major accounting firms (upon information and belief, including their own auditor, Ernst & Young, Ltd.) advised their corporate clients several years ago to change the way ARS were treated on their balance sheets, and to stop classifying them as "cash equivalents." Upon information and belief, those in executive management positions at UBS were monitoring events in the marketplace with respect to ARS as part of their responsibilities to their shareholders and their company, and were thus privy to facts and information which indicated that ARS were becoming increasingly risky and would become virtually completely illiquid if UBS and the other major broker-dealers decided not to continue their artificial support of the ARS market. UBS's own balance sheet problems were recognized within UBS as a reason why it was undesirable for Defendants to keep

29

acquiring ARS and participating in and supporting the ARS market to prevent failed auctions. Other major broker-dealers that were also supporting the ARS auctions, such as Merrill Lynch, Citigroup, and others, also had serious balance sheet problems.  At the same time, Defendants were unloading these securities on unsuspecting individual clients, at times from their own inventory, using a uniform and misleading sales pitch that they were, *inter alia*, liquid, cash equivalents, and suitable alternatives to money market funds, CDs, or similar cash preservation investments, and appropriate for very short-term investors..

74.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market and market price of the ARS marketed and sold by UBS was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of ARS were artificially inflated, and relying directly or indirectly upon the integrity of the auction market in which the ARS were traded, or on the materially false and misleading statements made by Defendants, and/or the absence of material adverse information that was known to or deliberately disregarded, omitted or concealed by Defendants and not disclosed by Defendants during the Class Period,  Plaintiffs and the other members of the Class acquired ARS marketed and sold by UBS during the Class Period at artificially inflated prices and/or for unduly low interest rates and were damaged thereby.

75.    At the time of said misrepresentations and omissions, Plaintiffs and other Class members were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the nature of these investments, including, among other things, the illiquidity of and other risks associated with the ARS marketed and sold by UBS, as outlined herein, but which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased their ARS, or,

30

if they had acquired such securities during the Class Period, they would not have paid the artificially inflated prices which they paid for these securities and would have demanded greater rates of return given the undisclosed investment risks. Moreover, Defendants' continued misrepresentations and omissions misled Plaintiffs and other Class Members into refraining from selling their ARS on those securities' reset dates.

76. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

77. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases of ARS marketed and/or sold by UBS during the Class Period.

### COUNT II

#### Violation Of Section 20(a) Of The Exchange Act
#### Against Defendants UBS AG

78. Plaintiffs repeat and reallege each and every allegation set forth in the paragraphs above as if fully set forth herein. Plaintiff brings this cause of action on behalf of itself and the Class.

79. Defendant UBS AG acted as a control person of Defendants UBS Securities and UBS Financial, within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of its 100% ownership and control of these subsidiaries, UBS AG had the power to influence and control and did influence and control, directly and indirectly, the decision-making by these subsidiaries, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading, and the omission of certain material facts and information concerning ARS and the ARS market necessary to make any such statements or representations not materially false and misleading. UBS AG, its principals, and these

31

subsidiaries, were provided with or had unlimited access to copies of the reports, press releases, public filings, client statements, and other materials and information alleged by Plaintiffs herein to be misleading prior to and/or shortly after these statements were issued, and also had the ability to prevent the issuance of these materials, or to cause them to be corrected.

80.     As set forth above, UBS AG violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, these entities are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchase and retention of ARS from UBS AG during the Class Period.

## COUNT III

### Violations of the Investment Advisers Act (IAA) of 1940, 15 U.S.C. § 80b-1, *et seq.* Against All Defendants

81.     Plaintiffs repeat and reallege the allegations as set forth above as if set forth fully herein.

82.     Defendant UBS and/or its subsidiaries and affiliates listed herein are investment advisers under the Investment Advisers Act, 15 U.S.C. § 80b-1 *et seq.*, who entered into express brokerage contracts with Plaintiffs and other Class members.  Defendants engage, for compensation, in the business of advising Plaintiffs and other members of the Class, either directly or through publications or writings, as to the value of "securities" or as to the advisability of investing in, purchasing, or selling "securities" as defined at 15 U.S.C. § 80b-2(11).  The creation, maintenance and provision of a market for ARS was not incidental to the conduct of Defendants' usual brokerage business, and UBS receives and has received special compensation therefore.

83.     By reason of the conduct set forth herein, and the above-described omissions, concealment and misrepresentation of material facts, Defendants acted in violation of 15 U.S.C. § 80b-6, <u>Prohibited transactions by investment advisers</u>, which provides that

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--
>
>   (1) to employ any device, scheme, or artifice to defraud any client or prospective client;
>
>   (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
>
>   (3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph (3) shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction;
>
>   (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

84.     Moreover, under the IAA, Defendants, as investment advisers, owed to Plaintiffs and other members of the Class a fiduciary duty to fully and fairly disclose to all material facts and information, and an affirmative obligation to employ reasonable care to avoid misleading their clients.

