UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RONALD D. KASSOVER, CHRIS JONES STEPHEN M. MITTMAN, RONALD E. KLOKKE, JAN SCHNEIDER, MARJORIE ELLIOTT, RITA TUBIS and HELENA TUBIS on behalf of themselves and all others similarly situated,<br><br>    Plaintiff,<br><br>    v.<br><br>UBS AG and UBS FINANCIAL SERVICES, INC.,<br><br>    Defendants. | No.08-cv-02753 (LMM) (KNF) |
| In re UBS AUCTION RATE SECURITIES LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>ALL ACTIONS | Master File No. 08-cv-02967 (LMM) |

**DECLARATION OF FRANK R. SCHIRRIPA IN SUPPORT
OF LIMITED CONSOLIDATION OF THE *KASSOVER* ACTION WITH
THE PREVIOUSLY ORDERED CONSOLIDATION OF THE EXCHANGE
ACT CASES, AND APPOINTMENT OF SCHOENGOLD SPORN LAITMAN &
LOMETTI, P.C. AS INTERIM CLASS COUNSEL WITH RESPECT TO THE
<u>INVESTMENT ADVISER ACT AND COMMON LAW CLAIMS</u>**

| | |
|---|---|
| **SCHOENGOLD SPORN LAITMAN & LOMETTI , P.C**<br> Samuel P. Sporn (SPS-4444)<br> Joel P. Laitman (JL-8177)<br> Frank R. Schirripa (FS-1960)<br>19 Fulton Street, Suite 406<br>New York, New York 10038<br>Telephone: (212) 964-0046<br>Facsimile (212) 267-8137<br><br>*Attorneys for Plaintiffs and*<br>*Proposed Interim Class Counsel* | **FINKELSTEIN THOMPSON, LLP**<br> Burton H. Finkelstein, Esq.<br> Donald J. Enright, Esq.<br> Michael G. McLellen, Esq.<br> Elizabeth K. Tripodi, Esq.<br>1050 30th Street, N.W.<br>Washington, D.C. 20007<br>Telephone: (202) 337-8000<br>Facsimile: (202) 337-8090<br><br>*Attorneys for Plaintiffs Rita Tubis*<br>*and Helena Tubis* |

I, FRANK R. SCHIRRIPA, hereby declare under penalty of perjury the following:

1. I am associated with the law firm of Schoengold Sporn Laitman & Lometti, P.C. ("SSLL"), counsel for Plaintiffs in *KASSOVER, et al. v. UBS AG and UBS FINANCIAL SERCVICES, INC*, No. 08-cv-2753 (S.D.N.Y.). I submit this declaration in support of the *Kassover* Plaintiffs' motion for the limited consolidation of this action, *Kassover, et al. v. UBS AG*, No. 08-2753 (the "*Kassover* action") with the previously ordered consolidation of the Exchange Act actions,[1] *IN RE UBS AUCTION RATE SECURITIES LITIGATION*, No. 08-cv-2967, and for the approval of Plaintiffs' selection of counsel, SSLL, as interim class counsel with respect to the Investment Advisers Act of 1940 ("IAA"), 15 U.S.C. §80b-1, *et seq.*, and common law claims.

2. Attached hereto as Exhibit A is a true and correct copy of a *New York Times* article by Gretchen Morgenson published on June 29, 2008, entitled "E-mail That Investors Might Like to Read."

3. Attached hereto as Exhibit B is a true and correct copy of the firm biography of proposed Interim Class Counsel, Schoengold Sporn Laitman & Lometti, P.C..

I hereby declare under the laws of the United States, and under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: July 3, 2008

          /s/ Frank R. Schirripa
          Frank R. Schirripa

---

[1] The "Exchange Act cases" include: *Chandler v. UBS AG*, No. 1:08-cv-2967 (S.D.N.Y. filed Mar 21, 2008) (LLM); *Sanchez v. UBS AG*, No. 1:080-cv-3082 (S.D.N.Y. filed Mar. 26, 2008) (LMM).

**The New York Times**
nytimes.com

June 29, 2008

FAIR GAME
# E-Mail That Investors Might Like to Read

By GRETCHEN MORGENSON

EVERY few years, the conflicts of interest so deeply embedded in the Wall Street business model emerge from the shadows for all to see. Coming to light last week, courtesy of Massachusetts regulators, was UBS's dual roles in the auction-rate securities market, which have had devastating effects on the people and institutions that invested in them.

