UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
RONALD D. KASSOVER, CHRIS JONES            :
STEPHEN M. MITTMAN, RONALD E.              :   No.   08-cv-02753 (LMM) (KNF)
KLOKKE, JAN SCHNEIDER, MARJORIE            :
ELLIOTT, RITA TUBIS and HELENA TUBIS       :
on behalf of themselves and all others similarly  :
situated,                                  :   ECF CASE
                                           :
               Plaintiff,                  :
                                           :
          v.                               :
                                           :
UBS AG and UBS FINANCIAL SERVICES, INC.,   :
                                           :
               Defendants.                 :
-----------------------------------------------------------------x

## DECLARATION OF FRANK R. SCHIRRIPA IN SUPPORT OF OPPOSITION TO DEFENDANTS' MOTION FOR A <u>PROTECTIVE ORDER STAYING DISCOVERY</u>

| | |
|---|---|
| **SCHOENGOLD SPORN LAITMAN & LOMETTI , P.C** | **FINKELSTEIN THOMPSON, LLP** |
|   Samuel P. Sporn (SPS-4444) |   Burton H. Finkelstein, Esq. |
|   Joel P. Laitman (JL-8177) |   Donald J. Enright, Esq. |
|   Frank R. Schirripa (FS-1960) |   Michael G. McLellen, Esq. |
| 19 Fulton Street, Suite 406 |   Elizabeth K. Tripodi, Esq. |
| New York, New York 10038 | 1050 30th Street, N.W. |
| Telephone: (212) 964-0046 | Washington, D.C. 20007 |
| Facsimile (212) 267-8137 | Telephone: (202) 337-8000 |
| | Facsimile: (202) 337-8090 |
| *Attorneys for Plaintiffs and Proposed Interim Class Counsel* | *Attorneys for Plaintiffs Rita Tubis and Helena Tubis* |

I, FRANK R. SCHIRRIPA, hereby declare under penalty of perjury the following:

1. I am associated with the law firm of Schoengold Sporn Laitman & Lometti, P.C., counsel for Plaintiffs in *KASSOVER, et al. v. UBS AG and UBS FINANCIAL SERCVICES, INC*, No. 08-cv-2753 (S.D.N.Y.). I submit this declaration in support of the Plaintiffs' memorandum of law in opposition to Defendants' motion for a protective order staying discovery.

2. Attached hereto as Exhibit A is a true and correct copy of a *New York Times* article by Gretchen Morgenson published on June 29, 2008, entitled "E-mail That Investors Might Like to Read."

I hereby declare under the laws of the United States, and under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: July 7, 2008

                                                 __/s/ Frank R. Schirripa_____
                                                 Frank R. Schirripa

## **CERTIFICATE OF SERVICE**

I, Frank R. Schirripa, Esq., one of the counsel for Plaintiffs in the above-referenced action, do hereby certify that on July 7, 2008, a true and correct copy of the foregoing Declaration in support of Plaintiffs' memorandum of law in opposition to Defendants' motion for protective order staying discovery was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the notice of electronic filing. Parties may access this filing through the Court's CM/ECF System.

                                                          /s/ Frank R. Schirripa
                                                           Frank R. Schirripa

**The New York Times**
nytimes.com

June 29, 2008

FAIR GAME
# E-Mail That Investors Might Like to Read

By GRETCHEN MORGENSON

EVERY few years, the conflicts of interest so deeply embedded in the Wall Street business model emerge from the shadows for all to see. Coming to light last week, courtesy of Massachusetts regulators, was UBS's dual roles in the auction-rate securities market, which have had devastating effects on the people and institutions that invested in them.

Because every big brokerage firm that participated in this market faced the same conflicts as both underwriters of the securities and managers of the auctions that set their prices, similar ugliness will likely turn up elsewhere as regulators continue their digging.

Auction-rate securities are preferred shares or debt instruments with rates that reset regularly, usually every week, in auctions overseen by the brokerage firms that originally sold them. They have long-term maturities or, in the case of the preferred shares, no maturity dates whatsoever. The securities are issued by municipalities, student-loan companies, closed-end funds and tax-exempt institutions like hospitals and museums.

In mid-February, the $300 billion market for these instruments collapsed, trapping investors who had been told that they were safe and easy to cash in — leaving both wealthy investors and those of modest means unable to finance their small businesses, buy homes, pay college tuition and otherwise use their money as they had planned.

After receiving a flood of complaints from investors in his state, William F. Galvin, secretary of the Commonwealth of Massachusetts, subpoenaed documents from some major market participants. Thursday, he released materials produced by UBS and filed a civil suit against the firm, accusing it of defrauding investors.

