UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------x

| | |
|---|---|
| RONALD D. KASSOVER, CHRIS JONES : | |
| STEPHEN M. MITTMAN, RONALD E. : | No.    08-cv-02753 (LMM) |
| KLOKKE, JAN SCHNEIDER, MARJORIE : | |
| ELLIOTT, MARK THEISSMAN, RITA TUBIS : | |
| and HELENA TUBIS on behalf of themselves : | |
| and all others similarly situated, : | ECF CASE |
| : | |
| Plaintiff, : | |
| : | |
| v. : | |
| : | |
| UBS AG and UBS FINANCIAL SERVICES, INC., : | |
| : | |
| Defendants. : | |

----------------------------------------------------------------x

**DECLARATION OF JOEL P. LAITMAN IN SUPPORT OF
PLAINTIFFS' PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS
THE FIRST AMENDED CLASS ACTION COMPLAINT**

**SCHOENGOLD SPORN LAITMAN &
LOMETTI , P.C**
  Samuel P. Sporn (SPS-4444)
  Joel P. Laitman (JL-8177)
  Christopher Lometti (CL-9124)
  Jay P. Saltzman (JS-7335)
  Frank R. Schirripa (FS-1960)
  Daniel B. Rehns (DR-5506)
19 Fulton Street, Suite 406
New York, New York 10038
Telephone: (212) 964-0046
Facsimile (212) 267-8137

*Attorneys for Plaintiffs and Interim Class
Counsel for IAA and State Law Claims*

**FINKELSTEIN THOMPSON, LLP**
  Burton H. Finkelstein, Esq.
  Donald J. Enright, Esq.
  Michael G. McLellen, Esq.
  Elizabeth K. Tripodi, Esq.
1050 30th Street, N.W.
Washington, D.C. 20007
Telephone: (202) 337-8000
Facsimile: (202) 337-8090

*Attorneys for Plaintiffs Rita Tubis
and Helena Tubis*

I, JOEL P. LAITMAN, hereby declare under penalty of perjury the following:

1.      I am member of law firm of Schoengold Sporn Laitman & Lometti, P.C., and counsel for Plaintiffs in the above-referenced action.  I submit this declaration in support of the Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Class Action Complaint.

2.      Attached hereto as Exhibit 1 is a true and correct copy of the complaint filed by New York State Attorney General Andrew Cuomo against UBS Securities LLC and UBS Financial Services, Inc. on July 24, 2008.

3.      Attached hereto as Exhibit 2 is a true and correct copy of excerpts from UBS AG's web site.

4.      Attached hereto as Exhibit 3 is a true and correct copy of *The Wall Street Journal* article by Liz Rappaport and Randal Smith published on August 9, 2008, entitled "UBS to Pay $19 Billion As Auction Rate Mess Hits Wall Street."

5.      I hereby declare under the laws of the United States, and under the penalty of perjury, that the foregoing is true and correct to the best of my knowledge, information and belief.

Date: August 13, 2008

                                        __/s/ Joel P. Laitman_____
                                        Joel P. Laitman

<u>**CERTIFICATE OF SERVICE**</u>

I, Frank R. Schirripa, Esq., one of the counsel for Plaintiffs in the above-referenced

action, do hereby certify that on August 13, 2008, a true and correct copy of the foregoing

Declaration in Support of Opposition to Defendants' Motion to Dismiss the Amended Class

Action Complaint was filed with Court via ECF System and served on all parties via the ECF

System.

                                                    ___/s/ Frank R. Schirripa_____
                                                         Frank R. Schirripa

# EXHIBIT 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------X

THE PEOPLE OF THE STATE OF NEW YORK
By ANDREW M. CUOMO, Attorney General of the
State of New York,

|  |  |
|---|---|
| Plaintiff, | **SUMMONS** |
|  |  |
| - against - | Index No.: |
|  |  |
| UBS SECURITIES LLC and | **Plaintiff Designates** |
| UBS FINANCIAL SERVICES, INC., | **New York County as the** |
|  | **Place of Trial** |
|  |  |
| Defendants. | |

------------------------------------------------------------------X

TO THE ABOVE-NAMED DEFENDANTS:

YOU ARE HEREBY SUMMONED to answer in this action and serve a copy of your answer, or if the complaint is not served with the summons to serve a notice of appearance, on the plaintiff's attorney within twenty (20) days after the service of the summons, exclusive of the day of service. If the summons is not personally served upon you, or if the summons is served upon you outside of the State of New York, then your answer or notice of appearance must be served within thirty (30) days. In case of your failure to appear or answer, judgement will be taken against you by default, for the relief demanded in the complaint.

Date Filed:    July 24, 2008

ANDREW M. CUOMO
Attorney General of the State of New York
*Attorney for Plaintiff*
120 Broadway - 23rd Floor
New York, New York 10271
(212) 416-6563

By: _____

David A. Markowitz
Chief, Investor Protection Bureau

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

THE PEOPLE OF THE STATE OF NEW YORK :
By ANDREW M. CUOMO, Attorney General of the :
State of New York, :

 :

      Plaintiff, :

 :  **COMPLAINT**

    - against - :

 :  Index No.

 :

UBS SECURITIES LLC and :
UBS FINANCIAL SERVICES, INC., :

 :

      Defendants. :

 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiff, the People of the State of New York, by Andrew M. Cuomo, Attorney General of the State of New York ("Attorney General"), alleges upon information and belief the following against defendants UBS Securities LLC and UBS Financial Services, Inc. (collectively "UBS" or "Defendants"):

## SUMMARY

1. UBS has committed a multi-billion dollar consumer and securities fraud on the investing public by falsely selling securities facing mounting liquidity risk as cash equivalents. The fraud occurred in connection with UBS's underwriting, distribution and sale of auction rate securities. UBS represented that auction rate securities were safe, liquid and cash-equivalent securities. These representations were false and had severe detrimental impact on tens of thousands of UBS customers. Since February 13, 2008, UBS's customers who bought auction rate securities have been unable to cash or sell the securities.

2.    Not only did UBS fail to disclose the risks of auction rate securities to defrauded investors when UBS knew the market was crashing in the late fall of 2007 and early winter of 2008, but UBS also stepped-up its efforts to sell auction rate securities to its retail customers so as to reduce its own exposure. Most disturbingly, as the storm clouds loomed over the auction rate securities market and UBS pushed the soon-to-be illiquid paper on the investing public, several senior UBS officials sold over $21 million of their personal auction rate securities holdings.

3.    UBS misrepresented the risks of auction rate securities to its retail clients and other customers. Prior to February 13, 2008, UBS financial advisors marketed auction rate securities to UBS retail clients and other customers as liquid, short-term investments that were similar to money market instruments. Customers then received account statements that reinforced the misrepresentations, as the statements identified auction rate securities as cash equivalent securities. UBS's representations were false. UBS knew that the auction rate securities market was becoming increasingly strained, was being propped up by UBS and that UBS was considering various options, including letting auctions fail.

4.    UBS's fraudulent sales practices proved effective – UBS stood out as a market leader in auction rate securities sales. As of February 2008, UBS had more than 50,000 customer accounts, including over 7,000 New York accounts, holding auction rate securities. Customers purchasing auction rate securities were looking for safety and liquidity, and most believed they were invested in cash equivalent instruments. Those customers typically invested in what they believed were cash equivalents because they thought they would need the money in a near-term basis. Individual investors planned to use what they believed was cash safely stored at a reputable bank for health care costs, tax payments, and tuition costs, among others.

Companies purchasing auction rate securities planned to use the proceeds for various purposes, such as payroll, operating costs, and capital improvements. Despite UBS's representations, however, since February 2008, UBS's retail clients and other customers who hold auction rate securities in their UBS accounts have not been provided access to their funds, as they were promised when they purchased the securities.

5.     Beginning in the fall of 2007, the auction rate securities market dislocation that UBS failed to disclose to its customers was impossible for UBS to ignore. From the fall of 2007 up until widespread auction failures occurred in the early part of 2008, the auction rate securities market only continued as a result of UBS placing support bids. As the demand for auction rate securities lessened, UBS propped up the market that would have otherwise failed. This increase in UBS participation resulted in an exponential increase in UBS's auction rate securities inventory, increasing five-fold from June 2007 to January 2008.

6.     In the final months of 2007 and in the early weeks of 2008, UBS's management became increasingly concerned with the unsustainable growth in its inventory of auction rate securities and its need to support auctions in order to avoid auction failures. UBS created an auction rate securities working group ("Working Group") specifically to address the fissures in the auction rate securities market. During this time, UBS actively discussed letting auctions fail, which would have created a liquidity crisis for UBS's investors. During this period, UBS also looked for ways to have its financial advisors sell auction rate securities and lessen the mounting pressure of UBS's growing inventory. While many options were discussed, the only one that was repeatedly implemented was to re-double sales efforts to UBS's clients.

7.     While UBS management kept UBS's customers in the dark about the looming crisis and stepped up sales efforts so more UBS customers would buy auction rate securities,

various high-ranking UBS executives in-the-know dumped their personal auction rate securities holdings. Indeed, no fewer than seven members of the Working Group sold substantial amounts of their personal auction rate securities totaling approximately $10 million even after the Working Group had been formed. UBS betrayed its customers by allowing its senior officers to sell their personal auction rate securities holdings while UBS encouraged its customers to buy auction rate securities.

8.　On February 13, 2008, the vast majority of all auction rate securities failed when UBS and all other major broker-dealers refused to continue to support the auction rate securities auctions. Unlike the UBS executives who had sold their personal holdings, more than 50,000 customer accounts were left holding more than $37 billion in illiquid investments.

9.　This action under the Martin Act and Executive Law § 63(12) action seeks redress for all of UBS's defrauded customers. Through this action, the Attorney General seeks an order requiring, (a) UBS to keep its promise and buy back auction rate securities from defrauded customers at par, (b) disgorgement of ill-gotten gains, (c) restitution and other damages, (d) injunctions from further violations of the Martin Act and Executive Law § 63(12), and (e) such other relief as the Court finds just and proper.

## JURISDICTION AND VENUE

10.　The Attorney General has an interest in the economic health and well-being of those who reside or transact business within the State of New York. In addition, the Attorney General has an interest in ensuring that the marketplace for the trading of securities functions fairly with respect to all who participate or consider participating in it. The State of New York, moreover, has an interest in upholding the rule of law generally. Defendants' conduct injured these interests.

4

11.    The State of New York brings this action pursuant to its sovereign and quasi-sovereign capacities, as *parens patriae*, and pursuant to Executive Law §§ 63(1) and 63(12) and General Business Law §§ 352 *et seq.* (the "Martin Act"). The State sues to redress injury to the State and to its general economy and citizenry-at-large. The State seeks disgorgement, restitution, damages, costs and equitable relief with respect to Defendants' fraudulent and otherwise unlawful conduct.

12.    UBS's fraud emanated from New York, New York, where its short-term trading desk and other senior executives were located. Moreover, numerous New York residents and businesses, as well as the interests of the State of New York, were harmed by Defendants' conduct.

### PARTIES

13.    This action is brought by the Attorney General on behalf of the People of the State of New York upon his authority under Article 23-A of the General Business Law, § 63 (12) of the Executive Law of the State of New York, and the common law of the State of New York.

14.    Defendant UBS Financial Services, Inc. ("UBS Financial Services") is a wholly-owned subsidiary of UBS AG. UBS AG is a leading Swiss-based financial services firm specializing in asset management, investment banking, and securities services. UBS Financial Services is a Delaware corporation, and its principal executive offices are located in Weehawken, New Jersey. UBS Financial Services maintains offices located in New York, New York. UBS Financial Services is a registered broker/dealer, and offers brokerage, financial planning and investment products to individuals across the United States. UBS Financial Services employs more than 8,200 financial advisors in over 480 branch and satellite offices in the United States.

15.     Defendant UBS Securities LLC ("UBS Securities") is a wholly owned subsidiary of UBS AG.  UBS Securities is also a Delaware corporation with its principal place of business located in Stamford, Connecticut.  UBS Securities maintains offices, as well as its short-term trading desk, in New York, New York.  UBS Securities is a broker/dealer engaging in nationwide securities sales, trading, private banking, and underwriting services.