85.     In breach of their fiduciary duties to Plaintiffs and other members of the Class and in violation of the IAA, Defendants made the herein described omissions, concealment and

33

misrepresentation of material facts and information concerning their actions as "Financial Advisors" to customers in connection with ARS, thereby deceiving Plaintiffs and other members of the Class with full knowledge that their conduct was false and misleading due to material omissions and/or misrepresentations.

86.    As a result of these breaches of fiduciary duties, Plaintiffs and other Class members' purchases, investments and/or acquisitions of ARS are void under Section 15 of the IAA, 15 U.S.C. § 80b-15(b), which provides:

> Every contract made in violation of any provision of this title and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this title, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

87.    Further, Defendants acquired rights under and were benefited by these acts and conduct as set forth above and had actual knowledge of the conduct engaged in that violated the IAA.

88.    In addition to seeking a declaratory judgment that the ARS transactions with Plaintiffs and the Class are null and void, Plaintiffs seek rescission and an accounting and restitution for the benefit of all Class members who request rescission returning all monies and fees wrongfully obtained by Defendants, as well as disgorgement of all profits made by the Defendants due to their conduct in violation of the IAA.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

34

A.    Determining that this action is a proper class action, designating Plaintiffs as Lead Plaintiffs and certifying Plaintiffs as Class Representative under FRCP 23 and Plaintiffs' counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding those class members who purchased ARS from UBS the option of rescinding their purchases and recovering the full amount paid plus interest thereon;

D.    Declaring that all amounts received by UBS from or related to the marketing or sale of ARS to Plaintiffs and the Class members, and all proceeds thereof, are held as a constructive trust by UBS for the benefit of Plaintiffs and the Class members herein;

E.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

F.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law, equity and the federal statutory provisions sued hereunder; and

G.    Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 9, 2008

Respectfully submitted,

**MILBERG LLP**

By:    _Jerome Congress_

Jerome M. Congress (JC-2060)
Lori G. Feldman (LF-3478)
Kent A. Bronson (KB-4906)

35

One Pennsylvania Plaza
New York, NY 10119
(212) 594-5300
jcongress@milberg.com
kbronson@milberg.com

**MILBERG LLP**
Jeff Westerman (JW-6500)
One California Plaza300 South Grand Avenue,
Suite 3900
Los Angeles, CA 90071-3172
(213) 617-1200
jwesterman@milberg.com

**LAW OFFICES OF GEORGE A. SHOHET**
George A. Shohet  (Pro Hac Vice Admission
Pending)
245 Main Street, Suite 310
Venice, CA 90291
(310) 452-3176
georgeshohet@gmail.com

*Counsel for Aric A. Streit and Mary Streit as*
*Trustees for the benefit of the Streit Living Trust*
*And The Proposed Class*

36

# EXHIBIT E

Case 1:08-cv-02753-LMM-KNF    Document 31-6    Filed 06/27/2008    Page 2 of 5
Case 1:08-cv-02967-LMM    Document 13    Filed 05/16/2008    Page 1 of 4
Case 1:08-cv-02967-LMM    Document 12    Filed 05/15/2008    Page 1 of 4

*McKenna, J.*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID and SHELLY CHANDLER, Individually, And As Trustees of the Chandler Trust Dated 12/28/2005, And On Behalf of All Others Similarly Situated, Plaintiffs, <br><br> v. <br><br> UBS AG, UBS Securities LLC and UBS Financial Services Inc., <br><br> Defendants. | CIVIL ACTION NO. 08-CV-02967 (LMM) <br><br> USDC SDNY <br> DOCUMENT <br> ELECTRONICALLY FILED <br> DOC #: _____ <br> DATE FILED: 5/16/08 |
| RICARDO L. SANCHEZ, On Behalf of Himself and All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> UBS AG, UBS Securities LLC and UBS Financial Services Inc., <br><br> Defendants. | CIVIL ACTION NO. 08-CV-03082 (LMM) <br><br> **+ORDER OF** <br> **STIPULATION REQUESTING** <br> **CONSOLIDATION OF** <br> **RELATED CASES** |

WHEREAS on March 21, 2008, Plaintiffs David and Shelley Chandler filed the action styled *David and Shelley Chandler, Individually, and As Trustees of the Chandler Trust Dated 12/28/2005, And on Behalf of All Others Similarly Situated v. UBS AG, UBS Securities LLC and UBS Financial Services, Inc.*, No. 08-CV-02967 (LMM) ("*Chandler*");

WHEREAS on March 26, 2008, Plaintiff Ricardo L. Sanchez filed the action styled *Ricardo L. Sanchez, On Behalf of Himself and All Others Similarly Situated v. UBS AG, UBS Securities LLC and UBS Financial Services, Inc.*, No. 08-CV-03082 (LMM) ("*Sanchez*");

Case 1:08-cv-02753-LMM-KNF    Document 31-6    Filed 06/27/2008    Page 3 of 5
Case 1:08-cv-02967-LMM    Document 13    Filed 05/16/2008    Page 2 of 4
Case 1:08-cv-02967-LMM    Document 12    Filed 05/15/2008    Page 2 of 4