Because every big brokerage firm that participated in this market faced the same conflicts as both underwriters of the securities and managers of the auctions that set their prices, similar ugliness will likely turn up elsewhere as regulators continue their digging.

Auction-rate securities are preferred shares or debt instruments with rates that reset regularly, usually every week, in auctions overseen by the brokerage firms that originally sold them. They have long-term maturities or, in the case of the preferred shares, no maturity dates whatsoever. The securities are issued by municipalities, student-loan companies, closed-end funds and tax-exempt institutions like hospitals and museums.

In mid-February, the $300 billion market for these instruments collapsed, trapping investors who had been told that they were safe and easy to cash in — leaving both wealthy investors and those of modest means unable to finance their small businesses, buy homes, pay college tuition and otherwise use their money as they had planned.

After receiving a flood of complaints from investors in his state, William F. Galvin, secretary of the Commonwealth of Massachusetts, subpoenaed documents from some major market participants. Thursday, he released materials produced by UBS and filed a civil suit against the firm, accusing it of defrauding investors.

MR. GALVIN'S complaint says UBS misled investors by peddling auction-rate securities as cash equivalents and ultrasafe. But the suit also asserts that UBS dumped these securities on individual investors to minimize its own exposure to the risks inherent in keeping them on its own books.

Karina Byrne, a spokeswoman for UBS, said the firm would defend itself. "Contrary to the allegations, UBS is committed to serving the best interests of our clients. We continued to support the auction rate securities market longer than any other firm," she said in a statement. "We have offered our clients loans of up to 100 percent of the par value of their A.R.S. holdings at preferred lending rates. UBS, our clients and clients of other industry participants all share the impact of this unprecedented loss of

liquidity in the A.R.S. market."

Nevertheless, the e-mail messages attached to the Massachusetts complaint support Mr. Galvin's accusations in stunning black and white.

The problem UBS faces began in August, when the credit markets seized. Corporations — which are big buyers of auction-rate securities because of their slightly-higher-than-money-market yields — were beginning to sell. New buyers had to be found or UBS, as underwriter and auction manager, would be stuck with the securities. The firm was going into shell shock because of losses from subprime mortgages on its books, so it needed to find a way out of the auction-rate mess.

Throughout the autumn, increasingly frantic e-mail messages flew among UBS executives. "As you can imagine during these stressful times, the pressure is on to move our inventory," wrote David Shulman, global head of fixed income distribution at UBS, on Aug. 30. "I am aware that JPM and Citi are on all 'alert' in the same fashion with their retail groups."

Joel P. Aresco, chief risk officer for the Americas, sent this message on Nov. 15: "Why the continual increase" in the inventory of auction-rate securities? "What measures are being taken to reduce this exposure?"

On Dec. 11, Mr. Shulman wrote: "I am pushing every angle here to move product."

As it turned out, some of that product being moved was Mr. Shulman's own stake in auction-rate securities, the complaint said. He testified that he began selling in September, because of his "risk tolerance." By Dec. 12, he had dumped all his holdings.

UBS declined to make any of these executives available.

On Feb. 12, just days before the auctions ground to a halt, another UBS executive wrote: "We need to beat the bushes harder than ever to unload this paper."

UBS's Web site, meanwhile, continued to identify auction-rate preferred stock as a highly liquid cash alternative, the lawsuit said.

"The Massachusetts complaint alleges that sophisticated Wall Street insiders, knowing that the market for auction-rate securities was failing, foisted these same securities off on innocent public investors through profoundly deceptive sales practices," said Lewis D. Lowenfels, a securities law expert at Tolins & Lowenfels who represents a handful of auction-rate securities investors. "If these allegations prove to be true and prevalent throughout the Wall Street community, then civil actions awarding punitive damages and possibly even criminal actions may well become widespread."

UBS's clients were not the only ones that the firm's executives appear to have misled. Its brokers, too, seem not to have been told about the risks that auctions could fail and their clients could be locked into their holdings.

"We continue to be frustrated by the lack of information that they are providing to us, one broker wrote about the firm's auction-rate unit in a Jan. 10 message. "Given the strange and difficult environment, it is imperative that we are fully aware of the risk we are taking. We do not want to imperil any relationships over something as 'simple' as their cash investments. The lack of clarity regarding ARPS is contrary to our focus on 'improving the client experience.'" (ARPS refers to auction-rate preferred shares.)