MR. GALVIN'S complaint says UBS misled investors by peddling auction-rate securities as cash equivalents and ultrasafe. But the suit also asserts that UBS dumped these securities on individual investors to minimize its own exposure to the risks inherent in keeping them on its own books.

Karina Byrne, a spokeswoman for UBS, said the firm would defend itself. "Contrary to the allegations, UBS is committed to serving the best interests of our clients. We continued to support the auction rate securities market longer than any other firm," she said in a statement. "We have offered our clients loans of up to 100 percent of the par value of their A.R.S. holdings at preferred lending rates. UBS, our clients and clients of other industry participants all share the impact of this unprecedented loss of

liquidity in the A.R.S. market."

Nevertheless, the e-mail messages attached to the Massachusetts complaint support Mr. Galvin's accusations in stunning black and white.

The problem UBS faces began in August, when the credit markets seized. Corporations — which are big buyers of auction-rate securities because of their slightly-higher-than-money-market yields — were beginning to sell. New buyers had to be found or UBS, as underwriter and auction manager, would be stuck with the securities. The firm was going into shell shock because of losses from subprime mortgages on its books, so it needed to find a way out of the auction-rate mess.

Throughout the autumn, increasingly frantic e-mail messages flew among UBS executives. "As you can imagine during these stressful times, the pressure is on to move our inventory," wrote David Shulman, global head of fixed income distribution at UBS, on Aug. 30. "I am aware that JPM and Citi are on all 'alert' in the same fashion with their retail groups."

Joel P. Aresco, chief risk officer for the Americas, sent this message on Nov. 15: "Why the continual increase" in the inventory of auction-rate securities? "What measures are being taken to reduce this exposure?"

On Dec. 11, Mr. Shulman wrote: "I am pushing every angle here to move product."

As it turned out, some of that product being moved was Mr. Shulman's own stake in auction-rate securities, the complaint said. He testified that he began selling in September, because of his "risk tolerance." By Dec. 12, he had dumped all his holdings.

UBS declined to make any of these executives available.

On Feb. 12, just days before the auctions ground to a halt, another UBS executive wrote: "We need to beat the bushes harder than ever to unload this paper."

UBS's Web site, meanwhile, continued to identify auction-rate preferred stock as a highly liquid cash alternative, the lawsuit said.

"The Massachusetts complaint alleges that sophisticated Wall Street insiders, knowing that the market for auction-rate securities was failing, foisted these same securities off on innocent public investors through profoundly deceptive sales practices," said Lewis D. Lowenfels, a securities law expert at Tolins & Lowenfels who represents a handful of auction-rate securities investors. "If these allegations prove to be true and prevalent throughout the Wall Street community, then civil actions awarding punitive damages and possibly even criminal actions may well become widespread."

UBS's clients were not the only ones that the firm's executives appear to have misled. Its brokers, too, seem not to have been told about the risks that auctions could fail and their clients could be locked into their holdings.

"We continue to be frustrated by the lack of information that they are providing to us, one broker wrote about the firm's auction-rate unit in a Jan. 10 message. "Given the strange and difficult environment, it is imperative that we are fully aware of the risk we are taking. We do not want to imperil any relationships over something as 'simple' as their cash investments. The lack of clarity regarding ARPS is contrary to our focus on 'improving the client experience.'" (ARPS refers to auction-rate preferred shares.)

NO Wall Street firm likes to acknowledge that conflicts of interest bedevil its business. And UBS says its clients come first.

But one of the e-mail messages amassed by Mr. Galvin stands out for its cogent discussion of these troubling biases. It was written by Joe Gallichio, a managing director in the municipal finance department at UBS, on Feb. 21, after the market for auction-rate securities had frozen.

"As things change they also remain the same," Mr. Gallichio begins. "What we face now in the firm as related to muni short term is classic Wall Street. In its core, it is trading versus sales, risk management versus client franchise."

"As a firm we tell people we are client focused," he went on. "So if the client is always right, then we should fix the problem this product has created in WM," the firm's wealth management unit, which includes retail investors. "To let WM and the firm as a whole go through costly litigation, the loss of investor confidence and significant assets, the cost in management time, legal and compliance, IT spend, the total distraction from our core growth strategy and overall employee morale — will certainly be in excess of the multibillion-dollar hit to balance sheet we would take by just buying the rest of the assets from WM. I just don't get it."

Reached Friday, Mr. Gallichio declined to comment. He didn't have to. His e-mail said it all.

Copyright 2008 The New York Times Company

Privacy Policy | Search | Corrections | RSS | First Look | Help | Contact Us | Work for Us | Site Map