## FACTUAL ALLEGATIONS

### I.    Background on Auction Rate Securities

16.     Auction rate securities are typically long-term debt obligations (or, as explained below, in the case of Auction Preferred Shares, equity instruments with no stated maturity) with interest rates that are set at auctions every 7, 28, or 35 days in a bidding process conducted by securities dealers.  The bonds typically have maturities of 30 years; preferred shares have no maturity date.  Auction rate securities were first introduced in the 1980s.  Since then, the market for auction rate securities grew dramatically and the estimated value of auction rate securities in existence as of the market's February collapse was around $330 billion.  Investments in auction rate securities were initially limited to institutional investors, with required minimum investments of $250,000, but between 2006 and 2007, the minimum investment amount was reduced to $25,000.

17.     There are three primary types of auction rate securities:

(a)     **Auction Preferred Shares:** Auction Preferred Shares ("APS") are equity instruments without a stated maturity issued by closed-end funds.  They are collateralized by the assets in that fund and typically receive ratings from the major rating agencies.

(b)     **Municipal Auction Rate Certificates:** Municipal Auction Rate Certificates ("Municipal ARCS") are debt instruments (typically municipal bonds) issued by governmental entities with a long-term maturity and a nominal floating interest rate.

(c)  **Student Loan-Backed Auction Rate Certificates:** Student Loan-Backed Auction Rate Certificates ("Student Loan ARCS") are long-term debt instruments issued by trusts, which hold student loans.

All three types of auction rate securities typically have maximum or default interest rates that are set forth in a prospectus that defines interest rates in the event of auction failure. Some maximum rates are fixed percentage rates, while others are set pursuant to various formulas.

### A.    The Auction Process

18.    During the relevant period, UBS acted as a sole manager or lead manager for many issues of auction rate securities issued by municipalities, student loan companies, and closed-end funds. By acting as sole manager or lead manager, UBS and its short-term trading desk were the sole point of contact for clients and/or other broker-dealers who wanted to buy and/or sell any auction rate securities. The issuers that chose UBS to act as lead or sole manager paid UBS an annual fee to do so. UBS was typically paid a percentage for underwriting an auction rate securities offering and an additional fee to manage each auction.

19.    Auction rate securities were auctioned at par value, so the return on the investment to the investor and the cost of financing to the issuer were determined by the interest rate or dividend yield set through the auction. The auctions were commonly referred to as "Dutch" auctions, *i.e.*, one where the price was set at a low level and then increased throughout the course of the auction until all of the auction rate securities at the auction were sold. At the end of the auction, the rate at which all of the securities were sold, was set uniformly and was called the "clearing rate."

**B.    Support Bids**

20.    UBS placed orders for its own account through the use of "support bids." Support bids were proprietary bids placed by UBS through which UBS purchased auction rate securities where there otherwise would be insufficient demand to support an auction. Until February 13, 2008, UBS routinely submitted support bids for its auctions. This support bid would prevent the auction from "failing."

21.    Because of the nature of the auction process, UBS investors could not determine if auctions were succeeding because of normal marketplace demand, or if UBS was propping up auctions through support bids.

22.    From at least January 2006 to the present, UBS's auction rate securities offerings could not function without UBS support. UBS did not disclose to its customers that its auction rate securities offerings required UBS's support in order to function, or that cessation of UBS's support would cause widespread failure.

23.    When UBS purchased auction rate securities through support bids, auction rate securities were then owned by UBS and the holdings were recorded on UBS's balance sheet. For risk management purposes, UBS imposed limits on the amounts of auction rate securities inventory it could hold. During 2007 and the beginning of 2008, those inventory caps were between $2.1 billion and $2.5 billion.

**C.    Failed Auctions**

24.    When there were not enough orders – including UBS orders – to purchase all of the securities being sold at an auction rate securities auction, a "failed" auction occurred. Most importantly, in the event of a failed auction, none of the current securities holders could sell their securities. As UBS's Executive Director/Manager of the Short-Term Trading Desk ("Trading

Desk Manager") wrote in an e-mail dated December 19, 2007 to UBS's Global Head of

Municipal Securities Group ("Global Head of Municipal Securities"):

> In the event of a failed auction, the securities in question would be
> rendered illiquid. **The liquidity for these securities is contingent**
> **solely on the basis of successful auctions taking place.** Investors
> (who have predominately been "retail" and "cash management
> accounts") would be forced to hold the securities, at the fail rate
> pursuant to the documents, until the next scheduled auction. At the
> next scheduled auction (*i.e.* 7, 28 or 35 days) we would attempt
> again to conduct a successful auction, this cycle would be repeated
> until either a successful auction occurs or the issuer takes action to
> either restructure the outstanding auction securities or worse [sic]
> case until final legal maturity.

(Emphasis added).

　　　25.　　An auction failure would create a liquidity crisis for UBS's auction rate securities

customers. Since February 13, 2008, UBS's customers who own auction rate securities have

been unable to cash or sell their securities.


**II.　　UBS Misrepresented the Liquidity of Auction Rate Securities and Failed to Fully**
**　　Disclose Its Conflicted Role in the Auction Process**

　　　26.　　UBS Financial Services falsely represented to its customers that auction rate

securities were highly liquid, safe investments for short-term investing and were equivalent to

cash or money market funds. UBS made these false statements in its marketing materials about

auction rate securities. UBS brokers also generally conveyed these representations to their

clients. And these false statements were reinforced by UBS when customers received their

account statements, which listed auction rate securities as "cash equivalents."

### A.    Misrepresentations in Marketing Materials

27.    UBS Financial Services posted on its public website a marketing piece, "Cash & Cash Alternatives Addressing Your Short-Term Needs." In this marketing piece, UBS defined liquidity as **"the ability to quickly convert investments into cash when you need it.** Investing in cash alternatives can add this flexibility to your overall portfolio strategy. **Cash alternatives are highly liquid, short-term investments."** (emphasis added). Auction rate securities were among the cash and cash equivalent investments listed in this marketing piece.

28.    In August 2007, UBS Financial Services circulated its "Investment Intelligence" magazine, which is "a quarterly 'statement stuffer' that is sent to all (UBS Financial Services') retail clients and available to employees on the intranet." The featured topic was "Planning Your Retirement Cash Flow Strategy." The article states, in relevant part: "Where are you keeping your liquid funds now? Liquidity refers to the ability to quickly convert investments into cash when you need it. You can choose from a wide selection of cash alternatives including: Auction Preferred Stock and Auction Rate Certificates." Other products listed as cash alternatives included Certificates of Deposit and U.S. Treasury Bills.

### B.    UBS Financial Advisors Marketed and Sold Auction Rate Securities to Its Retail Clients as Safe, Liquid Investments

29.    UBS told its retail clients and other customers who purchased auction rate securities that they were purchasing safe, liquid instruments that were similar to money-market funds. UBS marketed the investments as part of its cash management program. Moreover, the vast majority of UBS's retail clients and other customers were not apprised of the risks of auction rate securities, including the risk of failed auctions or the collapse of the auction rate securities market, until after the auction rate securities market failures in February 2008.

10

30.     The stories of UBS customers all have a common theme – they were told auction rate securities were just like cash. The following are but a few examples of the experiences of defrauded customers that were induced into purchasing auction rate securities:

(1)     Customer A

31.     Like the majority of UBS customers that purchased auction rate securities, Customer A had immediate short-term liquidity needs. In November 2007, Customer A needed to keep her savings liquid because of her concern that her husband might be terminated from his employment. Customer A specifically instructed her UBS financial advisor that she needed a safe and liquid short-term investment in order to have access to her money if her husband lost his job. Her UBS financial advisor was fully aware that Customer A was a risk-averse investor who was looking for a liquid investment.

32.     Despite Customer A's instructions and the fact that auctions for auction rate securities had failed over the summer, the UBS financial advisor recommended and sold Customer A auction rate securities. Her UBS financial advisor represented to Customer A that auction rate securities were "just like cash" and retrievable on a week's notice. Customer A's UBS financial advisor further represented to her that the interest rate might vary from auction to auction.

33.     The UBS financial advisor never disclosed to Customer A that auction rate securities could become illiquid or were long-term debt instruments. The UBS financial advisor never provided a prospectus or any statement of risk. In fact, Customer A's UBS financial advisor never mentioned any risk of illiquidity or failed auctions. In addition, Customer A's UBS financial advisor never mentioned that UBS supported auction rate securities auctions or that UBS might one day cease supporting such auctions without warning to its retail clients.

11

After purchasing her auction rate securities, Customer A received a confirmation statement listing auction rate securities as "cash and cash equivalents."

34.    On March 6, 2008, Customer A received a call from her UBS financial advisor who advised her that her money was safe but there was a liquidity problem that would take months to resolve. This was the first time that Customer A had an idea that her money was or could be frozen. In the following days, Customer A contacted her UBS financial advisor and asked specific questions as to the terms of the securities; she received no answers. When Customer A asked what UBS was doing to resolve the problem, her UBS financial advisor responded: "They don't tell us that."

(2)    Customer B

35.    Upon leaving his company in January 2007, Customer B instructed his UBS financial advisor to place $400,000 in a safe, money market-type account. The UBS financial advisor informed Customer B that his money had been placed in a short-term investment, without identifying that the securities were auction rate securities. Consistent with his understanding, Customer B received account statements describing his investment as "cash alternatives" and a listing of each account in abbreviated form. Customer B did not receive any prospectus or disclosure statement before the auction rate securities market froze.

36.    On February 29, 2008, Customer B was contacted by his UBS financial advisor to inform Customer B that his accounts were frozen and that Customer B could not liquidate his investments. Customer B was shocked, furious and confused over how securities UBS assured him were liquid were not. On March 5, 2008, a UBS branch manager told Customer B's wife that the securities were auction rate securities – this was the first time that Customer B learned that his funds were placed in auction rate securities.

37.    On March 27, 2008, UBS issued a press release on its website in question-and-answer format describing auction rate securities and the subsequent auction failures. The release indicated that failed auctions and the consequences thereof were disclosed and explained in the auction rate securities offering documents. Such offering documents were not received by Customer B until March 2008. The information contained in the press release was inconsistent with UBS's description of auction rate securities on its own website less than one month prior to the March 2008 release, and UBS's marketing materials.

(3)    Customer C

38.    In June 2006, Customer C needed a safe, liquid investment. At the recommendation of his financial advisor, Customer C purchased auction rate securities in the amount of $1.25 million with auctions occurring every seven days. At the time of sale, Customer C's UBS financial advisor represented to Customer C that the auction rate securities were safe, liquid investments that were not subject to any market fluctuation. Similar to Customers A and B, Customer C did not receive any prospectus or offering documents at the time of purchase. From June 2006 to February 2008, Customer C received account statements classifying the auction rate securities as "cash alternatives."

39.    In March 2008, Customer C instructed his UBS financial advisor to sell Customer C's position in auction rate securities. Customer C intended to use the proceeds of such sale to purchase a retirement home. In response to Customer C's "sell" order, his UBS financial advisor told Customer C that UBS had stepped back from the auctions and that the auctions had failed.

40.    Customer C's UBS financial advisor did not indicate when liquidity would return to the market, thereby placing Customer C in a precarious position, requiring him to seek alternative financing to purchase a retirement home. On March 31, 2008, UBS marked down the

13

value of Customer C's auction rate securities approximately 3.09% to reflect changes in market conditions.

      (4)    <u>Customer D</u>

41.     On May 30, 2006, Customer D opened a retail account with UBS with an initial deposit of $5,000. On July 20, 2006, Customer D made a second deposit of $6,000. In October 2007, Customer D's assets were in a money market fund. Customer D advised his UBS financial advisor that Customer D wanted to keep his UBS account in money market instruments to use to pay for his son's college expenses. Shortly thereafter, Customer D's UBS financial advisor called to inform him that UBS offered a cash equivalent "paper." According to Customer D, his UBS financial advisor recommended a product that could earn higher interest than a money market fund. His UBS financial advisor stated that the minimal entry level for this product was $25,000 and described this product as a fixed interest cash equivalent with the full principle convertible to cash for trading at the conclusion of any 30-day cycle. His UBS financial advisor said that he had a number of clients invested in this cash equivalent who regularly converted their investments to cash on a weekly or monthly basis.