WHEREAS the *Chandler* and *Sanchez* actions involve common questions of law and fact;

WHEREAS the *Chandler* and *Sanchez* parties have agreed to consolidate their cases;

THEREFORE IT IS HEREBY STIPULATED AND AGREED by the parties, by and through their undersigned counsel, that:

1.      The *Chandler* and *Sanchez* actions are hereby consolidated for all purposes, including discovery, pretrial proceedings, trial proceedings, and post-trial proceedings, pursuant to Rule 42(a) of the Federal Rules of Civil Procedure;

2.      This action shall be captioned "*In re UBS Auction Rate Securities Litigation*," and the files of this action shall be maintained in one file under Master File No. 08-CV-02967. Any other actions now pending or hereafter filed in this District, or transferred to this District, which arise out of common alleged facts and include the same alleged claims against Defendants as alleged in the *Chandler* and *Sanchez* cases, shall be consolidated into this action for all purposes, if and when they are drawn to the Court's attention.

3.      This order is without prejudice to the rights of any party to apply to the Court for severance of any claim, issue, party or action, or for modification of this Order, for good cause shown.

4.      Every pleading filed in these consolidated actions, or in any separate action included herein, shall bear the following caption:

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re UBS AUCTION RATE SECURITIES LITIGATION | ) ) ) | Master File No. 08-CV-02967 |
| This Document Relates To: | ) ) ) | |

5.      When a pleading is intended to be applicable to all actions to which this Order applies, the words "All Actions" shall appear immediately after the words "This Document

2

Case 1:08-cv-02753-LMM-KNF    Document 31-6    Filed 06/27/2008    Page 4 of 5
Case 1:08-cv-02967-LMM    Document 13    Filed 05/16/2008    Page 3 of 4
05/15/2008  08:27    212-363-7171    LEVI & KORSINSKY    PAGE  02
Case 1:08-cv-02967-LMM    Document 12    Filed 05/15/2008    Page 3 of 4

Relates To:" in the caption set out above. When a pleading is intended to be applicable to some, but not all, of the consolidated actions, immediately after the words "This Document Relates To:" in the caption described above, there shall appear "Civil Action No. _____ (plaintiff's name)" for each individual related action to which the pleading is intended to be applicable.

**IT IS SO STIPULATED.**

Dated: May 15, 2008             **GIRARD GIBBS LLP**

                                By: _____

                                Jonathan K. Levine (JL-8390)
                                Daniel C. Girard
                                Aaron M. Sheanin
                                601 California Street, 14th Floor
                                San Francisco, CA 94108
                                Telephone: (415) 981-4800
                                Facsimile: (415) 981-4846

                                Christopher A. Seeger (CS-4880)
                                Stephen A. Weiss (SW-3520)
                                David R. Buchanan (DB-6368)
                                **SEEGER WEISS LLP**
                                One William Street
                                New York, NY 10004
                                Telephone: (212) 584-0700
                                Facsimile: (212) 584-0799

                                Norman E. Siegel
                                **STUEVE SIEGEL HANSON LLP**
                                460 Nichols Road, Suite 200
                                Kansas City, MO, 64112
                                Telephone: (816) 714-7100
                                Facsimile: (816) 714-7101

                                Counsel for Plaintiffs
                                David and Shelly Chandler

Dated: May 14, 2008             **LEVI & KORSINSKY, LLP**

                                By: _____

                                Eduard Korsinsky
                                Joseph E. Levi
                                Juan E. Monteverde

                                            3

Case 1:08-cv-02753-LMM-KNF   Document 31-6   Filed 06/27/2008   Page 5 of 5
Case 1:08-cv-02967-LMM   Document 13   Filed 05/16/2008   Page 4 of 4
Case 1:08-cv-02967-LMM   Document 12   Filed 05/15/2008   Page 4 of 4

39 Broadway, Suite 1601
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Attorneys for Plaintiff Ricardo Sanchez

Dated: May 15, 2008

PAUL, HASTINGS, JANOFSKY & WALKER LLP

By: _William F. Sullivan /HMP_

William F. Sullivan
Howard M. Privette
John S. Durant
515 S. Flower Street, 25th Floor
Los Angeles, California 90071
(213) 683-6000

Keith Miller
75 East 55th Street
New York, New York 10022
(212) 318-6000

James D. Wareham
875 15th Street, N.W.
Washington, D.C. 20005
(202) 551-1700

Attorneys for Defendants UBS Securities LLC and
UBS Financial Services Inc.