NO Wall Street firm likes to acknowledge that conflicts of interest bedevil its business. And UBS says its clients come first.

But one of the e-mail messages amassed by Mr. Galvin stands out for its cogent discussion of these troubling biases. It was written by Joe Gallichio, a managing director in the municipal finance department at UBS, on Feb. 21, after the market for auction-rate securities had frozen.

"As things change they also remain the same," Mr. Gallichio begins. "What we face now in the firm as related to muni short term is classic Wall Street. In its core, it is trading versus sales, risk management versus client franchise."

"As a firm we tell people we are client focused," he went on. "So if the client is always right, then we should fix the problem this product has created in WM," the firm's wealth management unit, which includes retail investors. "To let WM and the firm as a whole go through costly litigation, the loss of investor confidence and significant assets, the cost in management time, legal and compliance, IT spend, the total distraction from our core growth strategy and overall employee morale — will certainly be in excess of the multibillion-dollar hit to balance sheet we would take by just buying the rest of the assets from WM. I just don't get it."

Reached Friday, Mr. Gallichio declined to comment. He didn't have to. His e-mail said it all.

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map



# FIRM BIOGRAPHY

Schoengold Sporn Laitman & Lometti was originally founded in 1962. For over 45 years, the firm has specialized in representing investors in securities fraud cases, and its attorneys have an average of over 17.5 years of experience. During that time, the firm has helped recover billions of dollars for defrauded shareholders. Most recently, the firm represented an additional named plaintiff and certified class representative in the WorldCom securities class action wherein a record $6.13 billion was recovered. This is one of the largest securities fraud settlements of all time.

Since the enactment of the Private Securities Litigation Reform Act of 1995 -- which legislation sought to increase the role of institutional investors in securities fraud litigation -- the firm has established itself as a leading representative of Taft-Hartley pension and benefit funds in this area of the law. Schoengold Sporn Laitman & Lometti has served as counsel to dozens of such funds in federal securities fraud cases throughout the country over the past several years. We represented the very first Taft-Hartley fund to ever seek Lead Plaintiff status in a federal securities fraud class action case, and the very first Taft-Hartley fund to ever be certified by a federal court as a Class Representative in such a case.

Schoengold Sporn Laitman & Lometti is a true boutique law firm; we handle exclusively securities fraud and derivative cases. And because we are more streamlined than some other firms in the field, we have the ability to be more selective in the cases we bring. That is why our average recovery as a percentage of damages is approximately thirty-three percent (33%), more than 10 times greater than the larger, more litigious firms in the field.[1]

---

[1] This is based on a comparison of estimated recoverable damages versus the recovery amount for Schoengold Sporn Laitman & Lometti's Post-PSLRA cases, on the one hand, as compared to the results of a study conducted by Cornerstone Research entitled Post-

Our unique ability to maximize damage recoveries was highlighted by Federal District Judge McMahon of Manhattan in Maley v. Del Global Corp., 00-CV-8495 (S.D.N.Y), a case in which Schoengold Sporn Laitman & Lometti acted as Sole Lead Counsel. There Judge McMahon commended the firm for "going the extra mile" in obtaining a settlement that represented approximately 41 percent of the maximum recoverable damages incurred by the class, observing: "Through (Schoengold Sporn Laitman & Lometti's) efforts, after intensive investigation, concentrated litigation and extensive arm's-length bargaining, and without the benefit of any governmental agency's investigation, Class Counsel have secured a settlement fund which confers an excellent benefit to the Class. . . I can't ever remember having participated as a lawyer or a judge in a settlement of a securities fraud class action that yielded in excess of a forty percent rate of recovery."

The Wall Street Journal has also highlighted the firm's distinctive success rate. In an April 25, 2002 article, the Journal cited two of our cases wherein we served as Sole Lead Counsel as being among the largest recoveries as a percentage of damages to date (Anadigics, 44% and Versatility, 30%).

Over the years, SSLL has also litigated important and precedent-setting legal issues. For example, in Singer v. Nicor Corp. (Nicor Corp. Sec. Litig.), where SSLL was Sole Lead Counsel, the firm successfully argued that the stay of discovery under the PSLRA should be lifted in order to obtain important documentation that might well have been lost in the interim. And recently, in In re Dynex Capital Inc. Sec. Litig. and Teamsters Local 445 Freight Division Pension Fund v. Bombardier, Inc., where SSLL was again acting as Sole Lead Counsel, the courts permitted an expansive use of the class action device in the representation of investors in public offerings. In both cases, each court, in separate decisions, recognized the right of purchasers of securities on one offering to represent purchasers on a separate offering where it was alleged that the offerings were subject to the same alleged corporate misconduct by the same defendants.