42.     In October 2007, Customer D deposited additional funds in his UBS account to bring the balance up to slightly over $25,000 and requested that his UBS financial advisor proceed with investing $25,000 in the cash-equivalent product. In March 2008, Customer D contacted his UBS financial advisor after reading a Wall St. Journal on-line news report about UBS. His UBS financial advisor assured Customer D that the "media" was misleading and that no changes were anticipated in Customer D's account. Customer D requested that his UBS financial advisor convert the securities to cash. After Customer D reviewed his March 2008

account statement, Customer D's account was marked down approximately $1,400. Customer D

has been unable to liquidate his auction rate securities.

    (5)    <u>Customers A, B, C, and D's Experiences Were Similar to the Vast Majority of</u>
<u>UBS Retail Clients</u>

    43.    Like Customers A, B, C and D, the vast majority of UBS retail clients, as well as

other customers, had similar experiences in purchasing auction rate securities from UBS. UBS

financial advisors failed to disclose to their retail and other clients the risks associated with

auction rate securities. Further, UBS financial advisors failed to disclose the risks associated

with the specific auction rate securities purchased for their retail clients or provide any disclosure

or offering documents or prospectuses in connection with the sale of the auction rate securities to

their clients. UBS financial advisors failed to disclose to their retail clients the risk that the

auctions could fail or that the auctions had historically been prevented from failing because UBS

had an internal policy to purchase auction rate securities to prevent auction failures and to

preserve liquidity of auction rate securities. UBS financial advisors failed to disclose to their

retail clients that UBS could in the future choose not to purchase the auction rate securities

necessary to prevent an auction failure and thereby render the auction rate securities illiquid.

UBS financial advisors failed to disclose that these risks made auction rate securities a far

different product than cash or a money market fund.

    **C.**    **The UBS Financial Advisors Marketed and Sold Auction Rate Securities to UBS**
        **Customers As Highly Liquid, Cash Alternatives**

    44.    What is most striking about this fraud is that many of the facts are largely

uncontested. Indeed, UBS financial advisors readily admit that they represented auction rate

securities to be cash equivalents, as that was their understanding. Many UBS brokers did not even

have the most basic understanding of how auction rate securities worked until after UBS determined

not to participate in any auctions on February 13, 2008. In fact, many UBS financial advisors did not

receive any instruction or compliance training from UBS with respect to auction rate securities.

Moreover, most UBS financial advisors sold auction rate securities on a solicited basis, meaning that

it was the UBS financial advisor that suggested that the customer purchase the auction rate securities.

The following recounts the experiences of some financial advisors.

      (1)    UBS Financial Advisor A

      45.    UBS financial advisor A is a Senior Vice President at UBS who sold auction rate

securities to approximately 35 UBS customers. Financial advisor A explained that the majority

of those sales were solicited by him. Financial advisor A sold auction rate securities as a cash

alternative: "I mean the whole point of the auction rate is that it's, you know, it's a cash

alternative. If someone has money that they just want to, that they are trying to get the best rate

that they can and they want a certain level of liquidity in it, it made sense." UBS financial

advisor A did not disclose the risk of auction failure, as he "was not aware that they could [fail]."

      (2)    UBS Financial Advisor B

      46.    UBS financial advisor B is a Senior Vice President at UBS and a member of

UBS's President's Council for Financial Advisors. UBS financial advisor B sold auction rate

securities to approximately 60 New York customers. UBS financial advisor B solicited most of

his auction rate securities sales. Similar to other UBS financial advisors, UBS financial advisor

B recommended and sold auction rate securities as liquid investments and was unaware that the

auctions might fail and that UBS was providing support bids, "I would have liked to have known

that the auctions could fail. I would have liked to tell my clients that." UBS financial advisor B

only learned that auction rate securities auctions could fail on February 12, 2008, the day before

UBS let its auction rate securities auctions fail. UBS financial advisor B explained that he was

worried after learning that auctions could fail because "I knew I had clients that had some

liquidity needs so that concerned me and because I didn't know that these auctions could fail."

UBS financial advisor B also did not know that UBS was supporting auction rate securities

auctions through support bids. If UBS financial advisor B had known that fact it might have

altered his disclosures: "Conceivably if I had known that UBS was supporting the auctions to a

large extent, I may have either been hesitant to recommend the securities or I would certainly

would have disclosed that to clients."

       (3)    <u>UBS Financial Advisor C</u>

     47.     UBS financial advisor C is a Senior Vice President at UBS. UBS financial

advisor C sold auction rate securities to approximately 100 households, totaling approximately

$50 to $60 million of auction rate securities as of February 2008. UBS financial advisor C

solicited most of his customer's auction rate securities purchases. Like the others, UBS financial

advisor C recommended auction rate securities as a money market alternative. And while UBS

financial advisor C testified that he advised customers that a single auction could be skipped, he

did not make any further disclosures about the securities.

       (4)    <u>UBS Financial Advisor D</u>

     48.     UBS financial advisor D is a First Vice President of Investments at UBS who sold

auction rate securities to approximately 40 retail clients in New York. UBS financial advisor D

solicited the vast majority of his customers' auction rate securities purchases. UBS financial

advisor D "sort of offered [auction rate securities] in, you know through our cash management

program so we offered it to clients." UBS financial advisor D described the cash management

program as consisting of "Certificates of deposits, treasury bills, auction rate securities, anything

that fit into that one year or less." Furthermore, UBS financial advisor D did not provide any

written disclosures to his retail clients and did not receive any written materials from UBS

regarding auction rate securities. UBS financial advisor D represented to his customers that they

would be able to liquidate their auction rate securities in a 7 day period, and did not disclose the

risk of auction failure.

       (5)     Financial Advisors A, B, C, and D's Conduct Was Similar to the Vast Majority of UBS Financial Advisors

49.     Upon information and belief, as with the experiences of UBS financial advisors

A, B, C and D, UBS financial advisors generally misrepresented the liquidity of and risks

associated with auction rate securities. UBS represented to customers through its financial

advisors that auction rate securities were the same as cash and were liquid, safe investments for

short-term investing. UBS financial advisors failed to disclose that auctions might fail and that

UBS was supporting the auctions.

50.     In addition, while individual financial advisors may have also – like their

customers – been uninformed about the troubles besetting the auction rate securities market,

UBS senior executives knew that auction rate securities were being sold as cash equivalents. By

e-mail dated December 15, 2007 UBS's Municipal Bond Chief and Head of Fixed Income

("Municipal Bond Desk Head") sent an e-mail acknowledging the manner in which auction rate

securities were sold to UBS customers:

> …but I believe have been **sold for years as a cash alternative instrument-and retail clients have--I am confident been told that these are "demand" notes and will be redeemed at par on demand-thereby relying on the remarketing agent to provide**

18

> **this liquidity 100 cents on the dollar on auction date.** Although
> there is no formal liquidity provision in place and always relies on
> the Dutch auction mechanism to clear.  The moral obligation runs
> very deep.

(Emphasis added).  In other words, the auction rate securities desk that was managing the

swelling liquidity crisis knew – and did not share its knowledge with most financial advisors –

that UBS was selling an increasingly illiquid investment as a liquid one.

### D.    UBS Repeated and Reinforced Its Marketing and Point of Sale Misrepresentations When It Mailed Confirmation Statements

51.    UBS client account statements issued to retail and other customers through and

including January 2008, listed auction rate securities under the heading: "cash

alternatives/money market instruments."  In the February 2008 UBS client account statements,

UBS removed that heading and listed auction rate securities as "cash alternatives/other."  After

February 2008,  auction rate securities were referred to as "fixed income/ARS."  That belated

correction came too late for UBS's investors, who were already stuck with illiquid investments.

### IV.    The Truth – The Majority of UBS's Offerings Faced Serious Liquidity Risks

52.    Contrary to the representations made by UBS sales representatives, auction rate

securities were far different from cash.  As discussed above, auction rate securities prices were set at

auction, and, if auctions failed, auction rate securities could not be sold.  Beginning in August 2007,

the auction rate securities market came under increasing strain.  Throughout the fall of 2007, that

strain increased, to the point where it became clear to UBS that widespread failure would occur

without corrective action.  The distress on the auction rate securities market grew, until widespread

failed auctions occurred in February 2007.  UBS never disclosed these obvious risks to its customers,

who continued to believe that they held cash equivalents until after the February 2008 auction failures.

**V.**    **UBS Knew About the Auction Rate Securities Market's Troubles, and Instead of Disclosing the Risks of Auction Rate Securities, Kept Its Customers In the Dark As It Propped Up Auctions Through Support Bids And Re-doubled Its Effort To Unload Auction Rate Securities On UBS's Unsuspecting Customers**

53.    The market dislocation occurring in the auction rate securities market was impossible for UBS to ignore.  As the auction rate securities market became dislocated, it only survived as a result of UBS supporting auctions through its own purchases in ever increasing amounts.  Without these support bids and purchases, UBS's auction rate program would have failed earlier.  UBS placed a total of $6.85 billion in support bids in June 2007.  The support bids placed by UBS increased to $7.53 billion in September 2007 and reached $14.12 billion in January 2008.  The following chart shows the increasing UBS spending in support bids:



54.    The reliance on UBS support in increasing amounts created an additional obviously unavoidable burden on UBS – an increase in its own inventory. From August 2007 on, UBS's auction rate securities inventory continued to grow as a result of its need:



55.    On several occasions, UBS took on inventory levels that exceeded permissible amounts established by UBS's risk-management department. UBS exceeded its inventory caps in August 2007 and again in December 2007. In part, due to the increase in auction rate securities holdings on its balance sheet, UBS convened a task force in December to discuss the serious issues that existed in the auction rate securities market. By the end of December 2007, UBS exceeded its inventory cap by several billion dollars. While UBS continued to deliberate for months over what to do, it kept its customers unaware of the mounting auction rate securities problem.

56.    As UBS addressed its mounting auction rate securities inventory, it contemplated several courses of action but consistently implemented only one:  a re-doubled sales effort to its customers.  UBS found itself in an inherently conflicted position: UBS could disclose its marketplace problems and risk further inventory on its balance sheet or it could hide the mounting risks in the auction rate securities market and try to offload the risk by selling its auction rate securities inventory to its customers.  Time and again, UBS put its interests above those of its customers, continuing to sell auction rate securities in spite of the problems in the auction rate securities market without making appropriate disclosure to its customers.

### A.    August 2007 – September 2007: Initial Disruptions in the Auction Rate Securities Market

57.    Beginning in August 2007, UBS felt tremors in the auction rate securities market that alerted it to potential liquidity concerns.  Specifically, three auctions managed by UBS and some auctions managed by UBS competitors failed that month.  As a result of market turbulence created by the August failures, UBS's auction rate securities inventory increased.  On or about August 23, 2007, UBS's inventory levels exceeded its $2.1 billion cap.  UBS's auction rate securities desk responded to the rising inventory levels by requesting an increase in the cap.  UBS risk-management granted permission to exceed the cap: "Limit extension granted for one night.  Please continue to price aggressively to work off inventory."

58.    In what would become a pattern, UBS responded to the increased inventory by stepping up its sales efforts.  In an e-mail dated August 22, 2007 regarding "[financial advisor] call on the auction markets," the Global Head of Municipal Securities wrote:

> We have encouraged our [Wealth Management] partners to
> mobilize the troops internally to focus on value so that we can
> move more product through the system...this is our best and most

> effective way of hedging our exposure…and to demonstrate the
> relative value in the muni product area…thank you for your focus.

59.    That same day, the Trading Desk Manager acknowledged the sales efforts in an e-mail summarizing a conference call that day with UBS financial advisors:

> On another note a conference call was held this afternoon with the
> retail FA system. The call had great participation from the field,
> the Wealth Management Research group did an excellent job in re-educating the field as to the structure and credit quality of the 40'
> act deals. Our hope is that this gains some traction with the sales
> force and alleviates capital usage concerns over the coming days.

60.    The paramount need to lower UBS's inventory was the focus of an August 30, 2007 e-mail written by the Global Head of Municipal Securities: "As you can imagine during these stressful times, the pressure is on to move our inventory."