SO ORDERED:

_____   5/16/08
LAWRENCE M. McKENNA
United States District Judge

4

# EXHIBIT F

RECEIVED

JUN 1 6 2008

PAUL HASTINGS

BEFORE THE JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

IN RE AUCTION RATE SECURITIES )
BROKER-DEALER LITIGATION ) MDL DOCKET NO. _____

MOVANTS' MOTION TO
TRANSFER FOR COORDINATION

Pursuant to 28 U.S.C. § 1407, Movants[1] hereby move the Judicial Panel on Multidistrict

Litigation to take jurisdiction over thirty-one related cases and transfer them for coordination of

pretrial proceedings to the United States District Court for the Southern District of New York, or,

alternatively, the Northern District of California or any other district the Panel deems

appropriate.

---

[1]    The term "Movants" refers to the plaintiffs from the following thirteen cases, all of whom are represented by the undersigned counsel: (1) *Chandler v. UBS AG, et al.*, Case No. 08-cv-02967 (S.D.N.Y.); (2) *Kraemer v. Deutsche Bank AG, et al.*, Case No. 08-cv-02788 (S.D.N.Y.); (3) *Burton v. Merrill Lynch Corp., et al.*, Case No. 08-cv-03037 (S.D.N.Y.); (4) *Waldman v. Wachovia Corp., et al.*, Case No. 08-cv-02913 (S.D.N.Y.); (5) *Humphrys v. TD Ameritrade Holding Corp., et al.*, Case No. 08-cv-02912 (S.D.N.Y.); (6) *Swanson v. Citigroup, Inc., et al.*, Case No. 08-cv-03139 (S.D.N.Y.); (7) *Jamail v. Morgan Stanley, et al.*, Case No. 08-cv-03178 (S.D.N.Y.); (8) *Oughtred v. E*Trade Financial Corp., et al.*, Case No. 08-cv-03295 (S.D.N.Y.); (9) *Defer LP v. Raymond James Financial, Inc., et al.*, Case No. 08-cv-03449 (S.D.N.Y.); (10) *Van Dyke v. Wells Fargo & Co., et al.*, Case No. 08-cv-01962 (N.D. Cal.); (11) *Vining v. Oppenheimer Holdings, Inc., et al.*, Case No. 08-cv-04435 (S.D.N.Y.); (12) *Brigham v. Royal Bank of Canada, et al.*, Case No. 08-cv-04431 (S.D.N.Y.); and (13) *Bondar v. Bank of America Corp., et al.*, Case No. 08-cv-02599 (N.D. Cal.).

As set forth more fully in the accompanying Brief in Support of Movants' Motion to Transfer for Coordination, transfer under section 1407 is appropriate because:

1.    There are thirty-one pending actions in five different federal district courts arising from the alleged improper marketing of auction rate securities ("ARS");

2.    The plaintiffs in all the cases contend that broker-dealers misrepresented the nature of ARS and failed to disclose material facts about ARS;

3.    Because they arise from the same alleged wrongful conduct, all of the actions involve common questions of fact, and they will require overlapping discovery;

4.    The majority of the actions plead the same legal claims, and will involve common questions of law; and

5.    The majority of the actions are pleaded as class actions under Fed. R. Civ. P. 23. Because of these unifying characteristics, the Panel should transfer the underlying thirty-one cases for pre-trial coordination.

Movants request that the Panel transfer the actions to the United States District Court for the Southern District of New York because most of the thirty-one pending cases are already on file in that jurisdiction, that district is convenient for the parties and witnesses because several of the defendants maintain their executive offices there, and that district is easily accessible by various means of transportation. Alternatively, should the Panel find that docket congestion or litigation expense of the Southern District of New York make transfer to another district desirable, Movants respectfully suggest transfer to the Hon. Jeffrey S. White of the Northern District of California, or any other judge the Panel deems appropriate.

WHEREFORE, Movants respectfully request that the Panel grant their Motion to Transfer for Coordination, order the thirty-one underlying cases be transferred to the United

2

States District Court for the Southern District of New York for coordinated pre-trial proceedings, order that future "tag along" actions also be transferred to that jurisdiction for coordinated pre-trial proceedings, and grant any other relief the Panel deems just and proper.

Dated: June 12, 2008

**STUEVE SIEGEL HANSON LLP**

Norman E. Siegel
Matthew L. Dameron
460 Nichols Road, Suite 200
Kansas City, MO 64112
(816) 714-7100
(816) 714-7101 (fax)
siegel@stuevesiegel.com
dameron@stuevesiegel.com

**GIRARD GIBBS LLP**
Daniel C. Girard
Jonathan K. Levine
Aaron M. Sheanin
601 California St, Suite 1400
San Francisco, CA 94108
(415) 981-4800
(415) 981-4846 (fax)
dcg@girardgibbs.com
jkl@girardgibbs.com
ams@girardgibbs.com

**SEEGER WEISS LLP**
Christopher Adam Seeger
Stephen A. Weiss
David R. Buchanan
One William Street, 10th Floor
New York, NY 10004
(212) 584-0757
(212) 584-0799 (fax)
cseeger@seegerweiss.com
sweiss@seegerweiss.com
dbuchanan@seegerweiss.com

# EXHIBIT G

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

LHB INSURANCE BROKERAGE INC., individually
and on behalf of all others similarly situated,