---

Reform Act Securities Lawsuits; Settlements Reported Through Deccember 2003, on the other. The latter uses a different methodology for computing estimated damages than the methodology we employ.



## PROMINENT CASES & RECOVERIES

Among the more prominent cases wherein the firm or its client served in a leadership capacity are the following:

- In re WorldCom Corp. Securities Litigation, 02-CV-3288 (S.D.N.Y.) ($6.13 billion recovery).

- In re McKesson HBOC, Inc. Securities Litigation, 99-CV-20743 (N.D. Cal.) ($1.04 billion settlement subject to court approval).

- In re Oxford Health Plans, Inc. Securities Litigation, MDL Docket No. 1222 (S.D.N.Y.) ($300 million recovery).

- In re Wedtech Securities Litigation, 86-CV-8628 (S.D.N.Y.) ($77.5 million recovery).

- In re Bank One Shareholders Class Actions, 00-CV-880 (N.D. Ill.) ($50 million recovery).

- In re Danis v. USN Communications, Inc., 98-CV-7482 (N.D. Ill.) ($44.7 million recovery).

- In re Nicor Securities Litigation, 02-CV-5168 (N.D. Ill.) (July 9, 2004 - $39 million recovery).

- In re PNC Financial Services Group, Inc. Securities Litigation, 02-CV-271 (W.D. Penn.) ($46.675 million recovery).

- In re JWP Securities Litigation, 92-CV-5815 (S.D.N.Y.) ($36 million recovery).
.

- In re First Investors Securities Litigation, 90-CV-7225 (S.D.N.Y.) ($33 million recovery).

- In re Westar Energy, Inc. Securities Litigation, 03-CV-4003 (D. Kansas) (September 1, 2005 - $30 million recovery).

- In re DSC Communications Corp. Securities Litigation, 85-CV-2005 (N.D. Tex.) ($30 million recovery).

- In re Stern v. Jerome and Fisher Bond Fund v. Davis (SpectraVision Securities Litigation), 94-CV-2236 and 95-CV-3062 (N.D. Tex.) ($28.20 million recovery).

- In re APAC Teleservices Securities Litigation, 97-CV-9145 (S.D.N.Y) ($21 million recovery).

- In re ProNet Securities Litigation, 96-CV-1795 (N.D. Tex.) ($15 million recovery).

- In re Kreigel v. Pacific Scientific Co., 98-CV-4163 (C.D.Cal.) ($14.75 million recovery).

- In re Anadigics, Inc. Securities Litigation, 98-917 (D.N.J.) ($11.5 million recovery).

- In re Maley v. Del Global Technologies Corp., 00-CV-8495 (S.D.N.Y.) ($11.5 million recovery).

- In re SPX Corp. Securities Litigation, 3:04-CV-99 (W.D.N.C.) April 13, 2007 – $10 million cash settlement (Sole Lead Counsel)

- In re Datascope Corp. Securities Litigation, 93-CV-4954 (D.N.J.) ($10.5 million recovery).

- In re Kassover v. Coeur d'Alene Mines Corporation Securities Litigation, 92-CV-0015 (D. Ohio) ($5.875 million recovery).

- In re Rite Aid Corp. Derivative Litigation, 99-CV-1349 (E.D. Pa.) ($5 million paid to corporation in conjunction with $334 million class action settlement).

- In re Versatility, Inc. Securities Litigation, 98-CV-1676 (S.D.N.Y.) ($4.625 million recovery).

- In re Alcohol Testing of America, Inc. Securities Litigation, 92-CV-123 (C.D. Cal.) ($ 4.6 million recovery).

- In re Roberts and Silverman v. U.S. Homecare Corp. Securities Litigation, 93-CV-4060 (S.D.N.Y.) ($3 million recovery).



# FIRM RECOGNIZED BY FEDERAL COURTS

Schoengold Sporn Laitman & Lometti's predecessor firm began specializing in shareholder class and derivative securities litigation with its representation of one of the parties in the seminal case of Escott v. Barchris Construction Corp., 283 F. Supp. 643 (S.D.N.Y. 1968). To this day, Barchris is recognized as the leading securities case dealing with the appropriate standards of liability for issuers, underwriters, accountants and lawyers.