61.    In September 2007, UBS's inventory reached over $3 billion.  The Global Head of Municipal Securities continued to focus on the need to reduce auction rate securities inventory in an e-mail dated September 6, 2007:

> I have legal looking into options to EXIT some business lines (to
> resign from supporting the programs that we have been senior
> manager on for 5+ years) to accommodate our firms request and
> what our liability in the marketplace/[Wealth Management] and
> reputation issues with issuers as well as investors would be… long
> term - this will cost us - my view

**B.      October 2007-November 2007: UBS Increased Sales Efforts**

62.    By October 2007, UBS was internally discussing hedging its auction rate securities risk as the inventory levels continued to increase.  On October 31, 2007, the Global Head of Municipal Securities revealed in an e-mail to the assistant of the President and Chief Operating Officer of UBS Investment Bank ("President IB") titled "Holding the Bag":

> This is what I am dealing with – fyi – **retail [wealth
> mangagement] that now is demanding liquidity** – putting more

23

> pressure on the balance sheet etc…this is the gift that keeps on giving…am speaking to[UBS's Global Head of Products and Marketing] tonight from Zurich on this and **all failed auction stuff…this is a huge albatross**…really something …wm enjoyed all the fees when are good…now the ib steps in to provide balance sheet and risk with a limited exit strategy – **very hostage to wm for distribution** – that was and is the model…totally lopsided…unreal

(emphasis added).

63.     In November 2007, UBS's inventory continued to rise as more auctions required more UBS support to avoid failure.  UBS's risk management department noticed the increase, and pressed the auction rate securities desk to reduce its exposure.  On November 15, UBS's Chief Risk Officer of Americas UBS Investment Bank ("Chief Risk Officer of the Investment Bank") e-mailed senior members of the UBS auction rate securities desk and demanded: "Why the continual increase in ARC inventory? What measures are being taken to reduce this exposure?"  On November 15, 2007, the Trading Desk Manager replied:

> We continue to see selling pressure across all investor classes.  We are aggressively widening spreads across all silos in efforts to attract cross over and non-traditional buyers… We will continue to price securities to attempt to attract those investors mentioned above.

64.     On November 20, 2007, the Chief Risk Officer of the Investment Bank sent an additional e-mail to the Trading Desk Manager instructing that, "This is an overall ARC limit excess. With the current trend and double auction tomorrow I would like to see a gameplan for inventory reduction."

65.     On November 27, 2007, the Chief Risk Officer of the Investment Bank again reminded the Trading Desk Manager, the Global Head of Municipal Securities, the Managing Director of Institutional Trading ("Managing Director of Institutional Trading"), the Municipal Bond Chief and Head of Fixed Income ("Municipal Bond Chief") and the Managing Director,

Municipal Finance Group ("Managing Director of Municipal Finance") that it was paramount for them to reduce inventory: "Ok - you need to make progress on reducing overall exposure. This issue has been o/s for a while. Can we get a gameplan? And timing?" The Global Head of Municipal Securities responded that, "We continue to cheapen our levels to clear this paper."

66.    As was its practice, UBS responded to the increasing auction rate securities problem by trying to increase its retail sales of auction rate securities. As the auction rate securities inventory increased, UBS continued to push its financial advisors to sell auction rate securities. In an e-mail dated November 27, 2007 from the Global Head of Municipal Securities to the co-heads of the Student Loan Group at the Investment Bank ("Co-Head of Student Loan"), the Co-Head of Fixed Income Sales ("Co-Head of Fixed Income"), the Structured Products Sales Manager ("Manager of Structured Products"), the Institutional Sales Manager for the Municipal Securities Group ("Municipal Securities Institutional Manager"), and the Managing Director/Head of Public Finance Banking Department ("Head of Public Finance"), he stated:

> I would ... scale out this as FIRST an internal call only ... then we will roll out to our clients broadly for an interactive call ... clearly there is great value and opportunity here and it is important for our sales force to understand the credit dynamics and the clear market misperception of the instrument ... we have the capabilities [sic] and industry expertise to empower our sales team with good information to help move this product ... hopefully we can set up a call for either Wednesday this week or Friday ...

67.    A Co-Head of Student Loan responded by noting, "... I already reached out ... yesterday to begin the process with the WM financial advisors." Two days later, the Trading Desk Manager participated in a UBS Financial Advisor Conference Call ("Financial Advisor Conference Call") discussing the market conditions of auction rate securities. Upon information and belief, the Trading Desk Manager failed to reveal the inventory levels or the amount of support UBS was giving to the auctions during this conference call.

68.    At the end of November 2007, UBS held approximately $2.7 billion in auction rate securities. UBS was over its own capital limit by approximately $500 million.

## C.    December 2007: Inventory Increased and UBS Formed Auction Rate Securities Working Group

69.    Starting in December 2007, UBS's auction rate securities inventory level increased meteorically, and UBS greatly exceeded its caps imposed by UBS's risk management department. In an e-mail dated December 10, 2007, the Managing Director of Institutional Trading requested another extension from its inventory cap: "We are currently over our 28/35 day Arcs inventory limit, as well as our overall Arcs limit. We would like to request a limit extension until the close of business 12/11." The Chief Risk Officer of the Investment Bank remarked that UBS's Group Chief Risk Officer ("Group Chief Risk Officer") "is not approving the excess in overall ARC exposure. Please revert back with gameplan for reduction." However, auction rate securities inventory levels were not reduced. It was clear at that point that auction rate securities liquidity was a serious problem.

70.    On December 11, 2007, UBS held over $3.2 billion in auction rate securities. On December 11, 2007, in response to an e-mail from the Group Chief Risk Officer, in which the Group Chief Risk Officer admitted that he was "very nervous about getting long a bunch of paper," the Global Head of Municipal Securities acknowledged that, "I understand completely the need to move this paper down ... Despite being very hostage to the [Wealth Management] franchise for distribution of these products (we are pressing as hard as we can), we are reaching deep into the institutional client base to take these." As was UBS's tendency, its reaction was to re-double its sales efforts.

71.     That same day, the Global Head of Municipal Securities sent a Co-Head of Student Loan and the Municipal Securities Institutional Manager an e-mail titled "Need to Put Together a Sales Force Call on Muni Arcs-Student Loan." The Global Head of Municipal Securities Group provided the following instruction: "We need to move this paper and have to explore all angles possible ... we need to do this as quickly as possible."

72.     The very next day, the Global Head of Municipal Securities received an e-mail from the Trading Desk Manager stating: "**The auction product does not work** and we need to use our leverage to force the issuers to confront this problem [sic] **our options are to resign as remarketing agent or fail?**" (emphasis added). This fact was not shared with UBS's customers nor was the fact that the auction rate securities market was dependant on UBS's ever-increasing support. Moreover, the fact that UBS was seriously considering withdrawing that support also was not disclosed to UBS customers.

73.     By at least December 17, UBS started monitoring its inventory levels on a daily basis. The inventory levels were sent daily to UBS's senior management.

74.     By December 19, 2007, the concern about the auction rate securities inventory increases were elevated to the highest levels at UBS's parent, UBS AG. The Group Chief Risk Officer spoke with UBS AG's Governing Executive Board ("GEB") about the auction rate securities market conditions. Following this meeting, the Group Chief Risk Officer sent an e-mail titled "Munis/student loans etc. URGENT" to the Global Head of Municipal Securities, the Chief Risk Officer of the Investment Bank, the Global Head of Products and Marketing and the Deputy CEO. The e-mail requested a host of information to be provided to the GEB, including: (1) a description of inventory levels, (2) a description of what happens when an auction fails, (3) where would failed auction paper be sold, (4) to describe "ugly scenario and how much money

we will lose, considering technical (supply-demand) imbalances and on the other hand a
deterioration in credit worthiness".

75.    The Trading Desk Manager responded by pointing out that, "In the event of a
failed auction, the securities in question would be rendered illiquid." The Trading Desk Manager
acknowledged that, "Our risk in essence, resulting from failed auctions, would be a required
reclassification of the assets on the book from the current mode (i.e. 7, 28, or 35 day) to an asset
(FRN) with a 30-40 year final maturity. This reclassification would be accompanied by
significant increases in VAR, Stress and Capital charges."

76.    The Trading Desk Manager further noted that widespread auction rate securities
failures could occur and that failures occurring in one type of auction rate securities could create
market failures for all types of auction rate securities:

> This forces the hand of every broker dealer in the auction market to
> **decide between supporting deals, taking inventories or at levels
> far below market rates or failing auctions (not supporting)
> which triggers a chain reaction of selling across all auction
> products,** regardless of them being Student Loans, Municipals or
> Auction Preferred Stock. **Mark to market losses would be
> significant, to all parties involved.**

(Emphasis added).

77.    In December 2007, UBS convened the Working Group to manage the condition
of UBS's auction rate securities program. The Working Group held numerous meetings in the
weeks leading up to the market failures in February 2008. During a presentation by the
Municipal Business Task Force during a Working Group meeting on December 21, 2007, the
Municipal Business Task Force discussed allowing the auctions to fail as a potential solution to
the inventory levels. According to the presentation outline, the benefit of a failed auction would

be to "Limit inventory and balance sheet usage," as well as "Severe reputational issue which may also cause greater MTM exposure."

78.    During the same period in which the Working Group discussed the benefit of a failed auction, the Trading Desk Manager participated in a Financial Advisor Conference Call regarding auction rate securities and, upon information and belief, failed to disclose the inventory levels or the amount of support UBS was providing so the auctions would not fail.

79.    The focus of the Working Group continued to be, among other things, the buildup in UBS's inventory of auction rate securities and strategies for exiting the auction markets. On December 31, 2008, the Global Head of Municipal Securities advised the Group Chief Risk Officer and the Global Head of Products & Marketing that the inventory "numbers are higher since Dec 20th presentation since we have taken back more paper.."

80.    The Global Head of Municipal Securities additionally noted that, "I am concerned that today..-although a fairly light auction day...we had to support 40%+ of student loan paper. took in approx 187mm...the pressure still really most isolated in student loan paper...we currently own 4.4 billion in student loan out of program size total of 26 billion." On December 31, 2007, UBS held approximately $6.2 billion in auction rate securities.

**D.    January 2008: UBS Did Not Disclose the Increase in Inventory and Continued to Encourage Its Financial Advisors to Sell Auction Rate Securities**

81.    In January, UBS's auction rate securities inventory continued to grow.  By January 2008, some auctions at other broker-dealers failed, and pressure mounted at UBS to "move product."  In an e-mail dated January 8, 2008, the Municipal Bond Chief advised the Head of Municipal Securities Derivative Marketing Solutions Group ("Municipal Securities Derivative Marketing") and the Head of Public Finance Banking Department that, "I see 2 ARCs

deals on the calendar for later this month. We are not permitted to do any further deals." The Head of Public Finance Banking Department responded that, "They have been on the calendar for 5+ mths. We need to talk about this. If I actually tell bankers we are not permitted to do an ARC deal (even after we have been appointed to it for that long), **it will be another indication (perhaps preliminarily) that we are killing this thing**." (Emphasis added.)

82.    In another e-mail that same day, the Municipal Bond Chief wrote "Already Starting" to the Global Head of Municipal Securities that, "I was just asked by a former co-worker…that he is hearing that municipals at UBS going to be shut down." The Global Head of Municipal Securities remarked: "**Imagine if wm fa's get a whiff of this – how much paper you think they sell back to desk- scary and delicate quite frankly**." (Emphasis added.)

83.    The very next day, January 9, 2008, the Group Chief Risk Officer sent an e-mail to UBS's President of the Investment Bank, with a courtesy copy to many members of senior UBS management, including the CEO, the Deputy CEO and the Global Head of Products and Marketing requesting a summary of the current market conditions of auction rate securities for GEB. The Group Chief Risk Officer asked the President of the Investment Bank to consider, among other things, "The merits of a strategy in which we discriminate which auctions we fail based on credit quality and separately based on which clients own that particular issue." Further, the Group Chief Risk Officer asked for an assessment "…of whether such auction failures would materially affect commercial paper market." The Group Chief Risk Officer pointed out that, "Given poor auction behavior this year, this is urgent..."

84.    The severity of the inventory increased the discourse at UBS about allowing auctions to fail. On January 13, 2008, the Global Head of Municipal Securities e-mailed senior executives and discussed the "contagion and reputational risk of UBS becoming first to fail and

breaking the moral obligation to support these markets in an orderly fashion." The Global Head of Municipal Securities discussed the possible UBS options, including allowing student loan auction rate securities to fail. The Global Head of Municipal Securities noted that implementing this option would lead to: "Regulatory issues, Legal risk, rep risk, headline risk, FED and/or SEC will get involved -could create crisis of confidence in financial markets."