                    Plaintiffs,

          -v-                                               No. 08 Civ. 3095(LTS) (FM)

CITIGROUP INC. and CITIGROUP
GLOBAL MARKETS, INC.,

                    Defendants.
-----------------------------------------------------------x

LISA SWANSON, individually and on behalf
of all others similarly situated,

                    Plaintiffs,

          -v-                                               No. 08 Civ. 3139 (LTS) (AJP)

CITIGROUP INC., CITIGROUP GLOBAL
MARKETS, INC. and CITI SMITH BARNEY,

                    Defendants.
-----------------------------------------------------------x

SAMUEL A. STOCKHAMER and ALICE L.
STOCKHAMER, on behalf of themselves and
on all others similarly situated,

                    Plaintiffs,

          -v-                                               No. 08 Civ. 3904 (LTS) (KNF)

CITIGROUP INC., and CITIGROUP GLOBAL
CAPITAL MARKETS, INC.,

                    Defendants.
-----------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED  JUN 2 5 2008

WEDGEWOOD TACOMA LLC, individually and
on behalf of all others similarly situated,

Plaintiffs,

-v-                                                    No. 08 Civ. 4360 (LTS) (FM)

CITIGROUP INC., CITIGROUP GLOBAL
MARKETS, INC. and CITI SMITH BARNEY,

Defendants.
--------------------------------------------------------------x

SAED GHALAYINI, individually and
on behalf of all others similarly situated,

Plaintiffs,

-v-                                                    No. 08 Civ. 5016

CITIGROUP INC., CITIGROUP GLOBAL
MARKETS, INC. and CITI SMITH BARNEY,

Defendants.
--------------------------------------------------------------x

LAURA TAYLOR SWAIN, UNITED STATES DISTRICT JUDGE

### ORDER CONSOLIDATING CASES, APPOINTING LEAD PLAINTIFF AND APPROVING SELECTION OF LEAD PLAINTIFF'S COUNSEL

Before the Court are related securities fraud class actions alleging that some or all

of Defendants Citigroup Inc., Citigroup Global Markets, Inc. and Citi Smith Barney (collectively,

"Defendants"), failed to disclose material facts while marketing auction rate securities ("ARS")

and that, once Defendants ceased their artificial support for the ARS auction market, the market

collapsed and Plaintiffs were left with illiquid ARS. Plaintiff Wedgewood Tacoma, LLC,

together with movant Jemstone, LLC (collectively referred to as "Wedgewood"), moved the

Court to consolidate the above-captioned putative class actions and for an order appointing them

lead plaintiffs and their counsel lead counsel. Movants David Dignam and Ted Link

(collectively "the Dignam Group") also moved the Court to consolidate the above-captioned

putative class actions and appoint the Dignam Group lead plaintiff and its counsel lead counsel.

Movant Dr. Michael A. Passidomo ("Dr. Passidomo") moved the Court to consolidate the above-

captioned putative class actions and for an order appointing him lead plaintiff and his counsel

lead counsel. Plaintiff LHB Insurance Group ("LHB"), moved the Court for an order appointing

it lead plaintiff. The Court construed each motion to relate to the above-captioned actions and

any class actions relating to the same subject matter as the above-captioned actions hereafter filed

in or transferred to this Court.

   On June 11, 2008, the Court issued an order setting a briefing schedule and

scheduling a hearing on the applications for June 24, 2008. The Court received a memorandum

of law in opposition to the consolidation of the <u>Stockhamer</u> action, 08 Civ. 3904, from the

plaintiffs in that action ("<u>Stockhamer</u> Plaintiffs"), and a response to the <u>Stockhamer</u> Plaintiffs'

opposition from the Defendants. The Court received a memorandum of law and a reply

memorandum in further support of Dr. Passidomo's motion and in opposition to competing lead

plaintiff designation motions. The Court also received a memorandum of law and a reply

memorandum in further support of Wedgewood's motion and in opposition to competing motion.

In these latest papers, Wedgewood augmented its application with a request that its counsel be

designated interim class counsel with respect to non-PSLRA claims in the event the cases were

consolidated and Wedgewood selected as lead plaintiff. The Dignam Group filed a statement of

no opposition to Dr. Passidomo's motion and subsequently filed a supplement, indicating that it

took no position on the challenges to Dr. Passidomo's or Wedgewood's adequacy as a lead

plaintiff, but indicated that it was still willing to serve as lead plaintiff, if the Court desired. LHB filed no additional papers.

On June 24, 2008, the Court held a hearing on the motions. Counsel appeared on behalf of LHB, on behalf of the Dignam Group, on behalf of the Stockhamer Plaintiffs, on behalf of Wedgewood, on behalf of Dr. Passidomo and on behalf of the Defendants. The Court has considered thoroughly all submissions and argument related to these motions and the decision to be rendered reflects such consideration. For the following reasons, and for the reasons stated on the record of the hearing, the Court grants the motions to consolidate and Dr. Passidomo's motion for appointment as lead plaintiff and approves Dr. Passidomo's selection of Zwerling, Schachter & Zwerling LLP as lead counsel. The oral application of the Stockhamer Plaintiffs and their counsel to be appointed as lead or co-lead plaintiffs and counsel with respect to the non-PSLRA claims is denied.