Federal courts throughout the country have long noted the firm's experience and ability in complex securities litigation. Among the cases in which the firm's credentials were recognized are:

- In Maley v. Del Global Technologies Corp., 00-CV-8495 (S.D.N.Y.), a case in which Schoengold Sporn Laitman & Lometti acted as sole lead counsel, Judge McMahon commended the firm for "going the extra mile" in obtaining a settlement representing approximately 41 percent of the maximum recoverable damages incurred by the class, observing: "Through Schoengold [Sporn Laitman & Lometti]'s efforts, after intensive investigation, concentrated litigation and extensive arm's-length bargaining, and without the benefit of any governmental agency's investigation, Class Counsel have secured a settlement fund which confers an excellent benefit to the Class . . . I can't ever remember having participated as a lawyer or a judge in a settlement of a securities fraud class action that yielded in excess of a forty percent rate of recovery."

- In re Westar Energy, Inc. Securities Litigation, 03-CV-4003(D. Kansas), a case in which the class recovered over 34% of total damages, Judge Robinson noted "Class Counsel are highly skilled. They have brought some unique and creative allegations...not based solely on the work of others...but much of which has been based on their own work...the attorneys have great experience, a national reputation, and substantial ability. [T]hey are highly experienced...more than competent...and have diligently represented the class."

- In re SPX Corp. Sec. Litigation, 3:04-CV-99 (W.D.N.C.), the Court commended the firm for its "skill, perseverance[,] … diligent advocacy" and "aggressive representation" of the class in achieving "from a financial standpoint, a very fair settlement" aggregating $10 million, or approximately 22 percent of the maximum recoverable damages, noting that SSL&L is among the "leading attorneys in the country in the area of class actions" and is "extremely competent" and "very experienced."

- In Kriegel v. Pacific Scientific Co., 98-CV-4163 (C.D. Cal.), a case in which the class received approximately 27 percent of their claimed maximum damages (which was 25 times defendants' estimation of damages), Judge Morrow concluded that the firm's "significant expertise" and the "hard-fought" settlement that was obtained "on the eve of trial" directly contributed to the case's "positive outcome."

- In Behr v. APAC Teleservices, Inc., 97-CV-9145 (S.D.N.Y.), Judge Jones recognized the "long efforts" of counsel in litigating the case and their "thorough investigation" of plaintiffs' claims, concluding that the "substantial settlement" obtained "saved [the class] a lot of years of complex litigation."

- In In re Rite Aid Corp. Derivative Litigation, 99-CV-1349 (E.D.Pa.), Judge Dalzell noted that Schoengold Sporn Laitman & Lometti "worked efficiently to help produce a result that benefits the corporation and, through it, its shareholders."

- In In re Datascope Corp. Securities Litigation, 93-CV-4954 (D. N.J.), Judge Bassler observed: "I have been continually impressed with the quality of the work in the case . . . in terms of the way this matter was handled, the professionalism, quality of the legal work, I've never seen anything better, so and for that I'm very grateful to everybody."

- In In re Anadigics, Inc. Securities Litigation, CV-98-917 (D.N.J.), a case in which the class received approximately 44 percent of their legally recoverable damages, Magistrate Judge Wolfson praised the firm's achievement in resolving a difficult and complex case "without prolonging the litigation" and noted that the attorneys handling the matter were "well respected and experienced practitioners."

- In In re Versatility, Inc. Securities Litigation, 98-CV-1676 (S.D.N.Y.), Judge Sprizzo commended the firm for negotiating a settlement that "reflects . . . the best interests of the shareholders and the intelligence of the lawyers."

- In Ostroff v. Hemisphere Hotels Corp., (CCH) Fed. Sec. L. Rep. ¶ 94,713 (S.D.N.Y. 1974), Judge Bonsal observed that "Messrs. Schoengold and Sporn are able attorneys, especially in Securities acts cases."

- In <u>Abramson v. Hyatt International</u>, (CCH) Fed. Sec. L. Rep. ¶ 98,447 (S.D.N.Y. 1982), Judge Lowe commented that "Counsel on both sides are highly respected members of the bar and have substantial experience in stockholder litigation, federal securities litigation and class action litigation."

- In <u>IDI Securities Litigation</u>, 84-CV-3870 (S.D.N.Y.), where shareholders received over 95 percent of their recognized losses, Judge Broderick stated that the legal work done on behalf of the class was "excellent" and "the result was an excellent result."