85.    The Trading Desk Manager participated in a number of Financial Advisor Conference Calls in the latter part of January 2008 concerning the auction rate securities market conditions. Particularly, on January 24, 2008 and January 30, 2008, the Trading Desk Manager participated in Financial Advisor Calls. Despite UBS's senior management actively discussing the various scenarios discussed above, including market failure, the Trading Desk Manager, upon information and belief, never disclosed the inventory levels or the amount of support UBS was providing to support the market during these Financial Advisor Calls. By January 31, 2008, UBS held approximately $9 billion in auction rate securities, more that $6 billion over UBS caps.

**E.    February 2008: UBS Ceased Supporting Auctions**

86.    In February 2008, auction rate securities inventory continued to increase at UBS, as did a recognition that widespread failure was imminent. By e-mail dated February 1, 2008, entitled "Been thinking a lot," the Global Head of Municipal Securities concluded that the auction rate securities business, "despite generating approx 150-200 million for [Wealth Management] is a complete loser." (Emphasis added). The Global Head of Municipal Securities opined that UBS should close the business: "our best sensing this and will be leaving anyway" and remarked that, "This is absolute torture." Rather than apprise UBS's customers that a senior Municipal Securities official believed that UBS should close its auction rate securities business

as it was a "complete loser," UBS continued to push auction rate securities on its customers as a cash equivalent investment.

87.    For instance, on February 4, 2008, the Senior Vice President/Investments/ Corporate Cash Management Group sent an e-mail to several senior UBS officials, including the Global Head of Municipal Securities, again focusing on increasing UBS customer sales:

> Secondarily, I would try to re-educate the UBS sales force about the difference in our deals versus those that have failed and explain the "what ifs" if there is, in fact an auction failure. It is my opinion that both FA's and clients are unaware of all of the protective features of these structures and are simply selling because of lack of knowledge. While I understand that the firm has had numerous calls to discuss current market conditions, the questions asked on the call could be best described as "misguided" (I am being kind). A large percentage of the selling has come from this area and it is imperative that we re-engage their support.

However, the very next paragraph of the e-mail requested UBS to provide a very different message to its auction rate securities issuers:

> Third, it is imperative that Issuers understand that "this time is different". Over the years, we have had dislocations that temporarily pushed auction spreads above the norm, only to have them contract toward the mean after a few months. It is my opinion that approximately 15-20% of the "buyer base" has been affected by auction failures in some way and will never return. As a result, we have at least 20% "oversupply" and need to call deals and reissue in other markets to get to some level of equilibrium.

88.    On February 4, 2008, UBS held approximately $9 billion in auction rate securities. On February 6, 2008, the Head of Product & Marketing sent an e-mail to the Head of Product Management and the Global Head of Municipal Securities, in connection with a presentation to the GEB's Risk Committee, listing the issues to be discussed, including "exposures," "no easy way out-muddle along," "fail and exit," "backstop," "what biz could be with investment," each scenario-economics," "process to achieve with time-line," "risks" and

"implications." On February 7, 2008, the Global Head of Municipal Securities summed up UBS's auction rate securities situation: "Clock-ticking-not sustainable."

89.    By February 8, 2008, UBS held approximately $10.5 billion in auction rate securities. Due to the inventory levels, UBS was feverishly trying to sell the auction rate securities through its financial advisors for retail clients.

90.    On February 8, 2008, the Global Head of Municipal Securities e-mailed the President of the Investment Bank and expressed his concerns over the ever-rising inventory levels as a result of UBS continuing to support auction rate securities auctions:

> ...hopefully look to receive some closure or decision on the firm's overall posture and position with respect to the short term municipal market pressure we currently face...I am trying to walk the fine line and balance between managing market risk with overall franchise risk for UBS. ...I am not comfortable at all with the current risks that we in the [Investment Bank] are taking on with respect to [Auction Rate Certificates]... the risks of accumulating more positions are real and very significant... we must fully understand what position we put the [Investment Bank] and the [Municipal Securities Group] in by continuing to support the auctions. I do not like this risk nor would I look to accumulate this risk.

91.    Also on February 8, the Municipal Bond Chief questioned the continued participation of the Trading Desk Manager on Financial Advisor Calls: "How can [he] do this call? All FA's will have one question on supporting?" The Trading Desk Manager did participate in the Financial Advisor Call that day and continued to paint a promising picture of the auction rate securities market to financial advisors: "The public auction market continues to clear hundreds of auctions daily, with lead-broker-dealers frequently bidding to clear auctions where needed. While broker-dealers are not obligated to bid in auctions, we do not have reason to change our current practice when UBS is lead underwriter." After the Financial Advisor

Conference, a summary of the call made note of the fact that management was required to provide "a lot of cuddling & comforting today … ."

92.     On February 12, 2008, on the eve of UBS's allowing its auctions fail, the Deputy CEO sent the CEO an e-mail titled "Carpe Diem," and stated: "I will not repeat obvious statements about WM franchise risks and related subjects." That same day, the GEB held an "Extraordinary Audio Conference" on the current auction rate securities market conditions. Among the participants were senior UBS management, including, the CEO and the Group Chief Risk Officer. According to the meeting notes, which were mainly redacted:

> The GEB has an extensive discussion whether or not we should join the competitors … in failing auctions of student ARCS. The sense of the meeting is in favor of failing if the markets develop as they do, and [the Chief Risk Officer of UBS AG] is instructed to further watch the markets and make the appropriate decisions tomorrow.

93.     On February 13, 2008, UBS ceased supporting auction rate securities auctions, which then immediately failed. The Group Chief Risk Officer aptly noted that, "There will be significant client relationship damage." Thus, on February 13, 2008, the more than 50,000 UBS customers holding about $37 billion in auction rate securities that they thought were "just like cash" discovered, much to their surprise, that they could not sell these securities.

### F.    Post-Auction Market Failures: UBS Identified a New Business Opportunity

94.     Following UBS discontinuing its support of auctions, UBS embarked on an effort to profit from its decision. Immediately, the UBS Municipal Securities Group offered to restructure and refinance the auction rate securities of the issuers into different products. Of course, upon information and belief, UBS charged the issuers underwriting fees to restructure the auction rate securities.

95.    The Global Head of Municipal Securities noted in an e-mail dated February 14, 2008 to the Head of Municipal Derivatives Marketing that, "Unprecedented opportunity to restructure a 300 bn overall failed auction market … we have the relationships, access, expertise to be a true differentiator in the industry … we need to have the tools to be able to take advantage of this situation so that we can continue to service wm as well as bring in value added revenues to the ib …."

96.    Later that same day, the Global Head of Municipal Securities remarked in an e-mail that this was "the single greatest opportunity in decades for us to leverage our banking relationships more now than ever as we embark on a journey to restructure a 300 bn market in arcs…This is a bankers dream market."

97.    On February 21, 2008 and February 22, 2008, the Managing Director of Municipal Finance and Global Head of Municipal Securities aptly demonstrated UBS's shrouded conflict between its retail clients and its issuers: "risk management vs client franchise … IB balance sheet vs WM clients."  In the end, UBS decided to support the Investment Bank's balance sheet.

98.    To date, UBS has consistently refused clients' demands to purchase back the auction rate securities sold to them. UBS has offered to lend certain retail clients money using the auction rate securities as collateral.  However, the loans being offered to date are demand loans.  In other words, as it did with auction rate securities, UBS could stop supporting the loans at any time.

**VI.**    **As They Were Encouraging Investors To Buy Auction Rate Securities, Key Members of the Auction Rate Securities Desk and Senior UBS Officials Sold Their Auction Rate Securities**

99.    While UBS management kept UBS's customers in the dark and in fact stepped up sales efforts so more UBS customers would buy auction rate securities, UBS managers in-the-know sold their auction rate securities holdings.  Between November 1, 2007 and February 12, 2008, at least seven executives that participated in the Working Group sold at least $21 million from their personal auction rate securities holdings.

100.    Through their selling of auction rate securities, UBS senior executives demonstrated the importance of the information that UBS knew, but was not disclosing, to its customers.  These executives, who knew about the problems in the auction rate securities market, sold their personal interest in auction rate securities.  UBS customers would have liked to have had access to the same information and been given the ability to sell before the market suffered from widespread failure.

101.    By failing to disclose the market disruptions that were occurring while it was allowing its senior executives to reduce or eliminate their personal auction rate securities holdings, UBS betrayed its customers.

102.    In November 2007, UBS changed its pre-clearance requirements for auction rate securities and other securities, removing the need to pre-clear purchases through compliance.  Nevertheless, certain officials at UBS questioned the propriety of certain sales, though no action was taken to prevent such transactions.  The following describe the circumstances of some of the insider selling that took place after the Working Group had been formed.

A.    **Executive A**

103.    Executive A was a member of the auction rate securities Working Group.  On Friday, December 14, 2007, UBS's Chief Risk Officer sent an e-mail at 3:38 p.m. to UBS's CEO, which copied, *inter alia*, Executive A (the "December 14th e-mail").

104.    The December 14th e-mail outlined a series of problems with respect to UBS's auction rate securities market:

(a)    The December 14th e-mail discussed concerns with auction rate securities products, and explained how both municipal auction rate securities and student loan auction rate securities were "experiencing digestion problems."

(b)    The December 14th e-mail further outlined "potential trouble" with each product.

(c)    In particular, the December 14th e-mail noted that the auction desk was asked "to notify us every day of what support they will apply to auctions, and if an auction requires substantially more support than recently, they need to call us before supporting it."

(d)    The December 14th e-mail also explained that the auction desk was asked to "watch our competitors closely; if they stop supporting auctions, we have much better freedom to stop [supporting auctions]."

(e)    The December 14th e-mail outlined strategies to attempt to have third parties assume some of the risk of auction rate securities paper, and pointed to UBS's holding nearly $3 billion of auction rate securities products in its inventory and the dangers of continuing to amass "additional paper," stating that should this happen, UBS would "have to make a very tough decision."

(f)    The December 14th e-mail also contemplated having UBS provide a liquidity backstop for failed auctions, but noted that by doing so UBS "lose[s] the flexibility to walk away from 'moral' obligation to support these things" (emphasis added).

(g)    The December 14th e-mail explained that the "**reputation damage of walking away differs across client segments**" (emphasis added).

105.    Upon information and belief, Executive A read the December 14th e-mail on the evening of December 14, 2007.  At 6:19 p.m., Executive A forwarded the December 14th e-mail

to two other UBS senior managers. Executive A wrote a message accompanying the forwarded e-mail, but the text of the e-mail has been redacted by UBS under a claim of attorney-client privilege.

106.    Just ten minutes later, at 6:29 p.m., Executive A sent an e-mail to his personal financial advisor at UBS: "**I want to get out of arcs. Let's talk on Monday.**" (emphasis added). Over the weekend, on Sunday, December 16, 2007, his financial advisor e-mailed back, "ok."

107.    As of the date of the December 14th e-mail, Executive A held $250,000 in auction rate securities. All $250,000 of Executive A's auction rate securities were sold in a series of transactions occurring on December 18 and 21, 2007.

108.    Upon information and belief, on or about February 7 or 8, 2008, another executive's auction rate securities trading was reported to Executive A. Upon information and belief, Executive A questioned the other executive and his financial advisor about the propriety of the executive's auction rate securities trading.

109.    Upon information and belief, in mid-February 2008 it became clear to Executive A that UBS would stop supporting its auction rate securities auctions. Perhaps with his recent interview of the other executive in mind, on February 12, 2008 – the day before UBS stopped supporting its auctions – Executive A instructed his financial advisor to purchase back the exact same auction rate securities that had been sold from his account in December 2007. Due to the auction schedule, Executive A's financial advisor could not repurchase back the exact same auction rate securities that had been sold in December 2007. Accordingly, Executive A's financial advisor purchased $300,000 in substantially similar auction rate securities.

110.    The next morning, UBS stopped supporting its auction rate securities auctions.

**B.    Executive B**

111.    Executive B was a senior auction rate securities desk official. Executive B was generally aware of auction rate securities inventory levels, and was provided with daily inventory level updates since at least December 2007.

112.    Since at least August 2007, Executive B was apprising other senior managers of UBS's efforts to keep the wealth management department active in selling its customers auction rate securities to increase demand for the product.