Motion to Consolidate

Rule 42 of the Federal Rules of Civil Procedure provides that the Court may consolidate "actions involving a common question of law or fact." Fed. R. Civ. P. 42(a). A determination on the issue of consolidation is left to the sound discretion of the Court. Johnson v. Celotex Corp., 899 F.2d 1281, 1284-85 (2d Cir. 1990); Zicklin v. Breuer, 534 F. Supp. 745 (S.D.N.Y. 1982).

The Court finds that all of the above-captioned the actions present common factual and legal issues, involve overlapping defendants and will involve similar subject matter and similar issues related to class certification. The Court does not find persuasive the Stockhamer Plaintiffs' argument that they will be prejudiced by consolidation and finds, rather,

that the other parties may be prejudiced by a failure to consolidate. Accordingly, the Court grants

the motions for consolidation in the interests of judicial economy.

Motion for Appointment as Lead Plaintiff

The PSLRA provides in relevant part that "the court shall . . . appoint as lead

plaintiff the member or members of the purported class that the Court determines to be most

capable of adequately representing the interests of class members." 15 U.S.C. § 78u-

4(a)(3)(B)(i). In making its determination on a motion for appointment of a lead plaintiff, the

Court is also required to adopt the rebuttable presumption that the "most adequate plaintiff" is

> the person or group of persons that– (aa) has either filed the complaint or made a
>
> motion in response to [the initial class] notice . . . ; (bb) in the determination of
>
> the court, has the largest financial interest in the relief sought by the class; and
>
> (cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil
>
> Procedure.

15 U.S.C. § 78u-4(a)(3)(B)(iii)(I). This presumption may be rebutted only upon proof by a

member of the purported class "that the presumptively most adequate plaintiff–(aa) will not fairly

and adequately protect the interests of the class; or (bb) is subject to unique defenses which

render such plaintiff incapable of adequately representing the class." 15 U.S.C. 78u-

4(a)(3)(B)(iii)(II).

The Court finds that Dr. Passidomo is the presumptively most adequate plaintiff

under 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I) based on his undisputed financial interest and his

preliminary showing that he meets the typicality and adequacy requirements of Federal Rule of

Civil Procedure 23. See Fed. R. Civ. P. 23; see also In re Oxford Health Plans, 182 F.R.D. 42,

49 (S.D.N.Y. 1998) ("Typicality and adequacy of representation are the only provisions relevant to a determination of lead plaintiff under the PSLRA.").

The claims of Dr. Passidomo are typical of the class because his claims and injuries arise from the same course of conduct as that from which claims of the other class members arise. The adequacy of representation component of Rule 23 is also satisfied, as there is no conflict of interest between Dr. Passidomo and members of the purported class, he has obtained qualified and experienced counsel, and has a significant interest in the outcome of the litigation so as to ensure vigorous prosecution of the case. Cf. Weltz v. Lee, 199 F.R.D. 129, 133 (S.D.N.Y. 2001). The Court's preliminary determination of typicality and adequacy, will not, however, preclude any party from contesting class certification on such bases in the future.

The Court finds that the issues that Wedgewood raised in an attempt to rebut the presumption that Dr. Passidomo is the presumptive most adequate plaintiff are insufficient to raise any substantial issue as to Dr. Passidomo's adequacy or integrity, or as to whether he is subject to unique defenses, so that the presumption remains unrebutted.

The Court hereby grants Dr. Passidomo's motion for appointment as lead plaintiff, as to all causes of action asserted in the consolidated cases. The lead plaintiff designation motions of LHB, the Dignam Group and Wedgewood are denied.

## Appointment of Lead Counsel

Subject to the Court's approval, the most adequate plaintiff shall select and retain counsel to represent the class. 15 U.S.C. § 78u-4(a)(3)(B)(v). Dr. Passidomo seeks approval of his selection of Zwerling, Schacter & Zwerling LLP as lead counsel. Upon review of the papers submitted in support of Dr. Passidomo's motion and consideration of further representations

made on the record, the Court finds that Zwerling, Schacter & Zwerling LLP has had substantial

experience and success in prosecuting securities class actions, rendering it capable of serving as

lead counsel in this action. (Speirs Aff., Ex. D.)

The Court further finds that Dr. Passidomo's approximately $10,950,000 stake in

this action provides the type of incentive for close supervision of counsel that the PSLRA

contemplates. Accordingly, Dr. Passidomo's selection of Zwerling, Schacter & Zwerling LLP as

lead counsel is approved.