113.    Executive B was sent an e-mail on October 29, 2007 from a UBS senior vice president that forwarded an excerpt from an auditing firm warning that "there has been an increase in failed auctions associated with auction rate securities. …Depending on the duration of the lack of a market interest for the investment, there may be indicators of an other-than-temporary impairment." The sender noted for Executive B's benefit that this verbiage was "of particular concern."

114.    Later in the same string of e-mails, on October 31, 2007, Executive B sent an e-mail to another UBS employee in which he discussed the increasing inventory and failed auctions.

115.    On November 1 and 2, 2007, Executive B engaged in a series of transactions that effectively swapped one issue of auction rate securities for another. On November 1, 2007, Executive B sold $1,000,000 in auction rate securities. Executive B purchased a combined total of $950,000 in auction rate securities on November 1 and 2, 2007, for his primary trading account, yet these were the last purchases he would make of auction rate securities over the course of the next several months.

116.    In an e-mail dated November 27, 2007, Executive B was advised that UBS's auction rate securities inventory exceeded risk management caps and should be reduced.

117.    While engaging in the discussions noted above, Executive B sold $1,925,000 in auction rate securities from his personal account between November 8 and 28, 2007.

118.    Shortly after these sales, Executive B received an e-mail asking him for his views about the creditworthiness of auction rate securities:

> Good to see you last week and welcome to the new role.  Quick question, we spoke about ARCs.  I asked my UBS guy to look into AMT bonds, but importantly the security of such bonds is clearly important.  Do you see them as he describes them below [the author's UBS advisor had described them as government guaranteed].  do you feel good about them from a security standpoint?

119.    Executive B responded to the question with a discussion of liquidity issues:

> to me ... the underlying is sound quality ... the risk as I see it ...is that these instruments are all subject to a dutch auction process that relies on the remarketing agents (ubs for example) to create orderly auctions to ensure clearing levels in the marketplace...to me the risk is that the dealer community doesn't want to support the auctions because they are swollen in inventory and cannot take any more balance sheet capacity...to date there have been no failed auctions in the general ARCs market (there have been failed auction [sic] in very funky paper though)...this is to me a totally technical aberration in the marketplace-however could take months to sort out...in meanwhile you earn high return in tax exempt securities where the underlying credit quality I am comfortable with.

120.    Executive B concluded his response by saying, "**I myself have decent exposure to these instruments**."  What Executive B did not say, however, was that he had just sold $1.9 million in auction rate securities from his personal account and was about to sell the remainder of those instruments.

121.    As explained above, upon information and belief, by late November 2007, the

pre-clearance requirement for auction rate securities at UBS had been removed.  Shortly before

Executive B sold off all of his remaining auction rate securities, his UBS financial advisor

exchanged the following electronic messages with him on Friday, December 7, 2007:

> **Financial Advisor**: WE NO LONGER NEED TO GO
> THROUGH COMPLIANCE TO SELL WEEKLIES ... WE ARE
> SELLING ALL YOURS AS THEY COME UP
>
> **Executive A**: Reply: thank you ... you selling the arcs right?
>
> **Financial Advisor**: Reply: YES ... AS THEY COME UP
>
> **Executive A**: Reply: thank you

122.    On December 10, 2007, Executive B sold $1 million of his personal auction rate

securities.

123.    On December 11, 2007, Executive B received an e-mail from another senior

executive saying that he was:

> very nervous about getting long a bunch of paper. ... [W]e are now
> slightly over limit in ARC's. I also know that there is a risk that
> [Wealth Management] clientele pressure us to support auctions.
> We can't afford to have another blow up at the [Investment Bank]
> .... You must get below your limit ....

In response, Executive B explained that he was well aware of the need to reduce UBS's

inventory levels.  He further added that he was pursuing steps to reduce inventory.

124.    Executive B then sold $4,500,000 of municipal auction rate securities from his

personal account between December 11 and 14, 2007.

125.    By the end of that week, on December 15, 2007, Executive B e-mailed another

senior executive, conveying his concerns through the end of December.  He referred to the

establishment of a task force to look into possible restructuring of auction rate securities.  In

addition, he asked for guidance related to whether UBS should continue its support of student

loan auctions and noted the concern with the potential for spillover into all auction products.

126.    Executive B also noted that, while the auction rate securities product was flawed,

UBS's retail clients had nonetheless been sold the product as a cash alternative instrument and

had been told that the product was highly liquid.

127.    Executive B's rapid exit from the auction rate securities market in terms of his

personal holdings coincided with his growing concern over the impending implosion of the

auction rate securities market.  Strikingly, while he was redoubling his efforts to have UBS sell

this product to unsuspecting clients in order to lower UBS's own inventory of auction rate

securities products, he was simultaneously unloading his own position in auction rate securities.

128.    Upon information and belief, later, in January 2008, Executive B's financial

advisor sold additional auction rate securities holdings from out of Executive B's son's account.

129.    By the time of the February 13, 2008 UBS auction failures, Executive B had

completely liquidated his auction rate securities holdings.

130.    Upon information and belief, Executive B's financial advisor, and several of the

financial advisor's customers, also sold auction rate securities during the time period Executive

B made his auction rate securities sales.

131.    When questioned under oath regarding his auction rate securities trades,

Executive B asserted his Fifth Amendment privilege against self-incrimination.

**C.    Executive C**

132.    On December 12, 2007, Executive C received an e-mail from a senior manager

that indicated that UBS should exit the auction rate securities market.

42

133.    A month later, on January 11, 2008, one of UBS's senior managers in the Municipal Securities Group sent an e-mail on which Executive C was copied. The e-mail outlined several options concerning student loan and other auction markets; one proposal he set forth was for UBS to "be the 2nd or 3rd [broker/dealer] to fail."

134.    Just two days later, on January 13, 2008, the Head of the Municipal Group e-mailed several senior managers, including Executive C, a "summary of all of our discussion points," which set forth in great detail the seriousness of the "liquidity issue based on concern for the auction structure and mechanism," and advocated for an immediate restructuring of auction rate securities "as soon as possible ...."

135.    The e-mail's "key points" included the possibility of UBS failing to support its student loan auction rate securities auctions, but raised the specter of "contagion and reputational risk," which could put increased pressure on all other auction rate products. If UBS continued to support auctions while investors turned away from the auction products, the e-mail noted, UBS would end up owning $26 billion of student loan auction rate securities, as well as other auction products, in its inventory. Accordingly, failing its auctions might be the lesser of two evils, one which, in any event, ought to be seriously considered: "the decision to fail or not of course is ours as remarketing agent."

136.    Upon information and belief, Executive C was warned by another senior executive at UBS, prior to making trades of auction rate securities, that he should not purchase or sell UBS stock because of Executive C's status as a member of UBS's student loan auction rate securities task force.

137.    On January 22, 2008, Executive C checked with UBS's compliance department about whether pre-clearance was no longer required before he could trade auction rate securities

for his own account. On that day, he e-mailed his compliance department and inquired whether, "to 'sell' or put ARCS or Vrdos from my account back to ubs, I no longer need special permission?" Executive C did not make any mention of his particularized knowledge about UBS's auction rate securities market. Treating the request as a routine request, UBS's compliance department authorized the trade.

138.    Shortly thereafter, on January 25 and 28, 2008, Executive C sold his complete holdings of municipal auction rate securities, for which he received $850,000.

139.    Several days later, and only days before UBS decided to fail its auctions, the only share of auction rate securities held in Executive C's wife's retirement account was sold, for which she received $25,000.

140.    By the time of the February 13, 2008 auction failures at UBS, Executive C had liquidated his auction rate securities holdings.

141.    While Executive C and other senior level executives at UBS were able to liquidate their auction rate holdings in the weeks and days just before UBS ended its support for its auction rate securities auctions, other investors, including UBS's own Wealth Management clients, were not as fortunate. These UBS customers, who were told when they purchased their holdings in auction rate securities that these securities were "just like cash" discovered, from February 13, 2008 and after, much to their shock and dismay, that they could not sell these securities and get access to cash.

### D.    Other Executives

142.    Between November 2007 and February 12, 2008, Working Group members sold a total of over $21 million auction rate securities. In addition to the trading of the executives described above, there were at least four other members of UBS's Working Group who sold their

shares of auction rate securities in the several months before February 13, 2008. Between early

November 2007 and prior to February 13, 2008, those working group members' auction rate

securities trading resulted in net sales of $12.8 million worth of auction rate securities.

143.    Each of these additional Working Group members sold under different

circumstances with different levels of knowledge. Two of the working group members, for

example, claim to have not known about the auction rate securities trading in their account. The

first such working group member had asked his UBS financial advisor in December 2007

whether the executive owned any auction rate securities. According to the executive, the

financial advisor erroneously said no, later realized that there were auction rate securities in the

executive's account, and sold the auction rate securities on a discretionary basis. However, upon

information and belief, there is no written document supporting that the financial advisor had

discretionary authority over the account. The executive explained that he was too busy to review

his account statements, which clearly listed auction rate securities. That executive sold $1

million in auction rate securities on February 6, 2008.

144.    A second executive on the Working Group also has taken the position that he was

not aware of the auction rate securities trading in his account. However, this executive also

failed to have signed any authorizations permitting discretionary trading. This executive

purchased $3.7 million in auction rate securities and sold $4.1 million during the month of

November 2007, for a net reduction of $425,000 in auction rate securities during November

2007. The following month, while he purchased a total of $500,000 in auction rate securities, he

sold $2.75 million, for a net reduction of $2.25 million during the month of December 2007. By

January, his selling accelerated and his purchases nearly stopped: his total auction rate securities

purchases were limited to $100,000, while he sold $5.3 million, for a net reduction of $5.2 million in the month before liquidity dried up.

145.    UBS's Working Group should have been looking out for the interests of UBS's customers, not that of their own brokerage accounts. UBS should not have permitted its Working Group members to sell auction rate securities while the Working Group deliberated over the growing problems in the auction rate securities market.

## FIRST CAUSE OF ACTION
(Persistent Fraud or Illegality - Executive Law § 63(12))

146.    The acts and practices alleged herein constitute conduct proscribed by § 63(12) of the Executive Law, in that Defendants engaged in repeated fraudulent or illegal acts or otherwise demonstrated persistent fraud or illegality in the carrying on, conducting or transaction of business.

## SECOND CAUSE OF ACTION
(Securities Fraud - General Business Law § 352-c(1)(a))

147.    The acts and practices of the Defendants alleged herein violated Article 23-A of the General Business Law, in that they involved the use or employment of a fraud, deception, concealment, suppression, or false pretense, where said uses or employments were engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of any securities.

## THIRD CAUSE OF ACTION
(Securities Fraud - General Business Law § 352-c(1)(c))

148.    The acts and practices of the Defendants alleged herein violated Article 23-A of the General Business Law, in that Defendants made, or caused to be made, representations or

statements which were false, where (i) they knew the truth, or (ii) with reasonable efforts could have known the truth, or (iii) made no reasonable effort to ascertain the truth, or (iv) did not have knowledge concerning the representations or statements made, where said representations or statements were engaged in to induce or promote the issuance, distribution, exchange, sale, negotiation, or purchase within or from this state of any securities.

**WHEREFORE**, Plaintiff demands judgment against the Defendants as follows:

A.      Enjoining and restraining Defendants, their affiliates, assignees, subsidiaries, successors and transferees, their officers, directors, partners, agents and employees, and all other persons acting or claiming to act on their behalf or in concert with them, from engaging in any conduct, conspiracy, contract, or agreement, and from adopting or following any practice, plan, program, scheme, artifice or device similar to, or having a purpose and effect similar to, the conduct complained of above.