Interim Class Counsel

Federal Rule of Civil Procedure 23(g)(3) provides that the Court may appoint

interim class counsel prior to the certification of a class. With respect to the non-PSLRA claims,

the Court finds, based on the papers submitted in support of Dr. Passidomo's motion and the

further representations made during the hearing regarding the firm's willingness and ability to

assume the interim class counsel position, that Zwerling, Schacter & Zwerling LLP has the

necessary experience to render it a capable interim class counsel with respect to the consolidated,

non-PSLRA claims. The Court further finds that appointment of co-counsel with regard to the

non-PSLRA actions is unnecessary at this time, and might, in fact, be detrimental to effective

prosecution of the proceedings.

It is, therefore, ORDERED that:

## A. LEAD PLAINTIFF AND LEAD COUNSEL

1. Dr. Michael A. Passidomo is appointed Lead Plaintiff.

2. Zwerling, Schachter & Zwerling LLP shall serve as Lead Counsel for all plaintiffs in the

Consolidated Actions. Zwerling, Schachter & Zwerling LLP shall also serve as interim class counsel with regard to the non-PSLRA claims in the Consolidated Actions.

Lead/Interim Counsel shall have the following responsibilities:

    a. Sign any consolidated complaint, motions, briefs, discovery requests, objections, or notices on behalf of all plaintiffs or those plaintiffs filing the particular papers.

    b. Conduct all pretrial proceedings on behalf of plaintiffs.

    c. Brief and argue motions.

    d. Initiate and conduct discovery.

    e. Speak on behalf of plaintiffs at any pretrial conference.

    f. Employ and consult with experts.

    g. Conduct settlement negotiations with defense counsel on behalf of plaintiffs.

    h. Call meetings of plaintiffs' counsel.

    i. Distribute to all plaintiffs' counsel copies of all notices, orders, and decisions of the Court to the extent counsel have not registered on the ECF system for this case; maintain an up-to-date list of counsel available to all plaintiffs' counsel on request; and keep a complete file of all papers and discovery materials filed or generated in the Consolidated Actions, which shall be available to all plaintiffs' counsel at reasonable hours.

3. All other applications for appointment as lead (or co-lead) Plaintiff or counsel are denied.

### B. CONSOLIDATION

1. The motions for consolidation are granted and the above-captioned actions are hereby consolidated for all purposes pursuant to Federal Rule of Civil Procedure 42(a). The consolidated cases do not include Finn v. Smith Barney, et al., 08 Civ. 2975. The consolidated securities cases shall be referred to collectively as In re Citigroup Auction Rate Securities Litigation, Master File No. 08 Civ. 3095 (LTS)(FM).

2. No action taken hereunder shall have the effect of making any person, firm or corporation a party to any action in which the person or entity has not been named, served, or added as such in accordance with the Federal Rules of Civil Procedure.

### C. MASTER DOCKET AND SEPARATE ACTION DOCKETS

1. A Master Docket is hereby established for the consolidated proceedings in the actions consolidated herein and any other actions subsequently consolidated with them either for all purposes or for pretrial purposes (the "Consolidated Actions"). Entries in said Master Docket shall be applicable to the Consolidated Actions, and entries shall be made therein in accordance with the regular procedures of the Clerk of this Court, except as modified by this Order.

2.    (a) When a pleading is filed and the caption, pursuant to this Order, shows that it is applicable to "All Actions," the parties shall electronically or manually file such pleading pursuant to this Court's Guidelines and Amended Instructions for Electronic Case Filing.

(b) When a pleading is electronically filed and the caption, pursuant to this Order,

shows that it is applicable to "All Actions," the parties shall electronically file such pleading in the Master File only. Docket entries shall not be made to each separate action.

(c) When a pleading is manually filed and the caption, pursuant to this Order, shows that it is applicable to "All Actions," the parties shall submit to this Court the original pleading for the Master File. No copies shall be submitted for each separate action. Upon receiving the original pleading, the Clerk shall docket the pleading to the Master File only. Docket entries shall not be made to each separate action.

## D. MASTER FILE AND SEPARATE ACTION FILES

1. A Master File is hereby established for the consolidated proceedings in the Consolidated Actions. The Master File shall be 08 Civ. 3095. The original of this Order shall be docketed by the Clerk of Court in the Master File herein established.

2. The Clerk shall maintain a separate file for each of the Consolidated Actions, and filings shall be made therein in accordance with the regular procedures of the Clerk of this Court except as modified by Section B of this Order. The Clerk shall docket a copy of this Order in each such separate file. Once the Clerk has docketed this Order, counsel of record in each of the Consolidated Actions will receive a Notice of Electronic Filing.

## E. NEWLY FILED OR TRANSFERRED ACTIONS

1. When a class action that relates to the same subject matter as the Consolidated Actions is hereafter filed in or transferred to this Court and assigned to the undersigned, it shall be

consolidated with these actions in the same manner as the cases identified in Section A above (provided that any case transferred to this Court solely for pretrial proceedings shall be consolidated only to that extent absent further order of this Court), except as provided below, and the Clerk of Court shall:

(a)     Docket a copy of this Order in the file for newly filed or transferred actions.