B.      Directing that Defendants, pursuant to Article 23-A of the General Business Law and Section 63(12) of the Executive Law and the common law of the State of New York, disgorge all gains and pay all restitution and damages caused, directly or indirectly, by the fraudulent and deceptive acts complained of herein;

C.      Directing that Defendants pay Plaintiff's costs, including attorneys' fees as provided by law;

D.      An order requiring Defendants to buy back auction rate securities from defrauded customers at par;

E.      Directing such other equitable relief as may be necessary to redress Defendants' violations of New York law; and

F.     Granting such other and further relief as may be just and proper.

Dated: July 24, 2008
      New York, New York

ANDREW M. CUOMO
Attorney General of the State of New York
120 Broadway, 23rd Floor
New York, New York 10271
(212) 416-8198

By: _____

DAVID A. MARKOWITZ
Chief
Investor Protection Bureau

*Counsel for Plaintiff*

PAMELA LYNAM MAHON
CHRISTOPHER B. MULVIHILL
ETHAN G. ZLOTCHEW

Assistant Attorneys General
  *of Counsel*

EXHIBIT 2

Case 1:08-cv-02753-LMM-KNF    Document 48-3    Filed 08/13/2008    Page 2 of 10

 **UBS**

Accessibility    Zoom version    ↘ Location Finder    ↘ Service Finder    Contact    **eng** deu fra ita

→ Financial Market Data    → UBS F

# Welcome to UBS.

UBS is one of the world's leading financial firms. And we operate in two locations. Everywhere, and right next to you.

**Individual Clients**
- Wealth Management in the US
- Wealth Management in Switzerland
- Wealth Management around the world
- Retail Banking in Switzerland
- UBS Funds
- Service Finder for Individuals

**Corporate or Institutional Clients**
- Investment Banking & Securities
- Asset Management
- Business Banking in Switzerland
- Services for Financial Intermediaries
- Services for Banks
- Service Finder for Corporates & Institutions

**Analysts & Investors**
**Media**
**Careers**



UBS to report 2Q results on August 12th


You & Us

 **About us**
Learn all about UBS

 **Our locations**
Right next to you

**Explore virtual UBS**
Enter here

**Our News**

July 17, 2008
UBS statement of Mark Branson before the permanent Subcommittee of Investigation

More news
Latest quarterly results

**Client Login**

**Individuals:**
USA Client Account Login
e-banking in Switzerland
Quotes for UBS clients
More logins for Individuals

**Corporates or Institutions:**
Investment Bank Client Portal
More logins for Corp. or Institutio

Report fraudulent e-mail

**Market Information**
More...

Get Stock Quote
Symbol lookup
Find quotes and indices
Find exchange rates
Research Update

| | |
|---|---|
| UBS N | CHF 21.8 |
| UBS N | USD 20.5 |
| SMI | 7,187.94 |
| Dow Jones | 11,615.7 |
| Nikkei 225 | 13,254.8 |

Rate this site - Contact us

Important legal information - please read the disclaimer before proceeding.
Products and services in these webpages may not be available for residents of certain nations.
Please consult the sales restrictions relating to the service in question for further information. Independent, third party research on certain companies covered by the firm's research is available to customers of UBS in the Unite
no cost. Customers can access this research at http://www.ubs.com/independentresearch or can call 1-877-208-5700 to request that a copy of this research be sent to them.
© UBS 1998-2008. All rights reserved.
Privacy Policy - SEC Registration Statements - Global Patriot Act Certificate

 **UBS**

| Contact Us | Local Sitemap |  [Search]

→ About UBS Wealth Management    → Careers



Planning for a Lifetime
Investing
Financing
Banking
Research
Your Relationship With UBS
Business Services

UBS Homepage > Wealth Management US

# Welcome to UBS Wealth Management



You & Us
The difference between being listened to and being understood.

**What is your top financial priority?**
▸ Planning for your future    ▸ Growing your wealth    ▸ Protecting your wealth

**Find a Financial Advisor**

Enter your ZIP code
[        ] [Find]

→ Find a Financial Advisor by name

**Account Login** 🔒

User Name
[                ]

Password
[                ] [Go]

→ Benefits of Enrolling
→ Enroll Now
→ First-Time User

**Market Update**

| DJIA | 11556.17 |
| NASDAQ | 2341.27 |
| S&P 500 | 1279.98 |
| 30yr Tsy | **4.69** |

→ Market Info

Quotes delayed at least 20 minutes Market Information,

**Managing Wealth**          **Sponsored by UBS**          **Experiencing UBS**

The UBS Client Experience
Research Tailored to Private





**Planning for Sustainable Income**

**Pursuing Your Vision**

**Protecting & Transferring Wealth**

**Strategies For You**

**Simplify cash management with the UBS Resource Management Account**

**Reward yourself with the UBS Card Program**

Learn more about our events throughout the year

**News**

UBS is developing a structure to repurchase auction preferred stock from clients

UBS announces estimated results for second quarter

Clients
**Personalizing Your Financial Plan**

**Spotlight Articles**

**Market Outlook: Clouds on the horizon** (125kb)

**A Conversation with Marten Hoekstra**

Copyright 2002
Reuters Limited. All
rights reserved.

**Products & Services**

- select -

Print this page    E-mail this page

Important legal information - please read the disclaimer before proceeding.
Products and services in these web pages may not be available for residents of certain nations. Please consult the sales restrictions relating to the service in question for further information. www.ubs.com © UBS 2002-2008. All rights reserved.
Wealth management services in the United States are provided by **UBS Financial Services Inc.**, a registered broker-dealer offering securities, trading, brokerage and related products and services. Member SIPC. Member FINRA.
Privacy Policy. Notice for Non-U.S. Investors. Order Routing Disclosure. Statement of Financial Condition. Best Execution Statement. Loan Disclosure Statement. Account Sweep Yields. Advisory & Brokerage Services. CFP Board's Trademark Disclaimer.

 **UBS**

| Contact Us | Local Sitemap |  [          ] [Search]

→ About UBS Wealth Management    → Careers



UBS Homepage > Wealth Management US > **Your Relationship With UBS**

# Your Relationship With UBS

Planning for a Lifetime
Investing
Financing
Banking
Research
**Your Relationship With UBS**
   The UBS Client Experience
   Private Wealth Management
   Conducting Business With Us
   Account Types
   Account Sweep Yields
   Account Forms
   Utilizing Online Services
   Wealth Management Magazine
   U.S. Sponsorships
Business Services

Welcome to the Client Relationship area of the Wealth Management US website. This is where you can find information regarding our approach to client relationships, the products and services we offer and their respective fees[1].



With UBS, you have access to the resources of one of the world's largest wealth managers. Our size and strength enable us to develop and execute on a broad range of wealth management strategies and allow clients to draw from a substantial suite of offerings. And an essential element in our approach to building relationships with clients is making sure they are informed about all that we offer. Here we provide you with an overview of:

- Our commitment to providing you with a superior client experience
- What you can expect from a UBS Financial Advisor
- Specialized services for ultra high net worth investors
- The various ways we charge for our products and services
- The type of accounts we offer
- Your online capabilities through UBS Online Services
- Our client publication, Wealth Management magazine
- The kinds of events we sponsor

We hope you enjoy exploring the Client Relationship section along with the other Wealth Management US home pages on this UBS website.

**Find a Financial Advisor**

Enter your ZIP code
[          ] [Find]

→ Find a Financial Advisor by name

**Account Login** 🔒

User Name
[          ]
Password
[          ] [Go]

→ Benefits of Enrolling
→ Enroll Now
→ First-Time User

**Products & Services**

[- select -        ▼]

[1] Wealth management services in the United States are provided by UBS Financial Services Inc., a registered broker/dealer offering securities, trading, brokerage and related products and services.

**Related Page**

**Related Links**

**The UBS Client Experience**
Learn more about the process
that we use to focus on your
needs

**Private Wealth Management**

**Relationships & Pricing**

**Account Types**

**Account Forms**

**Utilizing Online Services**

**Wealth Management
Magazine**

**Managing Your Wealth**

Print this page    E-mail this page

Important legal information - please read the disclaimer before proceeding.
Products and services in these web pages may not be available for residents of certain nations. Please consult the
sales restrictions relating to the service in question for further information. www.ubs.com © UBS 2002-2008. All rights
reserved.
Wealth management services in the United States are provided by **UBS Financial Services Inc.**, a registered
broker-dealer offering securities, trading, brokerage and related products and services. Member SIPC.
Member FINRA.
Privacy Policy. Notice for Non-U.S. Investors. Order Routing Disclosure. Statement of Financial Condition. Best
Execution Statement. Loan Disclosure Statement. Account Sweep Yields. Advisory & Brokerage Services. CFP
Board's Trademark Disclaimer.

 **UBS**

| Contact Us | Local Sitemap |  [ Search ]

→ About UBS Wealth Management   → Careers

  

Planning for a Lifetime
Investing
Financing
Banking
Research
Your Relationship With UBS
   **The UBS Client Experience**
   Private Wealth Management
   Conducting Business With Us
   Account Types
   Account Sweep Yields
   Account Forms
   Utilizing Online Services
   Wealth Management Magazine
   U.S. Sponsorships
Business Services

UBS Homepage > Wealth Management US > Your Relationship With UBS > **The UBS Client Experience**

# The UBS Client Experience
## Focused on you and your needs

The essence of the UBS Client Experience is to provide a framework that helps us consistently deliver the services you want to support your financial decisions.

We understand that wealth management is more than just the wide range of financial services and solutions you can access at UBS — it is how those services and solutions are developed and delivered to help you pursue your goals.

That's why we offer a customized approach to wealth management, built on a personal relationship and shaped by an understanding of your needs and aspirations. To help manage your wealth, we harness the advisory and investment brokerage capabilities of one of the world's largest wealth management firms on your behalf.

Our structured approach to helping you pursue your objectives is based on findings from discussions with our clients, our Financial Advisors, and extensive market studies.

**Find a Financial Advisor**

Enter your ZIP code

[ ] [ Find ]

→ Find a Financial Advisor by name

**Account Login** 🔒

User Name
[ ]
Password
[ ] [ Go ]

→ Benefits of Enrolling
→ Enroll Now
→ First-Time User

**Products & Services**

[ - select - ▾ ]



We discovered there are clear expectations:

- You would like us to listen to you, which is why we take time to understand you and your situation
- You expect approaches that suit your needs and objectives, which is why we propose customized solutions
- You want to be comfortable with your decisions, which is why after you agree, we leverage our global resources to implement your strategies
- You want to know how you are doing, which is why we periodically review your financial situation to discuss where you are and where you want to be

This is all part of the UBS Client Experience — a process that continues throughout our relationship with you. At UBS, financial relationships extend over a long time. Sometimes, a lifetime.

| Contact a Financial Advisor for more information |

**Related Page**

Planning for a Lifetime
Learn more about how we incorporate planning into the UBS Client Experience

**Related Links**

Investing
Financing
Banking
Private Wealth Management

**Related Documents**

The UBS Client Experience
(619kb)
Focused on you and your needs

Print this page    E-mail this page

Important legal information - please read the disclaimer before proceeding.

Products and services in these web pages may not be available for residents of certain nations. Please consult the sales restrictions relating to the service in question for further information. www.ubs.com © UBS 2002-2008. All rights reserved.

Wealth management services in the United States are provided by **UBS Financial Services Inc.**, a registered broker-dealer offering securities, trading, brokerage and related products and services. Member SIPC. Member FINRA.

Privacy Policy. Notice for Non-U.S. Investors. Order Routing Disclosure. Statement of Financial Condition. Best Execution Statement. Loan Disclosure Statement. Account Sweep Yields. Advisory & Brokerage Services. CFP Board's Trademark Disclaimer.

EXHIBIT 3

4 of 5 DOCUMENTS

Copyright 2008 Factiva ®, from Dow Jones
All Rights Reserved

Dow Jones Factiva

(Copyright (c) 2008, Dow Jones & Company, Inc.)

THE WALL STREET JOURNAL.
The Wall Street Journal

August 9, 2008 Saturday
Correction Appended

SECTION: Pg. A1

LENGTH: 2199 words

HEADLINE: UBS to Pay $19 Billion As Auction Mess Hits Wall Street

BYLINE: By Liz Rappaport and Randall Smith

BODY:

A once-obscure corner of the bond market is triggering one of the messiest Wall Street scandals in years -- and potentially the largest mass bailout of American individual investors ever.

On Friday, facing allegations of wrongdoing over its sales of so-called auction-rate securities, UBS AG agreed to buy back from investors nearly $19 billion of the investments as part of a settlement with federal and a group of state regulators. It will start buying from individuals and charities in October and from institutional clients in mid-2010.

UBS was the third major firm this week to vow to buy back the securities, which allegedly were improperly sold as higher-rate equivalents for super-safe money-market funds.

UBS, Merrill Lynch & Co. and Citigroup Inc. have committed to taking back a total of more than $36 billion of the instruments. Other financial firms are expected to follow suit.