(b)     Make an appropriate entry in the Master Docket.

2. The Court requests the assistance of counsel in calling to the attention of the Clerk the filing or transfer of any case which might properly be consolidated with these actions.

### F. APPLICATION OF THIS ORDER TO SUBSEQUENT CASES

1. This Order shall apply to each class action assigned to the undersigned alleging claims similar to those set forth in these actions against Citigroup Inc., and/or its subsidiaries. This Order shall apply to each such case which is subsequently filed in or transferred to this Court and which is assigned to the undersigned, unless a party objecting to the consolidation of that case or to any other provision of this Order serves an application for relief from this Order or from any of its provisions within ten (10) days after the date on which the Clerk notifies counsel for that party of this Order. The provisions of this Order shall apply to such action pending the Court's ruling on the application.

2. Unless a plaintiff in a subsequently filed or transferred case is permitted by the Court to use a separate complaint, defendants shall not be required to answer, plead or otherwise move with respect to that complaint in any such case. If a plaintiff in any such case is permitted to use a separate complaint, each defendant shall have thirty days from the date the Court grants such

permission within which to answer, plead or otherwise move with respect to any such complaint.

## G. CAPTIONS

1. Every pleading filed in the Consolidated Action, and in any separate action included therein, shall bear the following caption:

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————— x

IN RE CITIGROUP AUCTION      :
RATE SECURITIES LITIGATION  :
                            :            MASTER FILE
                            :            08 Civ. 83095 (LTS)(FM)
                            :
This Document Relates To:    :
                            :
                            :
                            :
————————————————————— x

2. When a pleading is intended to be applicable to all actions to which this Order applies, the words "All Actions" shall appear immediately after the words "This Document Relates To:" in the caption. When a pleading is intended to apply to fewer than all of such actions, the docket number for each individual action to which it is intended to apply and the name of the plaintiff in said action shall appear immediately after the words "This Document Relates To:" in the caption.

## H. FILING AND DOCKETING

1. When a paper is filed and the caption shows that it is applicable to "All Actions," the parties shall electronically or manually file such paper pursuant to this Court's Electronic Case Filing Rules and Instructions.

2.     (a) When a paper is electronically filed and the caption shows that it is applicable to "All Actions," the parties shall electronically file such paper in the Master File only.  No docket entries shall be made to each separate action.

(b) When a paper is manually filed and the caption shows that it is applicable to "All Actions," the parties shall submit to this Court the original paper for the Master File. Copies shall not be submitted for each separate action.  Upon receiving the original paper, the Clerk shall docket the paper to the Master File only.  Docket entries shall not be made to each separate action.

3.     (a) When a paper is filed and the caption shows that it is applicable to fewer than "All Actions," the parties shall electronically or manually file such paper pursuant to this Court's Guidelines and Amended Instructions for Electronic Case Filing.

(b) When a paper is electronically filed and the caption shows that it is applicable to fewer than "All Actions," the parties shall electronically file such paper in the Master File and electronically file such paper to each separate action to which it applies.

(c) When a paper is manually filed and the caption shows that it is applicable to fewer than "All Actions," the parties shall submit to this Court the original paper for the Master File and copies of such paper for each separate action to which it applies.  Upon receiving the papers, the Clerk shall docket the original paper to the Master File and docket copies of such paper to each separate action to which it applies.

## I. SCHEDULE

1. The Lead Plaintiff, shall file and serve a Consolidated Amended Complaint for the Consolidated Actions and any actions subsequently consolidated with them, within <u>sixty (60) days</u> of the date of this Order.

2. Pending filing and service of the Consolidated Amended Complaint, defendants shall have no obligation to move, answer, or otherwise respond to any of the complaints in the actions consolidated herein or any actions subsequently consolidated with them, or to any discovery requests previously served in any of the consolidated actions.

3. Defendants shall answer or otherwise respond to the Consolidated Amended Complaint within of <u>sixty (60) days</u> after service thereof.

4. If Defendants move to dismiss the Consolidated Amended Complaint, opposition papers shall be served and filed within <u>forty-five (45) days</u> after the filing and service of such motion, and any reply papers shall be served and filed within <u>thirty (30) days</u> after the filing and service of plaintiffs' opposition papers.

5. Further proceedings in these consolidated actions will be conducted in compliance with the provisions of the Initial Conference Order dated April 21, 2008, and issued in 08 Civ. 3139 (<u>Swanson</u>) dated April 21, 2008, and in accordance with applicable orders, federal and local court procedural rules and Individual Practices Rules of the undersigned, including Rule 2.B. thereof.

      This Order resolves docket entries nos. 7, 10, 13 and 16 in case no. 08 Civ. 3095; docket

entry no. 9 in case no. 08 Civ. 3139; docket entry no. 5 in case no. 08 Civ. 3904; and docket

entry no. 5 in case no. 08 Civ. 4360.

SO ORDERED.

Dated: New York, New York
June 25, 2008

_____
LAURA TAYLOR SWAIN
United States District Judge