Auction-rate securities are a kind of debt that soared in popularity in recent years. They let issuers such as municipalities and student-loan organizations borrow for the long term, but at lower, short-term interest rates. The rates reset at periodic auctions, hence the name. Wall Street sold more than $330 billion of these securities to more than 100,000 individuals and other investors.

State regulators from Massachusetts and New York have sued Merrill Lynch and UBS for civil fraud, with the UBS case now settled. Regulators from several states have also shown up on Wachovia Corp.'s doorstep demanding documents; the bank says it is cooperating. A New York state official has accused Citigroup of destroying documents, a charge Citi has denied. Federal prosecutors are preparing to file criminal charges against two former Credit Suisse Group brokers who allegedly lied to investors about auction-rate securities.

It's rare that Wall Street firms make good on client losses, and the size of the auction-rate payments is unprecedented. But a review of several recent regulatory cases reveals the legal pressure facing Wall Street, and shows that some authorities believe the auction-rate market, which was created in the mid-1980s, got out of control.

Regulators say that financial firms, at various times, secretly propped up failed auctions; misled investors on the safety of the securities; pressed brokers and research analysts to sell the very securities executives were trying to unload; and resisted client demands for relief.

UBS to Pay $19 Billion As Auction Mess Hits Wall Street The Wall Street Journal August 9, 2008 Saturday Correction Appended

"It was kind of like a Moroccan bazaar," William Galvin, secretary of the Commonwealth of Massachusetts, said in describing the way Wall Street sold auction-rate securities. "There was no real control, no warranty, no worry about backing up what you said."

Wall Street executives say the auction market functioned smoothly for more than 20 years, and only buckled this year under the stress of a credit crunch that limited their ability to provide support. As a Merrill official put it Friday, its brokers believed such securities were "good investments" for clients seeking higher short-term returns in exchange for some risk the assets couldn't quickly be resold.

The auction-rate scandal has hit tens of thousands of American investors, such as Ken Pugh, a 60-year old retiree in Fort Lauderdale, Fla., who formerly supervised the delivery-truck operations for the Sun Sentinel newspaper.

Mr. Pugh has $350,000, or his entire life's retirement savings, in auction-rate securities in an account at Bank of America, $300,000 of which are backed by student loans; his statement puts a zero in the column for the value of the $350,000. The zero, said a person familiar with the firm, is meant to be read as "not available." Bank of America foot-notes statements to notify clients that the securities they hold are not worthless but are illiquid and not easily valued.

"I'm not a financial wizard, that's all I know," says Mr. Pugh. "I took their word for it, and like a dope, this is where I am." Mr. Pugh says he was told the securities were "28-day CDs."

He has gone back to work at an environmental services company for extra cash to live on until he "gets some resti-tution," he says. "All the stuff my wife and I planned on doing, we can't."

Mr. Pugh has filed an arbitration claim against Bank of America. Bank of America says it "does not comment on client relationships."

Regulators and prosecutors have alleged several kinds of abuses in the auction-rate market, detailed in regulatory cases and investigations. One allegation is that brokers secretly propped up failed auctions.

Interest rates were supposed to be reset by weekly or monthly auctions, at which investors could cash out if they wanted to. Until the market collapsed in February, investors got the impression there was heavy demand for the securi-ties because the auctions went off without a hitch. They weren't told how often Wall Street dealers stepped in to support the auctions with their own bids.

UBS submitted such bids in all of its auctions, according to Massachusetts regulators, who said the Swiss firm acted to prevent auction failures in no less than 69% of its 57,436 auctions between January 2006 and February 2008.

In an email to UBS executives last Dec. 15, David Shulman, who ran UBS's auction-rate desk, questioned whether the firm should continue to submit bids to support auctions.

In the email, Mr. Shulman acknowledged that investors expected UBS to make sure the auctions ran smoothly, even as he and others behind the scenes contemplated halting their bids entirely. "Retail clients have -- I am confident been told that these are 'demand' notes . . . and will be redeemed at par on demand," Mr. Shulman wrote. While there is no formal obligation to cash out clients at par, he added, "the moral obligation runs very deep."

UBS said it didn't intentionally hide the risks of auction-rate securities, and sold them "appropriately" to individuals for 20 years. UBS said it supported auctions "longer than any other major firm," and its inventory doubled while the number of issues in individuals' accounts declined.

A lawyer for Mr. Shulman said his emails were "taken largely out of context" and that Mr. Shulman was attempting "to be part of the solution, and was not part of the problem."

At Merrill, Massachusetts regulators allege, market-supporting bids by the firm "conceal[ed] the true level of inves-tor demand and created a false impression that there were deep pools of liquidity in the auction market." Merrill says few auctions failed before 2008 and that it disclosed that risk and the possible withdrawal of its support bids to inves-tors.

Another allegation by regulators is that some brokers misled investors on the safety of the securities.

Customers often were told that the securities, which had higher interest rates than rock-solid certificates of deposit, were just as safe and easily sold. They weren't told that the auctions could fail and leave them without the ability to sell.

UBS to Pay $19 Billion As Auction Mess Hits Wall Street The Wall Street Journal August 9, 2008 Saturday Correction
Appended

Merrill categorized auction-rate securities as "other cash" on its brokerage statements. Its marketing materials noted that 92% of issues had a top triple-A rating. But, according to Massachusetts investigators, clients say they weren't told the auctions might fail if Merrill withdrew from making bids. Merrill said that while online statements listed auction-rate securities as cash, its "official monthly statements" listed them as "securities," and that most were in fact triple-A.

Some UBS brokers testified to the New York attorney general's office that even they didn't realize the auctions could fail. UBS executives testified that brokers never received any training on how auction-rate securities worked.

UBS says investor guides citing resale risks and the auction process were available online. The firm says it changed its classification of auction-rate securities at the suggestion of an industry group as a result of this year's market difficulties.

Also, regulators say brokers were paid unusually rich commissions to sell the securities. In some cases, they say, brokers received high commissions for a product that appeared to offer high returns but held hidden risks.

The brokers and firms typically shared commissions of 0.25% of the securities sold -- compared with 0.05% for Treasury securities and zero for plain-vanilla money-market funds. Merrill sometimes offered extra commissions, at times up to a total of 1%. Merrill says commissions "didn't change" brokers' approach to auction-rate securities.

To help sell the securities as the market's problems intensified, Citigroup and brokerage firm RBC Dain Rauscher last winter raised commissions to outside brokers for selling Citi's and Dain Rauscher's auction-rate securities inventory, according to emails sent from a Credit Suisse trading desk to Credit Suisse brokers. Dain Rauscher didn't return calls for comment.

Commissions on auction-rate securities were "much higher than for any other equivalent securities," says auction-rate specialist Joseph Fichera, chief executive of Saber Partners LLC, a financial consultant.

State regulators also point to the ways financial firms pressed brokers and research analysts to pitch the securities.

Merrill bond analyst Martin Mauro prepared a research report on last Aug. 22 warning of the dangers of auction-rate securities. It said investors "need to rely on other buyers in the market to redeem the securities at par."

The report was never published, Massachusetts regulators say, because Frances Constable, who ran Merrill's auction-rate-securities desk, shut it down. "It may single handedly undermine the auction market," she emailed two other Merrill employees later that day, according to a complaint filed by the regulators. The regulators say Ms. Constable demanded that the analyst retract and rewrite the report, which appeared the next day with language added that rising rates made the securities "a buying opportunity."

Merrill said the retraction demand didn't change the analyst's views but merely resulted in "a longer, fuller and clearer version." The firm said its research reflected that auction-rate securities offered "higher returns in exchange for less liquidity." Merrill said its employees weren't available to comment.

As the credit crunch developed, financial firms faced pressure to reduce their own holdings of the securities. UBS's holdings of them, for instance, soared through an internal limit of $2.5 billion last September, reaching $11 billon by the time the market froze up this February.

UBS's Mr. Shulman told colleagues on Aug. 22 that he was encouraging UBS brokers "to move more product through the system." But that same day, he sold personal holdings of auction-rate holdings worth as much as $475,000. He sold the last of his personal auction-rate holdings by mid-December, according to the Massachusetts complaint.

The reason, he told Massachusetts investigators, was that some auctions had already failed, and they exceeded his own "risk tolerance." UBS management brought up auction-rate securities in 15 calls with its brokers between August 2007 and February 2008.

Mr. Shulman was one of the UBS executives alluded to, but not charged, in a civil complaint by New York State Attorney General Andrew Cuomo. Mr. Shulman was named but not charged in the Massachusetts regulatory complaint for selling his own stake in auction-rate securities in August.

UBS said that, after its own internal probe, it "found cases of poor judgment" but not illegality by certain individuals, and is "evaluating appropriate disciplinary measures." UBS placed Mr. Shulman on administrative leave in July. Mr. Shulman's lawyer declined to comment on the securities sale.

UBS to Pay $19 Billion As Auction Mess Hits Wall Street The Wall Street Journal August 9, 2008 Saturday Correction Appended

Brokers at Credit Suisse allegedly misled customers about the safety of auction-rate issues by falsely calling them "student loan" securities, according to a civil suit filed Wednesay. The plaintiff, Geneva chip maker STMicroelectronics NV, was filed Brooklyn federal court and seeks $415 million in damages. Federal prosecutors in Brooklyn, N.Y., are preparing to file criminal charges against two former Credit Suisse brokers whose clients included the chip maker, according to people familiar with the matter.

Credit Suisse said the brokers resigned in September after the firm "detected their prohibited activity," and that the firm has been assisting authorities. Credit Suisse said clients were given accurate trade confirmations and brokerage-account statements. As for the action filed by ST Microelectronics suit, a spokesman for Credit Suisse said it "declines to comment on meritless lawsuits."

It isn't clear how much in losses Wall Street firms ultimately will record by taking auction-rate securities back on their books. That will depend on if, when and how much the market recovers.

In UBS's Friday settlement, the Swiss bank agreed to buy back $8.3 billion in securities from individuals and charities and $10.3 billion later from institutions. It also has agreed to lend money to holders of the securities at 100% of their par value if they preferred.

On Thursday, Merrill agreed to buy back about $10 billion from about 30,000 investors, and Citigroup agreed to buy back about $7.3 billion from about 40,000 investors.



**Repurchase Plan**
Value, in billions, of auction-rate securities that banks agreed to repurchase and highlights of complaints against the companies:

| UBS | Merrill Lynch | citi |
|---|---|---|
| $18.6 | 10 | 7.3 |
| Massachusetts regulators charged UBS with using 'profoundly deceptive sales practices' by telling clients the securities were 'safe and liquid.' UBS 'kept purchasers in the dark...to keep offloading its inventory.' | Head of Merrill's auction-rate desk pressured a bond analyst to retract an August 2007 report warning auction-rate securities might not be able to be resold at face value, Massachusetts said; revised report said higher rates created 'a buying opportunity.' | New York's attorney general alleged Citigroup destroyed evidence sought in auction-rate probe. In settlement with attorney general and SEC, Citi agreed to reimburse investors and promised to avoid 'deceptive sales practices.' |

Source: WSJ reporting

**The Mechanics of Auction-Rate Securities**

**❶ Issuing the securities**

ISSUERS including municipalities, hospitals and museums, sell auction-rate securities with long maturities to raise money.

INVESTORS including individuals, funds, corporations or family trusts, hold them as liquid investments.

**❷ The auction**

HOLDERS of auction-rate securities can hold them or sell them.

Days

THE BANK holds an auction every 7 to 35 days, resetting the interest rate of the securities and passing them on to new holders.

NEW INVESTORS bid to take on securities from existing holders.

**❸ The payment**

ISSUER pays interest at the new rate to the winning bidders

Source: WSJ reporting

UBS to Pay $19 Billion As Auction Mess Hits Wall Street The Wall Street Journal August 9, 2008 Saturday Correction Appended

License this article from Dow Jones Reprint Service

NOTES:
PUBLISHER: Dow Jones & Company, Inc.

CORRECTION:

Corrections & Amplifications

Joseph S. Fichera is an expert in auction-rate securities and a financial adviser to corporations and governments. A page-one article Saturday describing him as a specialist and a financial consultant didn't mean to imply he was a broker.

(WSJ Aug. 13, 2008)

(END)

LOAD-DATE: August 13, 2008